# 12-3200

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES,
JOSEPH GOULDEN, and JIM BOUTON, individually and
on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

*v.*

GOOGLE INC.,

*Defendant-Appellant*.

On Appeal from an Order Granting Certification of a Class Action, Entered on
May 31, 2012, by the United States District Court for the Southern District of New
York, No. 1:05-cv-08136-DC Before the Honorable Denny Chin

## BRIEF FOR APPELLANT

DARALYN J. DURIE
JOSEPH C. GRATZ
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
(415) 362-6666

SETH P. WAXMAN
LOUIS R. COHEN
RANDOLPH D. MOSS
DANIEL P. KEARNEY, JR.
ARI HOLTZBLATT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

November 9, 2012

## RULE 26.1 DISCLOSURE STATEMENT

Defendant-Petitioner Google Inc., by its undersigned attorneys, hereby states, pursuant to rule 26.1 of the Federal Rules of Appellate Procedure, that it has no parent corporation and that there is no publicly held corporation that owns 10% or more of its stock.

Dated:  November 9, 2012                    /s/ Seth Waxman
                                            Seth Waxman

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE STATEMENT.................................................................i

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF ISSUES PRESENTED................................................3

STATEMENT OF THE CASE.................................................................4

STATEMENT OF FACTS ......................................................................5

      A.     Google Books Transforms How Readers And Scholars Find Books.......................................................................................5

      B.     Google Books Benefits Authors.............................................9

      C.     Proceedings In The District Court........................................11

SUMMARY OF ARGUMENT ..............................................................14

STANDARD OF REVIEW ...................................................................17

ARGUMENT ......................................................................................17

I.      CLASS PLAINTIFFS CANNOT ADEQUATELY REPRESENT THE MANY CLASS MEMBERS WHO BENEFIT FROM GOOGLE BOOKS AND DO NOT WANT TO SEE IT DISMANTLED..............................................17

II.     COMMON ISSUES DO NOT PREDOMINATE BECAUSE OVERCOMING GOOGLE'S FAIR USE DEFENSE REQUIRES INDIVIDUAL BOOK-BY-BOOK ANALYSIS OF THE STATUTORY FAIR USE FACTORS............................26

III.    WHETHER AN INDIVIDUAL IS ENTITLED TO RECOVER FOR INFRINGEMENT AS A MEMBER OF THE CLASS PRESENTS INDIVIDUAL ISSUES THAT WEIGH HEAVILY AGAINST CERTIFICATION ..........36

A.  Determining Class Membership For Millions Of Books Published Before 1978 Will Often Require Live Testimony From Authors Or Other Individuals ......................................................39

B.  Determining Whether An Individual Has A Copyright Interest That Can Support An Infringement Claim Will Require Numerous Book-by-Book Adjudications ............................40

    1.  Individual evidence would be necessary to determine whether each work was "made for hire".................................41

    2.  Determining each author's ownership of the necessary rights will also require individual examination of publishing contracts .................................................................43

CONCLUSION ...............................................................................................48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF ELECTRONIC FILING

CERTIFICATE OF SERVICE

SPECIAL APPENDIX

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Allen v. Dairy Farmers of America, Inc.*, 2011 WL 6148678 (D. Vt. Dec. 9, 2011)..........................................................................................21

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*, 247 F.R.D. 156 (C.D. Cal. 2007)...................................................19

*Alston v. Virginia. High School League, Inc.*, 184 F.R.D. 574 (W.D. Va. 1999) .......................................................................19, 21, 22

*Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011)..........4, 11, 12

*Authors Guild, Inc. v. HathiTrust*, 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) ...................................................................2, 28, 29

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52 (2d Cir. 2000).........................................................................18

*Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988) .............................19, 23

*Bill Graham Archives v. Dorling Kindersley Limited*, 448 F.3d 605 (2d Cir. 2006).........................................................................30

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) .................................................27, 28

*Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir. 1966).........................................................................42

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .........................................................24

*Cambridge University Press v. Becker*, 2012 WL 1835696 (N.D. Ga. May 11, 2012).......................................................................27, 32

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)...............1, 27, 28, 32, 35

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ...................42

*Cortner v. Israel*, 732 F.2d 267 (2d Cir. 1984).......................................................44

*Diamond v. Am-Law Publishing Corp.*, 745 F.2d 142 (2d Cir. 1984) ...................33

*Dresser v. William Morrow & Co.*, 105 N.Y.S.2d 706 (App. Div. 1951), *aff'd*, 107 N.E.2d 89 (N.Y. 1952) ................................................................44

*Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991) ..............................................................................................................34

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841) .............................................27

*Hansberry v. Lee*, 311 U.S. 32 (1940) .....................................................................24

*Harper & Row Publishers v. Nation Enterprises*, 471 U.S. 539 (1985) ...........30, 34

*Hyderi v. Washington Mutual Bank, FA*, 235 F.R.D. 390 (N.D. Ill. 2006) .............25

*In re General Motors Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir. 1995) ..........................................................24

*In re Initial Public Offerings Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ....................................................................16, 17, 37, 38, 40

*In re Masonite Corp. Hardboard Siding Products Liability Litigation*, 170 F.R.D. 417 (E.D. La. 1997) .....................................................................35

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir. 1998) ...............................................................................................43

*J.M. Woodhull, Inc. v. Addressograph-Multigraph Corp.*, 62 F.R.D. 58 (S.D. Ohio 1974) .........................................................................................25

*Lanzarone v. Guardsmark Holdings, Inc.*, 2006 WL 4393465 (C.D. Cal. Sept. 7, 2006) ...........................................................................................22

*Martin v. Wilks*, 490 U.S. 755 (1989) ......................................................................24

*Maxtone-Graham v. Burtchaell*, 631 F. Supp. 1432 (S.D.N.Y.), *aff'd*, 803 F.2d 1253 (2d Cir. 1986) .......................................................................31

*Maxtone-Graham v. Burtchaell*, 803 F.2d 1253 (2d Cir. 1986) ........................28, 33

*Mid America Title Co. v. Kirk*, 59 F.3d 719 (7th Cir. 1995) ...................................47

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) .............................26, 36

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010) ...........................................17, 22

*Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000) ........................22

*Phillips v. Klassen*, 502 F.2d 362 (D.C. Cir. 1974) ....................................19, 23, 24

*Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000) ...................18, 19

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406
   (2d Cir. 1946)................................................................................................40

*Silberman v. Innovation Luggage, Inc.*, 2003 WL 1787123 (S.D.N.Y.
   Apr. 3, 2003)................................................................................................45

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417
   (1984)....................................................................................................27, 35

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181
   (11th Cir. 2003) ....................................................................................14, 18

*Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521 (N.D. Ill. Dec. 18,
   2008) ..............................................................................................................36

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ................16, 29, 30, 35, 48

*Ward v. National Geographic Society*, 208 F. Supp. 2d 429 (S.D.N.Y.
   2002) ..............................................................................................................42

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003)................41

*Washingtonian Publishing Co. v. Pearson*, 306 U.S. 30 (1939) ............................40

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2d Cir. 2001) ............................17

## STATUTES, RULES, AND LEGISLATIVE MATERIALS

17 U.S.C.
   § 101 .......................................................................................41, 42, 43
   § 107 ................................................................................................26
   § 107(1).............................................................................................1
   § 107(2).......................................................................................30, 33
   § 107(2).............................................................................................30
   § 107(3).......................................................................................30, 32
   § 107(4).............................................................................................30
   § 201(a).............................................................................................43

§ 201(b) ................................................................................................41
§ 410(d) ...............................................................................................40
§ 412 ....................................................................................................40
§ 501(b) ...........................................................................38, 40, 43, 44

28 U.S.C.
§ 1292(e) ...............................................................................................3
§ 1331 ....................................................................................................3
§ 1338 ....................................................................................................3

Fed. R. Civ. P.
R. 23 ......................................................................................... *passim*
R. 32(a) .................................................................................... *passim*
R. 23(a)(4) ..........................................................................................18
R. 23(b)(3) ............................................................................... *passim*
R. 23(b)(3)(A) ....................................................................................25
R. 23(f) ....................................................................................3, 15, 13

H.R. Rep. No. 94-1476 (1976) ...................................................................27

S. Rep. No. 94-473 (1976) ..........................................................................38

## OTHER AUTHORITIES

Leval, Pierre N., *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105
        (1990) ............................................................................................32

Moore, James William, et al., *Moore's Federal Practice* (3d ed. 2007) ................37

Nimmer, David, & Melville B. Nimmer, *Nimmer on Copyright* (rev. ed.
        2012)33 .........................................................................................

Wright, Charles Alan, & Arthur R. Miller, *Federal Practice and
        Procedure* (3d ed. 2012) .....................................................18, 25

## INTRODUCTION

Google Books is a revolutionary search technology for books—a modern and marked improvement over the traditional card catalog.  Google has scanned and indexed more than 20 million books by agreement with major research libraries.  The Google Books tool allows any user to enter a search query, obtain a list of books containing the user's search terms, and view limited "snippets" of surrounding words showing how the terms are used.  Google Books does *not* allow users to read a book online, or even a single page of a book, without express permission from the rightsholder.  But its search capabilities help users find books to buy or borrow, connecting them with the books they need, and thus bringing to light a wealth of information previously hidden, undiscoverable, in books sitting on library shelves.  Google Books thus offers enormous benefits to authors and readers and to the progress and diffusion of human knowledge.

Plaintiffs claim that Google Books' scanning and snippet display of their works infringes their copyrights and seek to represent a class of authors in a suit to stop the project and to recover statutory damages.  Google's principal defense—the central issue in this litigation—is that the project is fair use:  Google's uses are "transformative" because they do not "supersede" the books but rather "add[] something new," a greatly improved way of finding them.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *see also* 17 U.S.C. § 107(1).  The

transformative nature of Google Books and the fact that, as a general matter, it makes books more accessible, more likely to be read and cited, and more likely to be sold render the entire project fair use. *See Authors Guild, Inc. v. HathiTrust*, 2012 WL 4808939, at *9-14 (S.D.N.Y. Oct. 10, 2012) (holding that digitization of books for use in libraries' online full-text search index is fair use because the use is transformative and causes no non-speculative market harm). But if the district court rejects the contention that the entire project is fair use, Google is also entitled to present its fair use defense as to uses of individual works, and the court must evaluate Google's particular uses of each of a wide variety of books.

Despite the individual issues at the heart of Plaintiffs' suit—and unrebutted evidence that a significant portion of the proposed class in fact approves, and benefits from, Google Books' uses—the district court certified a plaintiff class under Federal Rule of Civil Procedure 23(b)(3) consisting of "[a]ll persons residing in the United States who hold a United States copyright interest in one or more Books reproduced by Google as part of its Library Project." SPA2. That decision was error, for several reasons. *First*, Plaintiffs cannot adequately represent, as required by Rule 23(a), the large number of class members who would be harmed if Plaintiffs prevail—that is, the many class members who benefit economically and in other ways from the Google Books project and do not want to see it curtailed. *Second*, common issues do not predominate under Rule 23(b)(3)

- 2 -

because each individual author's claim will require the Court to determine that, under the particular circumstances, Google is not making fair use of the author's work. That issue will be specific to each work, requiring a series of mini-trials to determine fair use, and thus individual issues will overwhelmingly predominate at trial. *Third*, each class member's claim, seeking individual damages and injunctive relief, will also require proof of copyright registration and ownership as to each particular work. Resolving these issues, too, would often require book-by-book mini-trials, further rendering Plaintiffs' suit inappropriate for class litigation. For these reasons, the district court's class certification decision was error and should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. That court issued a decision on May 31, 2012 granting the lead Plaintiffs' motion for class certification under Rule 23(b)(3). SPA4-35. On June 14, 2012, Google filed a timely petition for permission to appeal that certification, which this Court granted on August 14, 2012 (A929-930). This Court has jurisdiction pursuant to Rule 23(f) and 28 U.S.C. § 1292(e).

## STATEMENT OF ISSUES PRESENTED

(1) Whether, under Rule 23(a), Plaintiffs who seek to stop Google's scanning, indexing, and limited search-generated display of their books can

adequately represent class members who benefit from Google's uses and want the Google Books project to continue.

(2) Whether in a copyright infringement action in which the principal issue is fair use of a wide variety of different kinds of works, whose authors benefit from the uses in substantially different ways and to different degrees, individual fair use issues preclude a finding of predominance under Rule 23(b)(3).

(3) Whether the need to conduct complex individual adjudications to determine, on a book-by-book basis, the circumstances of a putative class member's copyright registration and ownership precludes class certification.

## STATEMENT OF THE CASE

Plaintiffs filed a complaint against Google on September 20, 2005. Dkt. No. 1. On October 28, 2008, the parties filed a proposed class settlement agreement. Dkt. No. 55. Judge Chin rejected the proposed class settlement on March 22, 2011. *See Authors Guild, Inc. v. Google Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011). Plaintiffs filed their Fourth Amended Complaint (which is now operative) on October 14, 2011. A119-134. On May 31, 2012, Judge Chin granted the Plaintiffs' motion for class certification and certified a class consisting of:

> All persons residing in the United States who hold a United States copyright interest in one or more Books reproduced by Google as part of its Library Project, who are either (a) natural persons who are authors of such Books or (b) natural persons, family trusts or sole proprietorships who are heirs, successors in interest or assigns of such authors. "Books" means each full-length book published in the

United States in the English language and registered with the United
States Copyright Office within three months after its first publication.
Excluded from the Class are the directors, officers and employees of
Google; personnel of the departments, agencies and instrumentalities
of the United States Government; and Court personnel[.]

SPA2.  On June 14, 2012, Google filed a timely petition for permission to appeal

the class certification decision under Rule 23(f), which this Court granted on

August 14, 2012.  A929-930.  On September 17, 2012, this Court stayed

proceedings in the district court pending the outcome of this appeal.  Dkt. No. 29.

## STATEMENT OF FACTS

### A.    Google Books Transforms How Readers And Scholars Find Books

The rise of digital technology and the Internet has opened up a wealth of

information to individuals throughout the world.  Using search and other

technologies for organizing the Internet, a user of any connected computer can

discover and locate information on any topic imaginable.  A critical portion of

humanity's knowledge, however, still lies on the printed page, in books not easily

identified or discovered—many of which can be accessed only in major research

libraries.  Finding this information has required laboriously examining hard-copy

or electronic card catalogs that index each book according to only a few major

topics and then combing through the physical books to discover whether they

contain relevant material.

Google Books is a digital tool that allows users to find books in a way never before possible:  by searching with terms selected by the user.  In 2004, pursuant to agreements, Google began digitizing books belonging to the University of Michigan, Harvard, Stanford, Oxford, and the New York Public Library, and it has now scanned approximately 20 million books.  A505 ¶¶ 2, 4.  Google indexed all significant words and phrases from each book scanned.  *Id.* ¶ 2.  When a user enters a search term on the Google Books website, Google uses the index to return a list of books in which the term appears.  A user may then click on one of the search results to obtain more information about the book.  *Id.*  This information frequently includes so-called "snippets" of text from the book.  *Id.*  Each "snippet" is about one-eighth of a page in length (approximately two or three sentences) and is intended to provide context showing how the user's search term appears in the book, enabling the user to determine whether the book contains information of interest.  A506 ¶ 8.  Here is an example of snippets yielded by a search for "DNA" in Michael Crichton's *Jurassic Park*:



A490. On each webpage that displays snippets, Google Books also provides links to buy the book online and to find it in a nearby library. A505 ¶ 3. There are no advertisements on these pages, and Google does not receive payments in connection with the "buy the book" links. *Id.*[1]

The information that appears in Google Books does not substitute for reading the book. Google displays no more than three snippets from a book in

---

[1]  Through a separate Partner Program, publishers authorize Google to display much larger excerpts of works. A505 ¶ 6. More than 45,000 publishers have authorized inclusion of 2.5 million books in the Partner Program. A506 ¶ 6. Users search and view books in the Partner Program through the same web-interface used to search and sometimes view snippets of other books in the Google Books corpus. The Partner Program is not at issue in this case.

response to a search query, even if the search term appears many times in the book. A506 ¶ 8. Google also prevents users from viewing a full page, or even several contiguous snippets, by displaying only one snippet per page in response to a given search and by "blacklisting" (*i.e.*, making unavailable for snippet view in response to *any* search) at least one snippet per page and one out of ten pages in a book. *Id.* ¶ 10. And not all books are made available for snippet view. For example, Google does not display snippets of reference works such as dictionaries or cookbooks or of books of short-form poetry, where even a small snippet could potentially substitute for the reader's accessing the book itself. *Id.* ¶ 9. Google conducts human review of every individual book placed in snippet view to determine whether the book is appropriate for snippet view.

The Google Books tool—its index of texts and the search capabilities made available to users—represents a "card catalog" for the digital age. It allows readers to search for books by tailoring their own search terms, rather than relying on the limited topical subjects chosen for library catalogs. For example, consider the benefits of Google Books for a researcher interested in "500 Pearl Street." The Library of Congress catalog returns no results in response to this search query. *See* Library of Congress Online Catalog, http://catalog2.loc.gov (search "500 Pearl Street") (last visited Nov. 9, 2012). In contrast, Google Books points to certain obvious materials such as the U.S. Court Directory and the page in the

Congressional Record containing Senator Schumer's floor speech introducing the bill to name the courthouse for Daniel Patrick Moynihan. *See* Google Books, http://books.google.com/ (search "500 Pearl Street") (last visited Nov. 9, 2012). A Google Books search also points to books that almost certainly would never have been discovered on library shelves by anyone seeking information about the courthouse—books like Arthur Bonner's 1996 book *Alas! What Brought Thee Hither?: The Chinese in New York, 1800-1950*, which reveals that in the 1800s, 500 Pearl Street was the site of a cigar factory operated by William A. Hong, one of three Chinese Civil War veterans from New York. A further search on Mr. Hong's Chinese name, Hong Kee Kang, provides a link to a book with more information on Mr. Hong (an out-of-print collection entitled *Chinese America: History and Perspectives*), which can be found in libraries or purchased from Amazon.com, used, for $1.21. *See* Google Books, http://books.google.com/ (search "Hong Kee Kang") (last visited Nov. 9, 2012); Amazon, http://www.amazon.com/ (search "1885864000") (last visited Nov. 9, 2012).

### B.    Google Books Benefits Authors

Authors and publishers have long encouraged readers to browse books—in both brick-and-mortar stores and on websites such as Amazon.com—because they believe that book browsing promotes sales. Google Books offers similar benefits. Its search capabilities connect new readers to books and help readers determine

whether a book is relevant to their interests before deciding to buy or borrow it.
The Authors Guild recognized as early as 2004 that many books could benefit from
exposure through Google Books, and advised its members: "We think Google Print
will likely prove to be useful in promoting certain titles[.] … Midlist and backlist
books that are receiving little attention, for example, may benefit from additional
exposure in searches." A859.[2] One author put it more succinctly: Google Books
is "[t]he equivalent of advertising." A340 (respondent 100652).

Many authors recognize additional benefits from Google Books, including
assistance with their own research. *See, e.g.*, A317-322 (respondents 123, 127,
238, 246, 100101, 100233, 100271, 100305, 100440, 100489, and 100572). As a
group of 64 academic authors explained earlier in this litigation, Google Books'
"indexes and snippets advance scholarly research and improve access to
knowledge, especially when, as with [Google Books], searches yield links to
libraries from which the relevant books can be obtained." A98.

A survey of 880 randomly selected published authors by Google's expert,
Hal Poret, found that 58% approve of including their books in snippet view, 45%
believe inclusion helps sales of their books, and 19% believe it advances their
economic interests more generally. A233, A244. Only 15% of those surveyed
objected to Google Books' inclusion of their works. A253-254. For authors who

---

[2]    Google Books was previously called Google Print.

object, Google has a policy of removing books from snippet view on request.

A506 ¶ 7.  None of the named Plaintiffs has made such a request.  *Id.*, A366, A382,

A399.

### C.    Proceedings In The District Court

In 2005, the Authors Guild and several individual authors sued Google for

copyright infringement.  The suit sought injunctive and declaratory relief, and the

individual authors also sought statutory damages.[3]  After document discovery, on

October 28, 2008, the parties filed a proposed class settlement agreement, which

was subsequently amended by the parties and submitted to the district court for

approval on November 13, 2009.  The agreement would have permitted Google to

continue the project and, under certain conditions, to make full electronic versions

of the works available online.  In return, copyright holders would have received a

substantial portion (63%) of the revenues derived from Google's uses of the full

electronic versions of the books, and they would have retained all rights to license

their works to other entities and to demand, at any time, that Google cease using

their works.

The district court rejected the proposed settlement on March 22, 2011.  *See*

*Authors Guild, Inc. v. Google Inc.*, 770 F. Supp. 2d 666, 686 (S.D.N.Y. 2011).

The court expressed concern that, among other things, "class members would …

---

[3]    Plaintiffs later stipulated to seeking statutory damages of $750 per work.

- 11 -

be deemed—by their silence—to have granted to Google a license to future use of their copyrighted works." *Id.* at 680. The court also noted significant differences within the proposed class and concluded that the "class plaintiffs have not adequately represented the interests of at least certain class members." *Id.* at 679. For example, the court noted that many academic authors would prefer that unclaimed works be freely available to the public. *Id.* at 679 n.16.

On December 12, 2011, several individual Plaintiffs moved pursuant to Rule 23(b)(3) to certify a proposed class comprised of natural persons in the United States who hold a copyright interest in one or more books Google has included in the project.[4] The proposed class included hundreds of thousands of authors and millions of different books, with different types of content, varying degrees of availability (many are out of print), different publication dates, and different publishing contracts.

Google opposed class certification. It argued that class representatives seeking to dismantle Google Books cannot adequately represent absent class members who benefit from the project and want it to continue. Google also argued that the Rule 23(b)(3) predominance requirement was not met because its fair use

---

[4]    Plaintiffs defined "Books" as "each full-length book published in the United States in the English language and registered with the United States Copyright Office within three months after its first publication." The proposed class includes "natural persons who are authors of such Books" and certain successors. SPA2.

- 12 -

defense could not be overcome without individual assessments of the fair-use factors. Finally, Google argued that determining the copyright registration and ownership of each book in the proposed class would involve complex individual book-by-book inquiries.

The district court granted the motion for class certification on May 31, 2012. SPA4-35. The court rejected Google's challenge to the lead Plaintiffs' adequacy as class representatives, stating that the fact that "some class members may prefer to leave the alleged violation of their rights unremedied" did not defeat adequacy. SPA31. Concerning the predominance requirement, the court recognized that Google's "principal defense" is "fair use," but held that whether Google's "practice constitutes copyright infringement does not depend on any individualized considerations." SPA9, SPA33. It reasoned that the fair use defense could be resolved based on class-wide evidence, with sub-classes for "particular type[s] of book." SPA33. It also concluded that the need to prove an author's individual beneficial interest in a book (which would in many instances require detailed analyses of publishing contracts), although an "'individual' issue," did not predominate over other common issues in the litigation. *Id.*

Google timely petitioned this Court for permission to appeal class certification pursuant to Federal Rule of Civil Procedure 23(f). This Court granted the petition on August 14, 2012. A929-930.

## SUMMARY OF ARGUMENT

The district court's class certification decision was erroneous and should be reversed, for three principal reasons. *First*, Plaintiffs' objective in this litigation—to curtail Google Books—is at odds with the interests of a large number of absent class members, whom Plaintiffs cannot adequately represent in this litigation. Under Rule 23(a), plaintiffs who challenge the same conduct that benefits other class members cannot adequately represent the class, and a class cannot be certified. *See, e.g.*, *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). While Plaintiffs object to Google Books and seek to enjoin Google's searchable index and its display of snippets, many absent class members benefit from the Google Books project and want to see it continue, because it makes their books more widely known and accessible. That clash of interests between Plaintiffs and a large portion of the class precludes certifying a class here. If Plaintiffs were to prevail, they would deprive many authors of the benefits they obtain from Google Books. Indeed, a survey of authors showed that a majority of those interviewed supported Google's scanning of their books and the inclusion of their books in snippet view—the very conduct Plaintiffs challenge. Rule 23(a)'s requirement of adequacy protects those absent class members, and limits who may claim to represent them, regardless of the availability of opt-out under Rule 23(b)(3). In certifying a class, the district court erroneously gave no

- 14 -

weight to the survey and dismissed the dissenting views of absent class members as irrelevant, contrary to Rule 23(a) and the decisions of several courts of appeals.

*Second*, common issues do not predominate under Rule 23(b)(3) because the central disputed issue in this case—Google's fair use defense—cannot be rejected without analyzing the fair use factors as they apply to each of Google's uses of particular individual books.  Plaintiffs' suit encompasses an enormous variety of books, and fair use analysis of Google Books' uses implicates highly individual circumstances specific to each book.  In particular, there are many different ways Google Books may provide market benefits to an author that cannot be dismissed on a classwide basis.  Moreover, the amount and substantiality of Google's uses vary widely across the books in the class.  Indeed, Google's own guidelines for snippet-view display take into account the nature of the book (for example, snippet view is not available for certain reference works).  Finally, the nature of the books in the class varies widely.  For example, some books consist almost entirely of factual material, for which the fair use defense is broader, while others are works of fiction.  If Google does not prevail across the board, application of the fair use analysis will require the district court to weigh each of these factors in the context of Google's uses of a particular book.  Such book-by-book "mini-trials" could be avoided only by improperly depriving Google of its ability to present a full fair use

defense.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011) (class cannot be certified "on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims").

*Third*, Plaintiffs' suit also cannot proceed as a class action because whether an individual author can claim infringement as a member of the class raises important and complex individual fact issues regarding copyright ownership and registration.  These issues would require the district court to adjudicate, book-by-book, the circumstances of each book's creation, the timing of its copyright registration, and the putative class member's legal or beneficial ownership of a copyright interest under the relevant publishing contract.  In particular, the court would be faced with resolving, as to each book:  whether the book's copyright was "registered with the United States Copyright Office within three months after its first publication" (SPA2); whether the book was "made for hire;" whether the author transferred copyright ownership in the book to the publisher; whether copyright ownership in the book has reverted from the publisher to the author; whether the author agreed to an "all rights" contract with the publisher with respect to the book; and whether the author is either the legal or beneficial owner of certain promotional rights in the book.  The need for these individual fact inquiries further weighs against certification.  *See In re Initial Public Offerings Sec. Litig. ("In re IPO")*, 471 F.3d 24, 44-45 (2d Cir. 2006).

## STANDARD OF REVIEW

Plaintiffs bear the burden of showing that they meet the applicable class certification requirements of Federal Rule of Civil Procedure 23. *See Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Courts must engage in a "rigorous analysis" to determine whether they have met that burden. *In re IPO*, 471 F.3d 24, 33 (2d Cir. 2006). An appellate court reviews a district court's decision to certify a class for abuse of discretion. *See, e.g., id.* at 31-32. In making that determination, this Court reviews questions of law *de novo*. *See id.*; *see also Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (district court abuses its discretion when "its decision rests on an error of law (such as application of the wrong legal principle)").

## ARGUMENT

### I.  CLASS PLAINTIFFS CANNOT ADEQUATELY REPRESENT THE MANY CLASS MEMBERS WHO BENEFIT FROM GOOGLE BOOKS AND DO NOT WANT TO SEE IT DISMANTLED

At stake in this litigation is whether Google Books will go forward as a comprehensive catalog and search tool for millions of books. On this essential point, the proposed class is deeply divided. The class representatives object to the project and seek to enjoin Google's searchable index and its display of snippets. *See* A131-132 ¶¶ 45-52. However, many—and perhaps most—absent class

members want the project to continue because it makes their books more widely known and accessible.

Rule 23(a)'s "adequacy" requirement precludes certifying a class in these circumstances.  Fed. R. Civ. P. 23(a)(4).  "It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented." 7A Wright & Miller, *Federal Practice and Procedure* § 1768 (3d ed. 2012); *see Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (To demonstrate "adequacy," plaintiffs must show that their "interests are [not] antagonistic to the interest of other members of the class.").  Under this rule, a class cannot be certified where class representatives "claim to have been harmed by the same conduct that benefitted other members."  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003); *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("a class cannot be certified … when it consists of members who benefit from the same acts alleged to be harmful to other members of the class").

Courts have denied class certification where the class representatives' objectives are fundamentally at odds with a significant portion of the proposed class.  For example, the Seventh Circuit upheld a denial of class certification in a suit alleging that noise and chemicals associated with the operation of O'Hare

- 18 -

Airport reduced the value of surrounding homes. *See Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988). The court noted that nearby homeowners were fundamentally divided regarding the value of the airport's operations, and that "homeowners who want to sell to businesses (or are in areas zoned for business) may benefit from extra flights and so oppose homeowners differently situated." *Id.* Similarly, the D.C. Circuit affirmed denial of class certification where the lead plaintiffs challenged an early retirement plan that absent class members had benefited from and would not want declared "unlawful" and thus undone. *See Phillips v. Klassen*, 502 F.2d 362, 367 (D.C. Cir. 1974). The court reasoned that where the challenged conduct "may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual [class member], the foundations of maintenance of a class action are undermined." *Id.*[5]

---

[5]    *See also Pickett*, 209 F.3d at 1280 (rejecting class certification where some class-member cattle producers sold cattle to defendant on the spot market and others sold cattle using the forward contracts and marketing agreements challenged by the plaintiffs); *Alston v. Virginia High Sch. League, Inc.*, 184 F.R.D. 574, 579 (W.D. Va. 1999) (rejecting class certification in a Title IX discrimination suit challenging athletic scheduling where "[a] majority of the female public school athletes surveyed [by the defendant] expressed a desire to preserve the status quo"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) (rejecting class certification where some class members benefited from pricing scheme challenged by lead plaintiffs).

A similar clash of interests precludes certifying a class here.  Plaintiffs' objective is to dismantle a project that benefits many, and perhaps most, other class members.  Their complaint expressly seeks to enjoin Google's inclusion of class members' books in the Google Books tool.  *See* A131-132 ¶¶ 45-52.  And Plaintiffs have themselves explained that they declined to ask Google Books to stop using their own works because their principal interest is to see the whole project undone through litigation.  *See, e.g.*, A399 (explaining that she did not opt out because "[i]t is not the problem of my books.  It is the problem of the principle of doing this for all books"), A366, A380-382.  Moreover, if Plaintiffs were to prevail on their basic claim—that Google must contract with each copyright holder in order to include a work in Google Books—it would be impractical to continue with the project in present form.

That outcome would deprive many authors of the benefits they obtain from Google Books—a result those authors could not avoid by opting out of the class. And those authors are numerous:  A random survey of published authors by Google's expert showed that *58% approved* of Google scanning their copyrighted books so that the books could be searched online and snippets could be displayed; 45% had seen or expected to see demand for their books increase (versus 4% who expected demand to decline); and 19% said they financially benefit from the project (compared to only 8% who said they do not).  A244.  These survey findings

are consistent with statements from the Authors Guild about the benefits of additional web exposure for authors.  The Guild advised its members in 2004: "We think Google Print will likely prove to be useful in promoting certain titles[.] … Midlist and backlist books that are receiving little attention, for example, may benefit from additional exposure in searches."  A859.  It stands to reason that an author benefits when a book can be found through an Internet search engine and when book excerpts are available for browsing online—benefits that Google Books provides.

The district court erred as a matter of law in failing to give any weight to this evidence of a fundamental conflict in the class.  It simply dismissed the author survey as irrelevant, on the ground that the survey did not specifically ask authors whether they wanted to participate in litigation.  SPA31-32.  But the survey was not intended as an opt-out notice; it was designed to elicit class members' views about the Google Books project.  Other courts have relied on similar surveys in rejecting class certification on adequacy grounds.  *See Alston v. Virginia High Sch. League, Inc.*, 184 F.R.D. 574, 577 (W.D. Va. 1999) (relying on a "survey of public high school girls' attitudes toward the [athletic] scheduling practices complained of by plaintiffs"); *see also Allen v. Dairy Farmers of Am., Inc.*, 2011 WL 6148678, at *16-17 (D. Vt. Dec. 9, 2011) (relying on declarations from two dozen absent class member farmers about their preferences for bringing their milk to market);

- 21 -

*Lanzarone v. Guardsmark Holdings, Inc.*, 2006 WL 4393465, at *4 (C.D. Cal. Sept. 7, 2006) (relying on survey demonstrating that many absent class members preferred the meal-period arrangements challenged by the plaintiff). In any event, the survey evidence only reinforces what would be clear even without it—that a substantial number of authors benefit from, and would not wish to dismantle, a search index that makes it possible for potential readers to find their books. *See Alston*, 184 F.R.D. at 579 ("[c]ommon sense" suggested that many class members "would not favor the relief requested by plaintiffs"); *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 378 (2000) ("The quantum of empirical evidence needed … will vary up or down with the novelty and plausibility of the justification raised.").

Moreover, it is *Plaintiffs'* burden to prove that their interest in stopping Google Books does not fundamentally conflict with the interests of other class members. *See Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *Alston*, 184 F.R.D. at 580 (holding that plaintiffs had burden to rebut defendant's survey). Plaintiffs could, for example, have surveyed the over 8,500 published authors who are members of the Authors Guild to determine whether they share Plaintiffs' desire to shutter Google Books. A123-124 ¶ 18. Tellingly, they did not.

In addition to wrongly disregarding Google's evidence, the district court missed the legal significance of the fundamental clash of interests among class members here. The court thought of this as simply a case where some authors

want to press their legal claims and others are content "to leave the alleged

violation of their rights unremedied."  SPA31.  But that is not what is at issue here:

Google Books' comprehensive index and search tool offers real benefits to a

significant portion of the class, and if Plaintiffs prevail, those benefits will

disappear or be greatly diminished because the project cannot continue in its

present form.  The question is not merely whether a certified class can include

some number of dissenters, but whether Plaintiffs are entitled to proceed as if they

had the weight of an entire large class behind them when the record shows that

many or most favor the activities the lawsuit seeks to preclude.  Rule 23(a)'s

adequacy requirement is designed to prevent absent class members from being

conscripted into a suit that is contrary to their interests.  Indeed, the district court's

erroneous reasoning would apply equally to proposed classes that other circuits

have rejected under Rule 23(a):  Absent class members in those cases could

likewise be said to want to leave "unremedied" their right to be free of excess

airport noise and pollution, *see Bieneman*, 864 F.2d at 465, or their right to be

subject to an early retirement plan that was not "unlawful," *Phillips*, 502 F.2d at

367.

The adequacy requirement—the principle that the Plaintiffs' interests must

be aligned with the common interests of the class—is fundamental to the very

notion of class litigation.  As the Supreme Court has explained, class litigation is

- 23 -

"an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979). The class action solves a problem of numerosity where joinder is impracticable, but it is only appropriate "where the interests of those not joined are *of the same class* as the interests of those who are, and where it is considered that the latter *fairly represent* the former in the prosecution of the litigation of the issues in which *all have a common interest*." *Hansberry v. Lee*, 311 U.S. 32, 41-42 (1940) (emphasis added). Where that "common interest" is lacking, the Plaintiffs in the suit are not "entitled to stand in judgment for those who are not," and they cannot rightly claim to represent the interests of absent class members. *Id.* at 43; *see also Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) (person may fairly be bound by class litigation only where he "has his interests adequately represented by someone *with the same interests* who is a party" (emphasis added)).

The requirement of adequacy thus protects absent class members, and limits who may claim to represent them, regardless of the availability of opt-out under Rule 23(b)(3). SPA31 n.8. Rule 23(a)'s prohibition of fundamental intra-class conflicts cannot "be avoided merely by saying that it is always open to members of a class to 'opt out' of any relief to which they are held entitled." *Phillips*, 502 F.2d at 367; *see also In re General Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 809 (3d Cir. 1995) ("[T]he right of parties to opt out does not relieve

- 24 -

the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class."); 7A *Federal Practice and Procedure* § 1768 ("[T]he court is to some extent charged by Rule 23 with the responsibility for protecting the absent class members and it is not at all clear that judicial responsibility may be disregarded so easily").

The district court failed to apply these principles, and thus potentially tied many in the class to a suit that is contrary to their interests.  And although some authors may opt out, that is ultimately insufficient to protect them:  If Plaintiffs' class suit succeeds in dismantling Google Books, absent authors who benefit from the project will be in no position to resurrect it, whether they opted out or not.[6]

---

[6]    There are in any event "superior" ways to resolve the issues in this case than through class litigation, and denying class certification here would not leave authors who object to Google Books without a remedy.  Fed. R. Civ. P. 23(b)(3)(A).  One possibility would be to pursue separate cases involving smaller groups of works whose owners really do want their books excluded.  Resolution of common issues in such cases could have preclusive effect in future suits.  *See, e.g.*, *J.M. Woodhull, Inc. v. Addressograph-Multigraph Corp.*, 62 F.R.D. 58, 61-62 (S.D. Ohio 1974).  There is also sufficient incentive to bring individual suits given the availability of statutory damages and the ability to recover attorneys' fees and costs under the Copyright Act.  *See Hyderi v. Washington Mut. Bank*, 235 F.R.D. 390, 404 (N.D. Ill. 2006).

## II.   COMMON ISSUES DO NOT PREDOMINATE BECAUSE OVERCOMING GOOGLE'S FAIR USE DEFENSE REQUIRES INDIVIDUAL BOOK-BY-BOOK ANALYSIS OF THE STATUTORY FAIR USE FACTORS

Rule 23(b)(3) permits class certification only where "questions of law or fact common to class members predominate over any questions affecting only individual members."  To satisfy this predominance requirement, Plaintiffs must show that "the legal or factual questions that qualify each class member's case as a genuine controversy" that can be resolved "through generalized proof … are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber*, 306 F.3d 1247, 1252 (2d Cir. 2002).  Common issues do not predominate if "the central disputed issue[]" in a case can only be decided through "a series of mini-trials."  *Id.* at 1253.

The "central disputed issue[]" in this case is whether Google Books' uses constitute fair use.  *Moore*, 306 F.3d at 1252; *see* SPA9 (recognizing that fair use is Google's "principal defense").  That defense requires the trial court to evaluate four non-exclusive statutory fair use factors:  (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.  "The factors do not represent a score card that promises victory to the winner of the majority.  Rather, they direct courts to examine the issue from every pertinent corner and to ask in each case whether, and

- 26 -

how powerfully, a finding of fair use would serve or disserve the objectives of the copyright."  Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110-1111 (1990).

Resolving fair use issues ordinarily requires a context-specific, work-by-work analysis that is not possible in a class action.  *See Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (fair use requires "an open-ended and context-sensitive inquiry").  As Justice Story observed in the seminal fair use case, courts analyzing fair use have long found it difficult "to lay down any general principles applicable to all cases."  *See Folsom v. Marsh*, 9 F. Cas. 342, 344 (C.C.D. Mass. 1841) (No. 4,901).  The Supreme Court has consistently rejected "bright-line rules" in the fair use context, *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577 (1994), and has noted Congress's recognition that "'each case raising the [fair use] question must be decided on its own facts,'" *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 n.31 (1984) (quoting H.R. Rep. No. 94-1476 (1976)).  This often requires a fine-grained analysis that can lead to different fair use conclusions even about uniform uses of substantially similar works.  *See, e.g.*, *Cambridge Univ. Press v. Becker*, 2012 WL 1835696, at *62, *67 (N.D. Ga. May 11, 2012) (reaching opposite fair use conclusions about 37-page excerpts from two different books because one book earned significant digital licensing income and the other did not); *id.* at *76, *161 (finding use of 41 pages equaling 5.8% of a book fair

- 27 -

because the portion "was decidedly small," but use of a shorter excerpt from a shorter book not fair in part because the excerpt comprised 8.28% of the total work, which the court found "not decidedly small").

Plaintiffs have nonetheless sought to litigate their claims on an all-or-nothing basis, arguing that Google Books is a "single program" that is either lawful or not. Dkt. No. 1008, at 2. Google has argued, in turn, that the transformative nature of Google Books and the significant public benefits of the project render the entire project fair use and defeat the infringement claim of every member of the proposed class. Because the project creates new information—a comprehensive searchable catalog of the world's books—and does not replace books, the first fair-use factor (the purpose and character of the use) decidedly tilts the analysis in Google's favor across-the-board.[7] *See Authors Guild, Inc. v. HathiTrust*, 2012 WL

---

[7]    In addition, because the purpose of Google Books is to aid research and scholarship, a Google Books user is engaged in the type of activity treated as "noncommercial" for purposes of analyzing the first fair use factor. *See Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir. 1986) (noting that the "commercial nature of a use is a matter of degree, not an absolute" and concluding that the "educational elements of" the book at issue "far outweigh the commercial aspects of the book"). Google's status as a commercial entity is of minimal significance to the fair use inquiry given that Google Books is highly transformative. *See Campbell,* 510 U.S. at 579 ("the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use"). Indeed, this Court has often found fair use even where the defendant benefited commercially from the use. *See, e.g.*, *Blanch*, 467 F.3d at 254 (explaining that "other factors, including commercialism, are of less significance" where the "new work is substantially transformative" and finding fair use even where defendant was compensated more than $100,000 for a

4808939, at *11 (S.D.N.Y. Oct. 10, 2012) (holding that digitization of books in

connection with Google Books for use in libraries' online full-text search index is

"transformative because the copies serve an entirely different purpose than the

original works:  the purpose is superior search capabilities rather than actual access

to copyrighted material").[8]

But Plaintiffs' strategic choice to litigate the fair use issue in an across-the-

board manner cannot deprive *Google* of its ability to present a full fair use defense

based on individual book-specific considerations.  *See Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2541, 2561 (2011) (class cannot be certified "on the premise that

[the defendant] will not be entitled to litigate its statutory defenses to individual

claims").  If Google's argument based on the first factor (along with the overall,

beneficial nature of the project) does not uniformly prevail, its fair use defense also

turns on book-specific reasons why its uses of individual books are fair.  Three of

the four statutory fair use factors require careful individual analysis before

Google's fair use defense can be denied:  "the nature of the copyrighted work"

(factor two), "the amount and substantiality of the portion used" (factor three), and

---

painting that incorporated plaintiff's photograph (internal quotation marks and
brackets omitted)).

[8]      Google has also argued (relevant to factor four) that Plaintiffs cannot
produce any relevant evidence of market harm caused by Google Books for *any*
work in the class, which further supports an across-the-board finding of fair use.
*See HathiTrust*, 2012 WL 4808939, at *13-14 (finding no relevant market harm
from digitization of books for use in libraries' online full-text search tool).

- 29 -

"the effect of the use upon the potential market for or value of the copyrighted work" (factor four).  17 U.S.C. § 107(2)-(4).  Because Google's fair use defense as to these factors cannot be rejected based on class-wide evidence, the Rule 23(b)(3) predominance requirement is not satisfied, and class litigation cannot produce a complete "common answer[]," *Wal-Mart*, 131 S. Ct. at 2551, to "the central disputed issue[]" in this case, *Moore*, 306 F.3d at 1253.

Consider, first, the fourth fair use factor—market impact—which often carries the most weight.  *See Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 566 (1985) (describing factor four as "the single most important element of fair use").  Courts evaluate this factor based not only on the market harm but also on the market benefit of the challenged use.  *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613, 615 n.5 (2d Cir. 2006).  There are many different ways Google Books may provide market benefits to an author that cannot be dismissed on a classwide basis.  For example, an author might benefit from Google's inclusion of a particular book in Google Books because it helps the author "get [the] book reissued or reprinted" (A327 (respondent 100024)); or because it attracts readers to a self-published, online book (*see, e.g.*, *id.* (respondent 95)); or because it generates interest in the author's "online drawing classes" (*id.* (respondent 188)); or because it helps an author get speaking engagements or increases his or her name recognition; or because it helps scholars

more easily navigate books that lack an index, *see* User Stories, http://books.

google.com/googlebooks/testimonials.html (last visited Nov. 9, 2012); or because

it is especially effective for reaching certain types of readers, such as those

interested in "academic books," books of "poetry," "mysteries," or books about

"mathematic[s]," the "civil rights era," or "Russia."  *See* A329 (respondent

100572), A334 (respondent 100422), A335 (respondent 162), A336 (respondent

100024), A338 (respondents 100251, 100279), A339 (respondent 100489), A340

(respondent 100617), A341 (respondent 100715, 100723).

   Google Books makes books that are out of print, obscure, or hard to locate

much easier to find, which can benefit authors by raising their profiles or by

leading to renewed interest in their works (and perhaps even to their books

returning to print).  *See Maxtone-Graham v. Burtchaell*, 631 F. Supp. 1432, 1438

(S.D.N.Y.), *aff'd*, 803 F.2d 1253 (2d Cir. 1986) (whether work is out of print "is an

appropriate element to consider when assessing the impact on a copyrighted

work's potential market"); S. Rep. No. 94-473, at 64 (1976) ("whether or not the

work is available to the potential user" is a "key, though not necessarily

determinative, factor in fair use").  And books that are in print and widely known

in certain circles may benefit because they contain information relevant to readers

or researchers with different interests who may never encounter the book without

Google Books.

These significant differences mean that the net market impact of Google Books will vary across individual books in the class. *See Campbell*, 510 U.S. at 591 n.21 ("Market harm is a matter of degree, [which means that] the importance of this factor will vary … with the *amount* of harm." (emphasis added)). Indeed, the Executive Director of the Authors Guild has acknowledged that the extent to which Google Books benefits authors "varies depending on the type of book." A860 (responding to: "How much text needs to be displayed [in a snippet], in your view, in order to help promote sales?").[9]

Individual book-specific considerations are also highly relevant to the third fair use factor: "the amount and substantiality of the portion used." 17 U.S.C. § 107(3). The significance of a three- or four-line snippet in the context of an entire book varies widely across individual books. For example, an eighth of a page of Joseph Goulden's 428-page *The Money Lawyers* is a much smaller portion of an entire work than an eighth of a page of Betty Miles' 32-page *Goldilocks and the Three Bears*. This factor thus generally tilts more strongly in Google's favor for longer books than shorter ones. *See, e.g.*, *Cambridge Univ. Press*, 2012 WL

---

[9]    Differences among books in the class also affect whether any potential market harm could plausibly be attributed to Google Books. For example, Plaintiffs claim that Google Books encourages online digital piracy of books. *See* Dkt. No. 1008, at 26-27. But many individual books are already publicly available in digital form on the Internet, and whether Google Books presents any incremental risk of online piracy for those works raises, at a minimum, an individual issue.

1835696, at *76, *161.  Indeed, Google's own guidelines for "snippet view"
involve individualized review.  The decision whether to place a book in snippet
view is made following a human review of the book, and Google does not display
snippets of reference works such as dictionaries and cookbooks, where small
snippets might obviate purchasing the books.  A506 ¶ 9.  This kind of book-by-
book analysis mirrors the analysis the court would need to undertake to determine
whether the amount and substantiality of the work used supports a finding of fair
use.

    Likewise, Google's fair use defense will vary depending on the "nature" of
each individual book—the second fair use factor.  *See* 17 U.S.C. §107(2).  "Under
this factor, the more creative a work, the more protection it should be accorded
from copying; correlatively, the more informational or functional the plaintiff's
work, the broader should be the scope of the fair use defense."  4-13 Nimmer &
Nimmer, *Nimmer on Copyright* § 13.05[A][2][a] (rev. ed. 2012); *see also Diamond
v. Am-Law Publ'g Corp.*, 745 F.2d 142, 148 (2d Cir. 1984) (work that is
"avowedly informational … may be more freely published under Section 107 than
those of a creative nature"); *Maxtone-Graham*, 803 F.2d at 1262 (factor two
favored fair use because the work in question was "essentially factual" even
though it "contain[ed] elements of creative journalistic effort").  Different works
will fall along a spectrum depending on their relative mix of factual and creative

content.  The fair use analysis of, for example, "'sparsely embellished maps and directories [as opposed to] elegantly written biography.… [will] vary from case to case.'"  *Nation Enters.*, 471 U.S. at 563.  Certain books that are purely informational in nature may contain hardly any copyrightable material.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991).  Samuel Selby's *Standard Mathematical Tables*, for example, consists almost entirely of standard mathematical tables:



A494.  Google's display of snippets from works containing so little creative content is, at a minimum, fair use.

Finally, and perhaps most critically, fair use analysis requires the district court to balance each factor in combination. *See Sony Corp.*, 464 U.S. at 455 n.40 ("[F]air use analysis calls for a sensitive balancing of interests[;] … the question is not simply two-dimensional."). For example, "the importance of [market harm] will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *See Campbell*, 510 U.S. at 591 n.21. Where, as here, the analysis of each factor differs book by book, the balance among the factors will differ book by book as well.

Plaintiffs apparently sought to avoid this type of book-by-book analysis in framing their claims for purposes of class certification. But Google is not bound by Plaintiffs' strategy. It is entitled to present a full defense, and a class cannot be certified "on the premise that [Google] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart*, 131 S. Ct. at 2561; *see also In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 425 (E.D. La. 1997) (defendant "cannot receive a fair trial without a process which permits a thorough and discrete presentation of these defenses"). And while the district court apparently believed that subclasses for fiction, non-fiction, in-print, and out-of-print works could "obviat[e] the need to evaluate each book individually" (SPA33), the court never explained how it would use those subclasses to evaluate positive or negative market effects, or how it would distinguish among non-fiction

- 35 -

books containing varying amounts of factual information, or how it would account for the significance of a snippet display in the context of each book. Nor did the district court say how such subclasses would permit it to *weigh* each factor against the others. In short, the court's proposed subclasses would do little to address the critical predominance problem posed by Plaintiffs' suit—that Google has a fair use defense to its alleged infringement of individual works that simply cannot be overcome based on common evidence—and properly adjudicating Google's fair use defense with respect to each book would cause the litigation inevitably to break down into "a series of mini-trials." *Moore*, 306 F.3d at 1253.

## III. WHETHER AN INDIVIDUAL IS ENTITLED TO RECOVER FOR INFRINGEMENT AS A MEMBER OF THE CLASS PRESENTS INDIVIDUAL ISSUES THAT WEIGH HEAVILY AGAINST CERTIFICATION

Another reason not to allow Plaintiffs' suit to proceed as a class action is that whether an individual can claim infringement as a member of the class raises important and complex individual fact issues. Resolving these issues would require individual "mini-trials" to examine the circumstances of each book's creation, the timing of its copyright registration, and the putative class member's legal or beneficial ownership of a copyright interest under the relevant publishing contract. The need for these individual fact inquiries—whether viewed as a problem of predominance or of the appropriateness of the class definition—further weighs against certification. *See Vulcan Golf LLC v. Google*, 254 F.R.D. 521, 528,

537 (N.D. Ill. 2008) ("the possibility of hundreds if not thousands of individual hearings related to [intellectual property] ownership" renders class certification improper, since "multiple time-consuming inquiries regarding ownership" will be necessary); 5 Moore et al., *Moore's Federal Practice* ¶ 23.21[3][c] (3d ed. 2007) (explaining that "[a] class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class").

In *In re Initial Public Offerings Securities Litigation ("In re IPO")*, 471 F.3d 24 (2d Cir. 2006), this Court held that individual issues affecting class membership weighed significantly against certification where other individual proof issues were present. The Court observed that, in light of the individual proof of reliance and knowledge required by Plaintiffs' claims, the additional need for "numerous individualized determinations" to assess class membership was "[y]et a further example of an aspect of this litigation bristling with individual questions" and supported "[the] basic conclusion that individual questions permeate [the] litigation." *Id*. at 44-45. The class definition in *In re IPO* was limited to persons who had "paid any undisclosed compensation to the" defendant underwriters—an issue, the Court noted, that turned on individual fact questions such as whether there was a difference "between what brokerage the putative class member was charged and the customary commission for trades of a similar nature." *Id.* at 44.

The Court explained that such individual issues "further indicate the obstacles to proceeding with the [relevant] cases as class actions." *Id.* at 45.

Similarly, here, in light of the individual fair-use issues presented by Plaintiffs' claims, the need for additional individual determinations with respect to each putative class member's standing to recover for infringement further weighs against certification. To have a valid claim for infringement as a member of the class, each individual must demonstrate that his or her book was "registered with the United States Copyright Office within three months after its first publication" (SPA2) and that he or she is "[t]he legal or beneficial owner of an exclusive right under a copyright," 17 U.S.C. § 501(b). Applying these two requirements will require the district court to conduct factual inquiries, which will often be complex, to resolve the following questions with respect to each book:

- Whether the book's copyright was "registered with the United States Copyright Office within three months after its first publication." SPA2.

- Whether the book is a "work made for hire."

- Whether the author transferred copyright ownership in the book to the publisher.

- Whether copyright ownership in the book has reverted from the publisher to the author.

- Whether the author agreed to an "all rights" contract with the publisher with respect to the book.

- Whether the author is either the legal or beneficial owner of certain promotional rights in the book.

- 38 -

The district court assumed that these questions could be answered by straightforward documentary evidence that is collected in centralized databases or otherwise easily available.  SPA16-17.  But for many books it will be necessary to collect and interpret decades-old documents presumably in the possession of each individual author (or her heirs).  If the necessary documents cannot be found—as seems likely in many instances—live testimony would be required.  These individual issues weigh heavily against class certification.

### A.    Determining Class Membership For Millions Of Books Published Before 1978 Will Often Require Live Testimony From Authors Or Other Individuals

Determining whether each of the millions of scanned books that were published before 1978 was "registered with the United States Copyright Office within three months after its first publication" (SPA2) will require individual adjudications.  There is no centralized record of such information.  The Copyright Office's Catalog of Copyright Entries—the Office's sole record for registrations before January 1, 1978—does not include effective dates of registration, and registration dates do not appear on any registration certificate issued before January 1, 1978.  A499 (page from Catalog of Copyright Entries); A501-503 (pre-1978 registration certificates produced by Plaintiff Miles).  The court would have to conduct book-by-book inquiries to determine the "effective date" of a book's copyright registration—that is, "the day on which *an application, deposit, and fee*

*… have all been received in the Copyright Office*." 17 U.S.C. § 410(d) (emphasis added). Authors may well not possess documents that provide this information (1978 was nearly 35 years ago). *See, e.g.*, A374. In many cases, then, to determine whether an individual can recover for infringement as a member of the class, the court would have to take live testimony about decades-old events unlikely to be remembered because the events had no legal significance when they occurred.[10] Such "numerous individualized determinations of class membership," together with the needed individual fair-use inquiries, would force this class action to devolve into book-by-book mini-trials, further demonstrating why class certification was inappropriate here. *In re IPO*, 471 F.3d at 45.

### B. Determining Whether An Individual Has A Copyright Interest That Can Support An Infringement Claim Will Require Numerous Book-by-Book Adjudications

Under the Copyright Act, only "[t]he legal or beneficial owner of an exclusive right under a copyright" may sue for infringement. 17 U.S.C. § 501(b). Such ownership cannot be proved by common evidence. *Accord* SPA 33. The

---

[10]     Under the Copyright Act of 1976, which took effect January 1, 1978, registration within three months is one way to become eligible for statutory damages and attorneys fees. *See* 17 U.S.C. § 412. But under the previous copyright law (the Copyright Act of 1909) no consequences flowed from failure to register by the three-month deadline. *See, e.g.*, *Washingtonian Publ'g Co. v. Pearson*, 306 U.S. 30, 31 (1939); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 408 (2d Cir. 1946). Authors and publishers thus had little reason to register promptly before the 1976 Act took effect, and many did not. *See* A351.

court will be required to conduct many (potentially millions of) individual factual

adjudications to make these determinations.

### 1. Individual evidence would be necessary to determine whether each work was "made for hire"

To determine whether an individual has any copyright interest at all, the

court will first have to resolve whether his book is a "work made for hire."  An

author of a "work made for hire," even if contractually entitled to receive royalties,

is neither a legal nor a beneficial owner, because all rights under the copyright vest

in the employer.  *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140

(9th Cir. 2003).  Such individuals therefore cannot sue for infringement.[11]  For

example, although class Plaintiff Joseph Goulden appears to own the copyright in

some of his books (*e.g.*, *The Money Lawyers*), at least one of his books is a work

made for hire (*The News Manipulators*).  A383.

The individual inquiry to determine whether a work was made for hire may

be fact-intensive.  Under the Copyright Act of 1976, books are made for hire if

they are prepared by employees within the scope of employment.[12]  *See* 17 U.S.C.

---

[11]    The defined class includes natural persons, trusts, and sole proprietorships
(SPA2), but not corporate employers that own "works made for hire," *see* 17
U.S.C. § 201(b).

[12]    Textbooks and other instructional texts, and certain other categories of
works, are also considered works made for hire if there is a signed agreement to
that effect.  17 U.S.C. § 101.  For such works, the court will have to collect and
interpret individual contracts.

§ 101.  Courts applying that test must "consider the hiring party's right to control the manner and means by which the product is accomplished," in light of twelve non-exclusive common-law factors including "the location of the work," "whether the hiring party has the right to assign additional projects to the hired party," and "the tax treatment of the hired party."  *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989).

A different test governs books written before 1978.  A book is a "work for hire" under the Copyright Act of 1909 if it was created at the "instance and expense" of another who had "the right to exercise control over the manner in which the artist executed the work" unless there exists a later written or oral agreement reserving copyright in the writer.  *Ward v. National Geographic Soc'y*, 208 F. Supp. 2d 429, 435, 438 (S.D.N.Y. 2002) (applying 1909 Act and denying summary judgment on the "work for hire" question because of "a genuine issue of fact regarding the existence of an implied-in-fact agreement that he would retain copyright in his work"); *see also Brattleboro Publ'g Co. v. Winmill Publ'g Corp.*, 369 F.2d 565, 567 (2d Cir. 1966) (under the 1909 Act, "copyright shall be in the person at whose instance and expense the work is done").  For works by authors who were not United States nationals at the time the work was created (pre- or post-1978), the court will have to apply the copyright law of the country where the book was created to determine whether it was made for hire.  *See,*

*e.g.*, *Itar-Tass Russian News Agency v. Russian Kurier*, 153 F.3d 82, 90 (2d Cir. 1998) ("Since the works at issue were created by Russian nationals and first published in Russia, Russian law is the appropriate source of law to determine issues of ownership of rights.").  The need to resolve these diverse and complex book-by-book questions weighs heavily against class certification.

> ### 2. Determining each author's ownership of the necessary rights will also require individual examination of publishing contracts

To claim infringement, an author or other individual must establish legal or beneficial ownership of the work.  *See* 17 U.S.C. § 501(b).  The initial owner of a work (not made for hire) is the author, *see id.* § 201(a), but a publishing contract will often contain an exclusive license from the author to the publisher that transfers copyright ownership and divests the author of legal ownership.  A349 ¶ 16; 17 U.S.C. § 101 (an "exclusive license" is one type of "transfer of copyright ownership").  Some publishing contracts also provide for reversion of rights to the author upon occurrence of some event, such as the work going "out of print." A349 ¶ 12.  Accordingly, determining who owns the rights will often require both examination of the publishing contract and inquiry into events that may have triggered a reversion.  There is no central repository of documents showing whether rights in a book have reverted, and some authors (including the three individual Plaintiffs, according to their testimony) do not maintain such records

with respect to all their books.  A350 ¶ 19, A356 ¶ 3, A383, A402-404.  Where no documentary evidence exists—as is especially likely for older books—the court will need live testimony about events that may be in the distant past.

If an author cannot establish legal copyright ownership, he or she can rely on beneficial ownership to assert a claim for infringement, but this too would require book-by-book examination of publishing contracts.  For example, an author who transfers legal title "in exchange for percentage royalties based on sales or license fees" is a beneficial owner, *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984), but an author who receives an "outright fixed payment" for his copyright is not, *see* SPA17 n.5 (recognizing that an author who has "entered into an 'all rights' contract" does not have a beneficial interest in the copyright); *see also Dresser v. William Morrow & Co.*, 105 N.Y.S.2d 706 (App. Div. 1951), *aff'd*, 107 N.E.2d 89 (N.Y. 1952) (adjudicating a dispute regarding a book contract that provided for a transfer of copyright in exchange for an "outright fixed payment").

Moreover, the court would have to determine whether the author's *particular* beneficial interest is implicated by Google Books' uses, *i.e.*, the inclusion of the book in an online electronic database for full-text search with the display of search-generated snippets.  "The legal or beneficial owner of *an exclusive right* under a copyright" can sue only for "infringement *of that particular right* committed while he or she is the owner of it."  17 U.S.C. § 501(b) (emphasis

added); *see, e.g.*, *Silberman v. Innovation Luggage, Inc.,* 2003 WL 1787123, at *6-7 (S.D.N.Y. Apr. 3, 2003) (holding, based on contractual terms, that the plaintiff had transferred away the exclusive right to reproduce his photograph in its entirety as a poster of one size, but retained legal ownership of the exclusive right to reproduce it as a poster of a different size).  In the Library Project, Google is not reproducing or distributing hard-copy books, nor is it distributing or publicly displaying full-text in-copyright ebooks.  Rather, it is scanning books for purposes of creating a user-searchable index and displaying "snippets" of text.  If those uses infringe on any "exclusive right" held beneficially by an author (and of course Google maintains that they do not), they infringe only on one very narrow stick in the copyright bundle.  To determine whether an author is a beneficial owner of that stick, the court would have to conduct book-by-book inquiries into the allocation of rights and royalties in authors' publishing contracts.  For example, the court would have to determine, for each book, whether Google's uses implicate the rights granted to publishers in "promotional use" clauses in publishing contracts, which can vary widely from book to book, and if so, whether the author is entitled to any royalties from those uses.  One such promotional use clause allows the publisher to "publish and permit others to publish for publicity purposes without charge brief excerpts or selections from the Works not to exceed 10% of any Work, without compensation to Author."  A440 ¶ 6(f).  Some contracts make no

mention at all of rights related to full-text search or display of excerpts, whether for promotional purposes or otherwise, *see* A350 ¶ 21; A483-488, or expressly reserve such rights to the author, *see* A371.  To determine whether an author could even claim infringement, the court would thus need to review and interpret the publishing contract for each book at issue, or if the contract is not available, attempt to reconstruct the contract terms using live testimony or other documentary evidence.

The district court thought it could avoid such contract-by-contract adjudications because promotional use clauses authorize "a publisher"—not Google—"to promote [an author's] works," and also because it was not established that "the display of snippets facilitates sales."  SPA34 n.9.  But both points, even if factually correct (and the Authors Guild concedes that the latter is not true as to all books), are irrelevant.  The question is not whether Google has any general right to promote authors' books, or does so in fact, but whether the "natural persons" eligible to be members of the class hold the rights alleged to be infringed, if not legally then as beneficial owners of the exclusive right allegedly infringed by Google's uses.[13]

---

[13]    The district court also appeared to believe that certificates of copyright registration could be used as "*prima facie* evidence of copyright ownership." SPA16.  But a certificate of copyright registration at best shows only who the copyright owner was *at the time of registration*.  In addition, the presumption that facts stated in a certificate of copyright registration are true is rebuttable, and "the

\*       \*       \*

In sum, Plaintiffs' suit presented the district court with a cascade of individualized issues related to each putative class member's claim of infringement. The court would have to determine, as to each book, when a book's copyright was registered in relation to its publication, whether a putative class member obtained or holds legal copyright ownership in the book, and if not, whether he or she has any present beneficial copyright interest in the book, based on a book-by-book examination of the relevant publishing contract. Those inquiries would be required in addition to the individual inquiries related to Google's fair use defense, concerning the nature of the particular book and Google's uses of it and whether the author benefited from (or was harmed by) inclusion of the book in Google Books. The litigation, in other words, would necessarily either splinter into many individual mini-trials to resolve each putative class member's claim of infringement with respect to each book at issue, or result in Google's being unfairly constrained from presenting a full fair use defense to

---

burden of proof in the sense of the risk of nonpersuasion … remains throughout the trial upon the party on whom it was originally cast"—here, Plaintiffs. *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (internal quotation marks omitted). Evidence will often show that the facts in the registration are not true. For example, because many publishing contracts provide that the copyright registration will be made in the author's name even when the publisher is the legal owner, the certificate of registration may erroneously list the author as the owner. A351 ¶ 25.

- 47 -

each claim of infringement.  Neither outcome is consistent with the basic purposes

of class litigation, and the Rule 23 requirements—in particular the Rule 23(b)(3)

predominance requirement—preclude certification in such circumstances.  *See*

*Wal-Mart*, 131 S. Ct. at 2551 ("class cannot be certified on the premise that [the

defendant] will not be entitled to litigate its statutory defenses to individual

claims").  The district court could not have properly found those requirements met

here, and its decision to certify a class was erroneous.

## CONCLUSION

For these reasons, the Court should reverse the district court's class

certification decision.

Respectfully submitted

 /s/ Seth P. Waxman

| | |
|---|---|
| DARALYN J. DURIE | SETH P. WAXMAN |
| JOSEPH C. GRATZ | LOUIS R. COHEN |
| DURIE TANGRI LLP | RANDOLPH D. MOSS |
| 217 Leidesdorff Street | DANIEL P. KEARNEY, JR. |
| San Francisco, CA  94111 | ARI HOLTZBLATT |
| (415) 362-6666 | WILMER CUTLER PICKERING |
| | HALE AND DORR LLP |
| | 1875 Pennsylvania Avenue, NW |
| | Washington, DC  20006 |
| | (202) 663-6000 |

Dated:  November 9, 2012

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 11,547 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Seth P. Waxman
SETH P. WAXMAN

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on this 9th day of November 2012, I caused a pdf

version of the foregoing brief to be filed electronically using the CM/ECF system.

Prior to transmittal, the pdf was scanned for viruses and no viruses were detected.

/s/ Seth P. Waxman
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

I certify that on this 9th day of November 2012, I caused the foregoing brief to be filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.


/s/ Seth P. Waxman
SETH P. WAXMAN

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Page

Order Granting Class Certification, June 11, 2012, Dkt. No. 1026................... SPA1

Opinion Granting Motion for Class Certification, Denying Motion to
    Dismiss Fourth Amended Complaint, May 31, 2012,
    Dkt. No. 1023 ............................................................................... SPA4

Statutes and Rules

    Fed. R. Civ. P. 23 ...................................................................... SPA36

    17 U.S.C.
        § 101 .............................................................................. SPA37
        § 107 .............................................................................. SPA38
        § 201 .............................................................................. SPA38
        § 410 .............................................................................. SPA39
        § 412 .............................................................................. SPA40
        § 501 .............................................................................. SPA40

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

The Authors Guild, Inc., Associational Plaintiff,
Betty Miles, Joseph Goulden, and Jim Bouton,
individually and on behalf of all others similarly
situated,

                Plaintiffs,

          v.

Google Inc.,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 05 CV 8136-DC



~~[PROPOSED]~~ **ORDER GRANTING
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

THIS MATTER HAVING BEEN SUBMITTED TO THE COURT on Plaintiffs'

motion for an Order pursuant to Rule 23 of the Federal Rules of Civil Procedure:

    1.    Certifying the following class ("the Class"):

All persons residing in the United States who hold a United States
copyright interest in one or more Books reproduced by Google as part of
its Library Project, who are either (a) natural persons who are authors of
such Books or (b) natural persons, family trusts or sole proprietorships
who are heirs, successors in interest or assigns of such authors. "Books"
means each full-length book published in the United States in the English
language and registered with the United States Copyright Office within
three months after its first publication. Excluded from the Class are the
directors, officers and employees of Google; personnel of the departments,
agencies and instrumentalities of the United States Government; and Court
personnel;

**SPA1**

2.    Designating Betty Miles, Joseph Goulden, and Jim Bouton as

Representative Plaintiffs for the Class; and

3.    Appointing Boni & Zack LLC as Lead Counsel, and Milberg LLP

and Kohn, Swift & Graf, PC as Class Counsel.

AND THE COURT HAVING READ AND CONSIDERED all the papers filed in

support of and in opposition to the motion, and finding that the members of the Class are

so numerous that joinder of all members is impracticable, there are questions of law or

fact common to the Class, the claims or defenses of the representative parties are typical

of the claims or defenses of the Class, the representative parties will fairly and adequately

protect the interests of the Class, questions of law or fact common to Class members

predominate over any questions affecting only individual members, and a class action is

superior to any other available method for the fair and efficient adjudication of this

controversy,

IT IS HEREBY ORDERED:

1.    The Class is certified, defined as follows:

All persons residing in the United States who hold a United States
copyright interest in one or more Books reproduced by Google as part of
its Library Project, who are either (a) natural persons who are authors of
such Books or (b) natural persons, family trusts or sole proprietorships
who are heirs, successors in interest or assigns of such authors. "Books"
means each full-length book published in the United States in the English
language and registered with the United States Copyright Office within
three months after its first publication. Excluded from the Class are the
directors, officers and employees of Google; personnel of the departments,
agencies and instrumentalities of the United States Government; and Court
personnel;

2. Betty Miles, Joseph Goulden, and Jim Bouton are designated as

Representative Plaintiffs for the Class; and

3. Boni & Zack LLC is appointed Lead Counsel, and Milberg LLP and Kohn, Swift & Graf, P.C. are appointed Class Counsel.

DATED this _____11th_____ day of _____June_____ 2012.

Honorable Denny Chin,
United States Circuit Judge
Sitting By Designation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

THE AUTHORS GUILD <u>et al.</u>,                :

                   Plaintiffs,        :

         - against -              :        **<u>OPINION</u>**

GOOGLE, INC.,                           :        05 Civ. 8136 (DC)
                                                 10 Civ. 2977 (DC)
               Defendant.       :

- - - - - - - - - - - - - - - - - -x

AMERICAN SOCIETY OF MEDIA                :
PHOTOGRAPHERS <u>et al.</u>,
                                         :
                   Plaintiffs,
                                         :
         - against -
                                         :
GOOGLE, INC.,
                                         :
               Defendant.
                                         :
- - - - - - - - - - - - - - - - - -x

**CHIN, Circuit Judge:**

       Before the Court are two motions.  First, defendant

Google, Inc. ("Google") moves to dismiss the claims of the

associational plaintiffs in both of these cases.[1]  Second, the

---

     [1]     The Authors Guild is the only associational plaintiff
in the Authors Guild action.  The associational plaintiffs in the
American Society of Media Photographers ("ASMP") action include:
ASMP, the Graphic Artists Guild, the Picture Archive Council of
America, the North American Nature Photography Association, and
Professional Photographers of America (collectively, the "ASMP
Associational Plaintiffs").

three representative plaintiffs in the Authors Guild action --
Betty Miles, Joseph Goulden, and Jim Bouton (the "AG
Representative Plaintiffs") -- move for class certification.  For
the reasons stated below, Google's motions to dismiss the claims
of the associational plaintiffs are denied, and the motion for
class certification in the Authors Guild case is granted.

**BACKGROUND**

**A.   The Library Project**

          The following facts are not in dispute.  In 2004,
Google announced that it had entered into agreements with several
major research libraries to digitally copy books and other
writings in their collections (the "Library Project").  Since
then, Google has scanned more than 12 million books.  (See Zack
Decl. Ex. 7 at 3).  It has delivered digital copies to the
participating libraries, created an electronic database of books,
and made text available for online searching.  See Authors Guild
v. Google, 770 F. Supp. 2d 666, 670 (S.D.N.Y. 2011) (citing Emily
Anne Proskine, Google's Technicolor Dreamcoat:  A Copyright
Analysis of the Google Book Search Library Project, 21 Berkeley
Tech. L.J. 213, 220-21 (2006) (describing project)).  Google
users can search its "digital library" and view excerpts --
"snippets" -- from books containing search results.  Id.  (See

<u>also</u> Zack Decl. Ex. 7 at 3).  For example, when a user enters a search term on the Google Books website, Google displays a list of books containing that term.  In many cases, when the user clicks on the link to a particular book, Google displays up to three "snippets" of text from that book -- each about an eighth of a page -- each of which contains the search term.  (<u>See</u> Gratz Decl. Ex. 1; Zack Decl. Exs. 7, 10-12).

Millions of the books scanned by Google were still under copyright, and Google did not obtain copyright permission to scan the books.  <u>Authors Guild</u>, 770 F. Supp. 2d at 670 & n.3.

## B.   <u>The Authors Guild Action</u>

In 2005, the Authors Guild and the AG Representative Plaintiffs (together, the "Authors Guild Plaintiffs") brought a class action, charging Google with copyright infringement.  Specifically, the Authors Guild Plaintiffs allege that by reproducing in-copyright books, distributing them to libraries, and publicly displaying "snippets" of those works for search, Google "is engaging in massive copyright infringement."  (AG 4th AC ¶ 4).  The AG Representative Plaintiffs seek damages and injunctive and declaratory relief.  The Authors Guild seeks only injunctive and declaratory relief.

Also in 2005, several publishers initiated their own action. They are not parties to the instant motions.

The Authors Guild Plaintiffs, the publishers, and Google engaged in document discovery and, in the fall of 2006, began settlement negotiations. On October 28, 2008, after extended discussions, the parties filed a proposed settlement agreement. The proposed settlement was preliminarily approved by Judge John E. Sprizzo by order entered November 17, 2008. (ECF No. 64). Notice of the proposed settlement triggered hundreds of objections. As a consequence, the parties began discussing possible modifications to the proposed settlement to address at least some of the concerns raised by objectors and others. On November 13, 2009, the parties executed an Amended Settlement Agreement ("ASA") and filed a motion for final approval of the ASA pursuant to Federal Rule of Civil Procedure 23(e). (ECF No. 768). I entered an order preliminarily approving the ASA on November 19, 2009. (ECF No. 772).

Notice of the ASA was disseminated. As was the case with the original proposed settlement, hundreds of class members objected to the ASA. A few wrote in its favor. The Department of Justice ("DOJ") filed a statement of interest raising certain concerns. (ECF No. 922). Amici curiae weighed in, both for and

-4-

**SPA7**

against the proposed settlement.  I conducted a fairness hearing

on February 18, 2010.  The Authors Guild actively participated in

all these proceedings.

On March 22, 2011, I declined to grant final approval

of the ASA because, inter alia, "the ASA contemplates an

arrangement that exceeds what the Court may permit under Rule

23." Authors Guild v. Google, Inc., 770 F. Supp. 2d 666, 667

(S.D.N.Y. 2011).  Specifically, I found that the ASA was "an

attempt to use the class action mechanism to implement forward-

looking business arrangements that go far beyond the dispute

before the Court." Id. (citation and internal quotation marks

omitted).

## C.    **The ASMP Action**

In 2010, several individual photographers and

illustrators (the "ASMP Representative Plaintiffs") and the ASMP

Associational Plaintiffs (together, the "ASMP Plaintiffs")

brought another class action charging Google with copyright

infringement.  The ASMP Plaintiffs represent individuals who hold

copyright interests in certain photographs, illustrations, and

other visual works that appear within the books that Google has

copied.  They allege that Google's activity in connection with

the Library Project has infringed on their copyrights as well.

(ASMP FAC ¶¶ 4-5).  The ASMP Representative Plaintiffs seek damages and injunctive and declaratory relief.  The ASMP Associational Plaintiffs seek only injunctive and declaratory relief.

D.    **Recent Procedural History**

The Authors Guild Plaintiffs filed their Fourth Amended Class Action Complaint on October 14, 2011.  (ECF No. 985).  The ASMP Plaintiffs filed their First Amended Class Action Complaint on November 18, 2011.  (ECF No. 29).  Google's principal defense in each of these actions is "fair use" under § 107 of the Copyright Act, 17 U.S.C. § 107.

On December 12, 2011, the AG Representative Plaintiffs moved for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.  On December 22, 2011, Google moved to dismiss all associational plaintiffs for lack of standing under Rule 12(b)(1).  The Court held oral argument on both motions on May 3, 2012, and reserved decision.

**DISCUSSION**

First, I will address Google's motions to dismiss the claims of the associational plaintiffs for lack of standing.  Second, I will address the motion for class certification in the Authors Guild case.

**SPA9**

## A.   **Motions to Dismiss**

### 1.   **Applicable Law**

Ordinarily, for a plaintiff to have standing, the plaintiff must "'be himself among the injured.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992) (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)).  One exception to this general rule is "associational standing." Warth v. Seldin, 422 U.S. 490, 511 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."); Nat'l Motor Freight Traffic Ass'n v. United States, 372 U.S. 246 (1963) (per curiam).  "While the 'possibility of such representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy,' [the Second Circuit has] found that, under certain circumstances, injury to an organization's members will satisfy Article III and allow that organization to litigate in federal court on their behalf." Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock, 477 U.S. 274, 281 (1986) (quoting Warth, 422 U.S. at 511) (internal citations omitted).

"[A]n association has standing to bring suit on behalf of its members when:  (a) its members would otherwise have

-7-

**SPA10**

standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  The parties agree that the first two prongs of the Hunt test are satisfied here.  It is the third prong that is at issue and requires further discussion.

The third Hunt prong is not a constitutional standing requirement; it is prudential.  See United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555 (2d Cir. 1996).  "[O]nce an association has satisfied Hunt's first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more." Id. at 556, 558 (holding that Congress did not exceed its authority by authorizing union to sue for violation of statute on behalf of its members).  Indeed, Hunt's third prong focuses on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution."  Id. at 555-57; Alliance for Open Soc'y Int'l,

-8-

**SPA11**

Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 229 (2d Cir.
2011).[2]

Nonetheless, to determine whether the third Hunt prong
is satisfied, courts look to the degree of "individualized proof"
required to assert the claim and grant the requested relief.
Open Soc'y, 651 F.3d at 229-30.  Claims for which damages are
sought, for example, often require proof of harm on an
individualized basis, thereby defeating any "administrative
convenience" achieved by allowing an association to sue on behalf
of individual members.  See Bano v. Union Carbide Corp., 361 F.3d
696, 714 (2d Cir. 2004) (denying standing because claims were for
bodily injury and property damage and observing, "[w]e know of no
Supreme Court or federal court of appeals ruling that an
association has standing to pursue damages claims on behalf of
its members").

By contrast, associational standing may be appropriate
in cases involving pure questions of law or claims for injunctive

---

[2]    In United Food, the Supreme Court identified three
potential purposes of the third Hunt prong.  The Court explained
that the third prong (1) "may well promote adversarial
intensity"; (2) "may guard against the hazard of litigating a
case to the damages stage only to find the plaintiff lacking
detailed records or the evidence necessary to show the harm with
sufficient specificity"; and (3) "may hedge against any risk that
the damages recovered by the association will fail to find their
way into the pockets of the members on whose behalf injury is
claimed."  United Food, 517 U.S. at 556-57.

relief in which little or no individualized proof is required. See, e.g., Brock, 477 U.S. at 287-88 (union could litigate case without participation of any member where only question was whether Secretary properly interpreted statutory provision; once legal issue resolved, amount of damages per union member could be left to state authorities); Warth, 422 U.S. at 515 (denying standing because plaintiffs sought damages, but noting that if an association seeks an injunction, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"); Bldg. & Constr. Trades Council v. Downtown Dev., Inc., 448 F.3d 138, 150-51 (2d Cir. 2006) (standing where plaintiff only sought civil penalties and injunctive relief). "[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." Warth, 422 U.S. at 511 (emphasis added).

Indeed, "[t]he fact that a limited amount of individual proof may be necessary does not, in itself, preclude associational standing." Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press, 990 F. Supp. 245, 249-51 (S.D.N.Y.

-10-

1997) (associational standing where some individual participation necessary to prove that transactions were "contemporaneous" for purpose of Robinson-Patman claim); see also Hosp. Council v. City of Pittsburgh, 949 F.2d 83, 89-90 (3d Cir. 1991) (associational standing where evidence from individual member hospitals would be necessary to support discrimination claim); N.Y. State Nat'l Org. of Women v. Terry, 886 F.2d 1339, 1349 (2d Cir. 1989) (associational standing where affidavits and stipulations were sufficient to provide a basis for relief).

## 2. **Application**

Here, there is no dispute that the associational plaintiffs in these two actions have satisfied the first two prongs of the Hunt test. I conclude that the third prong is satisfied here as well, and the associational plaintiffs therefore have standing. Specifically, the associations' claims of copyright infringement and requests for injunctive relief will not require the participation of each individual association member. To the extent there is any ambiguity on this issue, I resolve it in favor of the associational plaintiffs, as application of the third Hunt prong is prudential and the equities in this case weigh in favor of finding that the associations have standing.

### a. __Individual Participation__

The associational plaintiffs assert claims of copyright infringement on behalf of their individual members. They allege that Google engaged, and continues to engage, in the wholesale copying of books (including any images contained therein) without the consent of the copyright holders, many of whom are association members. (See AG 4th AC ¶¶ 5-6, 18-19; ASMP FAC ¶¶ 4-5, 21). Unlike the representative plaintiffs, the associational plaintiffs request only injunctive and declaratory relief. They seek "an injunction barring Google from continued infringement of the copyrights of plaintiffs and the Class." (AG 4th AC ¶ 52; ASMP FAC ¶ 82). In addition, they seek "a judgment declaring that Google's actions are unlawful." (AG 4th AC ¶ 55; ASMP FAC ¶ 85). Neither the claims asserted nor the relief requested by the associational plaintiffs require a degree of individual participation that precludes associational standing under Hunt.

Limited individual participation will be necessary to establish the associations' copyright infringement claims. To establish infringement, a plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Arista Records, LLC v. Doe 3, 604 F.3d

-12-

110, 117 (2d Cir. 2010); see Fonar Corp. v. Domenick, 105 F.3d 99, 104 (2d Cir. 1997). The second element would not require individual participation because it is undisputed. Google does not deny that it copied millions of books -- original works -- without the permission of the copyright holders. Furthermore, it has displayed snippets of text from those books as well as images contained in the books, without the copyright holders' permission.

For those association members who still own all or part of the copyright to their work, the first element will not require individual participation. Copyright ownership information is available publicly on the United States Copyright Office's Registry. See www.copyright.gov/records (for books registered since Jan. 1, 1978); see also books.google.com/googleb ooks/copyrightsearch.html (for books registered before 1978). Furthermore, copyright registrations constitute prima facie evidence of copyright ownership, 17 U.S.C. § 410(c), and the Court may take judicial notice of them, Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005).[3]

---

[3]    To the extent Google wishes to rebut such evidence (see Perle Decl. ¶ 25), it may seek to do so on a case-by-case basis.

-13-

For those association members who have assigned their copyrights to a third party, but still retain a beneficial interest in their work -- e.g., by receiving royalties -- some individual participation may be required.[4]  If such beneficial ownership cannot be established through public records or Google's records, the association member arguably would have to come forward with a publishing contract or other document proving that he retains a beneficial interest in his work.[5]  This degree of individual participation, however, does not defeat associational standing.  See Coll. Bookstores, 990 F. Supp. at 249-50; Hosp. Council, 949 F.2d at 89-90.  Requiring some individual members to present documentary evidence of their beneficial copyright interest would not make this case administratively inconvenient or unmanageable.  The alternative -- forcing association members to pursue their claims individually -- would be burdensome and inefficient.

---

[4]     Individuals who receive royalties retain standing to sue for copyright infringement.  See Cortner v. Israel, 732 F.2d 267, 271 (2d Cir. 1984) (citing 17 U.S.C. § 501(b)); Harris v. Simon & Schuster, Inc., 646 F. Supp. 2d 622, 632 (S.D.N.Y. 2009).

[5]     If an association member cannot show that he retains a beneficial interest in the copyright -- for example, if he has entered into an "all rights" contract, see May 3, 2012, Oral Arg. Tr. at 16, or created the work as a "work for hire," 17 U.S.C. § 201(b) -- a substantial question will be raised as to whether he should be included in the group on behalf of which the association is suing.

Google claims that its fair-use defense would require the participation of individual association members as well. Specifically, Google contends that two fair-use factors, "the nature of the copyrighted work" and "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107, require an individualized inquiry. (Def.'s Br. at 12). It points out, for example, that creative works and non-creative works are often treated differently in the fair-use analysis. (Id. at 12-13). Furthermore, it argues that snippet display might, for example, affect the market for in-print books more than it affects the market for out-of-print books. (Id. at 13).

While different classes of works may require different treatment for the purposes of "fair use," the fair-use analysis does not require individual participation of association members. The differences that Google highlights may be accommodated by grouping association members and their respective works into subgroups. For example, in the Authors Guild action, the Court could create subgroups for fiction, non-fiction, poetry, and cookbooks. In the ASMP action, it could separate photographs from illustrations. The Court could effectively assess the merits of the fair-use defense with respect to each of these

-15-

**SPA18**

categories without conducting an evaluation of each individual
work. In light of the commonalities among large groups of works,
individualized analysis would be unnecessarily burdensome and
duplicative. See Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S.
Postal Serv., 604 F. Supp. 2d 665, 674-76 (S.D.N.Y. 2009)
(standing not defeated by affirmative defense that may raise
individualized issues; case-by-case analysis more appropriate at
the merits stage).

          Finally, no individual participation would be required
at the relief stage. If a certain group of association members
establishes infringement, and Google fails to prevail on its
fair-use defense with respect to that group, the Court could
simply enjoin Google from displaying snippets of those
association members' works. As the associational plaintiffs only
seek injunctive relief, no individual damage assessment would be
necessary. See Bldg. & Constr. Trades Council, 448 F.3d at 150.

          **b.   Equitable Considerations**

          Even if there were room for disagreement over whether
the third Hunt prong has been met in this case, associational
standing would still be appropriate. As noted above, the third
Hunt prong is not an Article III standing requirement; it is
prudential. Therefore, this Court has a certain degree of

discretion in granting associational standing where, as is undisputedly the case here, the first two prongs are met.

The Supreme Court has acknowledged that associational standing confers certain advantages on individual members and the judicial system as a whole. Specifically, an association "can draw upon a pre-existing reservoir of expertise and capital" that its individual members lack. Brock, 477 U.S. at 289. Furthermore, its participation assures "'concrete adverseness'" and "'sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'" Id. (quoting Harlem Valley Transp. Ass'n v. Stafford, 360 F. Supp. 1057, 1065 (S.D.N.Y. 1973)).

Indeed, the Authors Guild has played an integral part in every stage of this litigation since its inception almost seven years ago. It spent several of those years negotiating with Google on behalf of its members. Only when it became apparent, in 2011, that no settlement would be achieved did Google object to the Authors Guild's participation in the litigation. While the ASMP Associational Plaintiffs have not litigated against Google for as many years as the Authors Guild, their participation nonetheless confers the important benefits articulated in Brock.

Furthermore, given the sweeping and undiscriminating nature of Google's unauthorized copying, it would be unjust to require that each affected association member litigate his claim individually.  When Google copied works, it did not conduct an inquiry into the copyright ownership of each work; nor did it conduct an individualized evaluation as to whether posting "snippets" of a particular work would constitute "fair use."  It copied and made search results available <u>en</u> <u>masse</u>.  Google cannot now turn the tables and ask the Court to require each copyright holder to come forward individually and assert rights in a separate action.  Because Google treated the copyright holders as a group, the copyright holders should be able to litigate on a group basis.

**B.**   <u>**Motion for Class Certification**</u>

    **1.**   <u>**Applicable Law**</u>

A plaintiff seeking class certification must meet the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure -- numerosity, commonality, typicality, and adequacy of representation.  <u>See</u> Fed. R. Civ. P. 23.  If the prerequisites of Rule 23(a) are met, the court then must determine whether the putative class can be certified and maintained under any one of the three subsections of Rule 23(b).  <u>In re Literary Works In</u>

Elec. Databases Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011). Here, plaintiffs seek class certification pursuant to subsection (b)(3) of Rule 23.

The party seeking class certification bears the burden of showing, by a preponderance of the evidence, that the requirements of Rule 23 are met. Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201-04 (2d Cir. 2008). The Second Circuit has clarified the standards governing adjudication of a motion for class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement . . . .

In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006).

### a. **Rule 23(a) Prerequisites**

### i. **Numerosity**

Rule 23(a)(1) requires the putative class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity can be presumed if the class comprises at least forty members. <u>Consol. Rail Corp. v. Town of Hyde Park</u>, 47 F.3d 473, 483 (2d Cir. 1995). Courts do not require "evidence of exact class size or identity of class members." <u>Robidoux v. Celani</u>, 987 F.2d 931, 935 (2d Cir. 1993). If there is any dispute as to the size of the proposed class, however, the court must resolve it and make a finding as to the approximate size. <u>See</u> <u>In re IPO Sec. Litig.</u>, 471 F.3d at 41.

### ii. **Commonality**

Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Rule does not require all questions of law or fact to be common. Indeed, even a single common question will suffice. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2556 (2011) (citations and internal quotation marks omitted); <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.").

-20-

Commonality requires that the class members have "suffered the same injury," Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 (1982), and that their claims depend on "a common contention," Wal-Mart, 131 S. Ct. at 2551. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. Therefore, what matters is "'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" Id. (emphasis in original) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Importantly, Rule 23(a)(2) does not require that the claims of the lead plaintiffs "be identical to those of all other plaintiffs." Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 176 (S.D.N.Y. 2008). Indeed, "'factual differences in the claims of the class do not preclude a finding of commonality.'" Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 73 (S.D.N.Y. 2006) (quoting 5 Moore's Federal Practice § 23.23[2]). Commonality may be found where the plaintiffs' alleged injuries "derive from a

unitary course of conduct by a single system." Marisol A., 126
F.3d at 377.

### iii. **Typicality**

The commonality and typicality requirements of Rule
23(a) tend to merge such that similar considerations inform the
analysis for both prerequisites. Wal-Mart, 131 S. Ct. at 2551
n.5; Marisol A., 126 F.3d at 376. Rule 23(a)(3) requires that
"the claims or defenses of the representative parties are typical
of [those] of the class." Fed. R. Civ. P. 23(a)(3). The
typicality requirement "is satisfied when each class member's
claim arises from the same course of events, and each class
member makes similar legal arguments to prove the defendant's
liability." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d
147, 155 (2d Cir. 2001) (quoting Marisol A., 126 F.3d at 376)
(internal quotation marks omitted); see In re Flag Telecom
Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009)
(quoting Robidoux, 987 F.2d at 936). "[M]inor variations in the
fact patterns underlying [the] individual claims" do not preclude
a finding of typicality. Robidoux, 987 F.2d at 936-37. By
contrast, "unique defenses" that "threaten to become the focus of
the litigation" may preclude such a finding. Flag Telecom, 574
F.3d at 40 (citation and internal quotation marks omitted).

### iv. **Adequacy**

Finally, Rule 23(a) requires that the class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This question involves an inquiry as to whether: "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000).

This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). Not every conflict, however, precludes a finding of adequacy. "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001) (citations and internal quotation marks omitted), superseded on other grounds by rule, Fed. R. Civ. P. 23(g), as stated in Attenborough v. Const. and Gen. Bldg. Laborors' Local 79, 238 F.R.D. 82, 100 (S.D.N.Y. 2006).

-23-

b.   **Rule 23(b)(3)**

A class action may be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010) (quoting Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)) (internal quotation marks omitted).[6]  That an affirmative defense may arise that affects different class members differently "does not compel a finding that individual issues predominate over common ones."  In re Nassau Cnty. Strip Search

---

[6]     Rule 23(b)(3) requires that the district court determine what questions of law or fact are common to the members of the class.  Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 106 (2d Cir. 2007) (internal quotation marks and alteration omitted).

*Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (citation and internal quotation marks omitted).

Together with the "superiority" requirement, the predominance requirement "ensures that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes*, 502 F.3d at 104 (quoting *Amchem Prods.*, 521 U.S. at 615).

    **2.  Application**

In this case, the proposed class is defined as "[a]ll persons residing in the United States who hold a United States copyright interest in one or more Books reproduced by Google as part of its Library Project, who are either (a) natural persons who are authors of such Books or (b) natural persons, family trusts or sole proprietorships who are heirs, successors in interest or assigns of such authors."  (*See* Notice of Mot. for Class Cert. at 2).[7]

---

    [7]  A "Book" is defined as a "full-length book published in the United States in the English language and registered with the United States Copyright Office within three months after its first publication."  *Id.*  Google's directors, officers, and employees are excluded from the class, as well as United States Government and Court personnel.  *Id.*

### a.   **The Rule 23(a) Requirements Are Satisfied**

Google does not dispute that the proposed class satisfies the numerosity, commonality, and typicality requirements of Rule 23(a).  Indeed, those requirements are met here.

The class meets the numerosity requirement.  The class will likely number in the thousands, at least, as Google has scanned millions of books.

The class also meets the commonality requirement.  Every potential class member's alleged injury arises out of Google's "unitary course of conduct."  Marisol A., 126 F.3d at 377.  Specifically, every potential class member has allegedly been injured by Google's Library Project, whereby Google, without authorization, copied books in which the class members own copyright interests.  Whether Google's actions constitute an infringement of these copyright interests and whether Google's use of "snippets" of these works constitutes "fair use" are "common questions" capable of class-wide resolution.  Wal-Mart, 131 S. Ct. at 2551.

Similarly, the typicality requirement is satisfied, as "each class member's claim arises from the same course of

events":  Google's copying of books pursuant to its Library

Project.  See Robinson, 267 F.3d at 155.

Google disputes, however, whether the adequacy

requirement has been satisfied.  It argues that "most [] class

members perceive [Google's copying of their work] as a benefit."

(Def.'s Cert. Opp'n at 9).  Accordingly, it contends that there

is "a fundamental conflict between the interests the named

plaintiffs seek to advance and the interests of absent class

members," rendering the representation inadequate.  (Def.'s Cert.

Opp'n at 8).  In support of this argument, Google points to a

survey in which slightly over 500 authors (58% of those surveyed)

"approve" of Google scanning their work for search purposes, and

approximately 170 (19% of those surveyed) "feel" that they

benefit financially, or would benefit financially, from Google

scanning their books and making snippets available in search.

(Decl. of Hal Poret, Ex. 1 at 14).

Google's argument is without merit.  The lead

plaintiffs are adequate representatives of the class.  First,

their copyright claims do not conflict in any way with the

copyright claims of the other class members.  This is not a case

where the lead plaintiffs, in pursuing their own claims, might

compromise the claims of another group of class members.[8]
Indeed, Google has not pointed to any legal or factual argument
made by the lead plaintiffs that would undermine the copyright
claim of any other class member.

Second, that some class members may prefer to leave the
alleged violation of their rights unremedied is not a basis for
finding the lead plaintiffs inadequate. "'The court need concern
itself only with whether those members who are parties are
interested enough to be forceful advocates and with whether there
is reason to believe that a substantial portion of the class
would agree with their representatives were they given a
choice.'" Eisen v. Carlisle and Jacquelin, 391 F.2d 555, 563 n.7
(2d Cir. 1968) (quoting Jack B. Weinstein, Revision of Procedure:
Some Problems in Class Actions, 9 Buffalo L. Rev. 433, 460
(1960)). Accordingly, the survey results cited by Google do not
preclude a finding of adequacy.

In any case, the survey does not prove that any
individual author would not want to participate in the instant

---

[8]    To be sure, some potential class members' interests may
be different from other members' interests. (See Letter from
Pamela Samuelson, Professor of Law and Information, UC Berkeley
School of Law (Feb. 13, 2012) (on file with the court)). But
this fact does not undermine the overall efficacy of a class
action. If any author feels that her interests are not aligned
with those of the other class members, she may request to be
excluded. See Rule 23(c)(2)(B).

class action.  Importantly, the survey did not ask the respondents whether they would want to be part of a law suit through which they might recover damages.  Indeed, it is possible that some authors who "approve" of Google's actions might still choose to join the class action.  Therefore, the court cannot conclude from the survey that the representative plaintiffs' interests are in conflict with any subset of class members.

####     b.    The Requirements of 23(b)(3) Are Met

Finally, class certification is warranted in this case because the predominance and superiority requirements of Rule 23(b)(3) are satisfied.

####         (i)  Predominance

The common issues presented in this litigation predominate over any individual ones.  As discussed above, these common questions include:  (1) whether Google's actions in connection with the Library Project constituted copyright infringement; and (2) whether the affirmative defense of "fair use" applies.  These issues are largely subject to "generalized proof."  See Cordes, 502 F.3d at 107-08.  Every potential class member's claim arises out of Google's uniform, widespread practice of copying entire books without permission of the copyright holder and displaying snippets of those books for

search.  Whether this practice constitutes copyright infringement
does not depend on any individualized considerations.
Furthermore, the question of "fair use" may be evaluated on a
sub-class-wide basis.  The Court would determine whether the
defense applies to a particular type of book, obviating the need
to evaluate each book individually.  Finally, because
representative plaintiffs only ask for statutory damages, there
is no need for any individualized inquiry into the harm suffered.
See Engel v. Scully & Scully, Inc., 279 F.R.D. 117, 130 (S.D.N.Y.
2011).

       Google argues -- as it did in its motions to dismiss --
that the issue of copyright ownership is not subject to
generalized proof because publishing contracts can create varying
degrees and types of ownership interests, not all of which would
permit the author to sue for infringement.  (Def.'s Cert. Opp'n
11-15).  Accordingly, to obtain relief, it may be that an author
will have to submit some documentation proving that he retains a
beneficial interest in the copyrighted work.  This "individual"
issue, however, does not predominate over the "common" ones
discussed above.[9]

       [9]    Google also contends that many authors do not receive
royalties for "promotional" uses, and therefore have no
beneficial interest in the right to use their work for
promotional purposes.  (Def.'s Cert. Opp'n at 14).  It argues

-30-

**SPA33**

**(ii) Superiority**

Class action is the superior method for resolving this litigation.  It is, without question, more efficient and effective than requiring thousands of authors to sue individually.  Requiring this case to be litigated on an individual basis would risk disparate results in nearly identical suits and exponentially increase the cost of litigation.  <u>See</u> <u>Cromer Fin. Ltd. v. Berger</u>, 205 F.R.D. 113, 133 (S.D.N.Y. 2001).  Class action, by contrast, would achieve economies of time and effort, resolving common legal and factual issues "without sacrificing procedural fairness or bringing about other undesirable results."  <u>Cordes</u>, 502 F.3d at 104.

<u>CONCLUSION</u>

For the reasons stated above, Google's motions to dismiss the claims of the associational plaintiffs are denied and

---

that the display of snippets "facilitates sales" and is therefore a promotional use in which these authors have no beneficial interest.  (<u>Id.</u>).  This argument fails as it is based on the unestablished premise that the display of snippets facilitates sales.  Furthermore, while these authors may have authorized a publisher to promote their works, they have not authorized Google to do so.

-31-

**SPA34**

the AG Representative Plaintiffs' motion for class certification

is granted.

        SO ORDERED.

Dated:    New York, New York
            May 31, 2012

                              DENNY CHIN
                              United States Circuit Judge
                              Sitting by Designation

## RULES AND STATUTES

**Fed. R. Civ. P. 23—Class Actions**

**(a)**    **Prerequisites.**  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

    **(1)**    the class is so numerous that joinder of all members is impracticable;

    **(2)**    there are questions of law or fact common to the class;

    **(3)**    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    **(4)**    the representative parties will fairly and adequately protect the interests of the class.

**(b)**    **Types of Class Actions.**  A class action may be maintained if Rule 23(a) is satisfied and if:

*    *    *

    **(3)**    the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

        **(A)**    the class members' interests in individually controlling the prosecution or defense of separate actions;

        **(B)**    the extent and nature of any litigation concerning the controversy already begun by or against class members;

        **(C)**    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        **(D)**    the likely difficulties in managing a class action.

*    *    *

## 17 U.S.C. § 101—Definitions

*      *      *

A "work made for hire" is—

(1)    a work prepared by an employee within the scope of his or her employment; or

(2)    a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment—

(A)    shall be considered or otherwise given any legal significance, or

(B)    shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

\*        \*        \*

## 17 USC § 107—Limitations on exclusive rights:  Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

## 17 USC § 201—Ownership of copyright

(a)     **Initial Ownership.**—Copyright in a work protected under this title vests initially in the author or authors of the work.  The authors of a joint work are coowners of copyright in the work.

(b)     **Works Made for Hire.**—In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

\*        \*        \*

**SPA38**

**(d)** **Transfer of Ownership.—**

    **(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

    **(2)** Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

*     *     *

## 17 USC § 410—Registration of claim and issuance of certificate

    **(a)** When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office. The certificate shall contain the information given in the application, together with the number and effective date of the registration.

    **(b)** In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.

    **(c)** In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

    **(d)** The effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office.

## 17 USC § 412—Registration as prerequisite to certain remedies for infringement

In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a), an action for infringement of the copyright of a work that has been preregistered under section 408(f) before the commencement of the infringement and that has an effective date of registration not later than the earlier of 3 months after the first publication of the work or 1 month after the copyright owner has learned of the infringement, or an action instituted under section 411(c), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—

    **(1)**    any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

    **(2)**    any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

## 17 USC § 501—Infringement of copyright

**(a)**    Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be.  For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A(a).  As used in this subsection, the term "anyone" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity.  Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

**(b)**    The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a

decision in the case.  The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright.

                    *       *       *