# 12-3200

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————————

THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES,
JOSEPH GOULDEN, and JIM BOUTON, individually and
on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

*v.*

GOOGLE INC.,

*Defendant-Appellant.*

————————————

On Appeal from an Order Granting Certification of a Class Action, Entered on
May 31, 2012, by the United States District Court for the Southern District of New
York, No. 1:05-cv-08136-DC Before the Honorable Denny Chin

————————————

**BRIEF FOR APPELLEES**

————————————

MICHAEL J. BONI
JOSHUA D. SNYDER
JOHN E. SINDONI
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200

SANFORD P. DUMAIN
MILBERG LLP
One Pennsylvania Place
New York, NY 10119
(212) 594-5300

ROBERT J. LAROCCA
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

February 8, 2013

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees are class representatives Betty Miles, Joseph Goulden and Jim Bouton. They are natural persons.

Plaintiff The Authors Guild, Inc. is an unincorporated association whose members are authors. It is neither a class representative nor a member of the certified class. Since this is an interlocutory appeal under Fed. R. Civ. P. 23(f), limited to the propriety of class certification, The Authors Guild is not a party to this appeal.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ........................................................... 6

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 6

STATEMENT OF THE CASE ................................................................. 6

STATEMENT OF FACTS ...................................................................... 7

    A.    Google's Reproduction And Distribution Of Copyrighted Books ................................................................................... 8

    B.    Google's Display Of The Books ................................................. 9

    C.    Google's Purpose Is Commercial ............................................... 10

    D.    The Representative Plaintiffs .................................................... 11

SUMMARY OF ARGUMENT ............................................................... 12

ARGUMENT .................................................................................... 13

STANDARD OF REVIEW .................................................................... 13

I.    THE CLASS REPRESENTATIVES ARE ADEQUATE ........................... 14

    A.    The District Court Adopted And Applied The Correct Legal Standard ............................................................................ 14

    B.    Google's Improper "Survey" Does Not Defeat Class Certification ....................................................................... 21

        (1)    Google's Premises Are Faulty ............................................. 22

        (2)    Class Members Do Not Support Copyright Violations ............ 24

            (a)    The Survey Was Procedurally Improper ....................... 25

   (b)  The Survey Was Misleading And Confusing ................28

II. COMMON QUESTIONS PREDOMINATE AS TO GOOGLE'S
  FAIR USE DEFENSE ...................................................................33

  A. The District Court Adopted And Applied The Correct Legal
   Standard .............................................................................33

  B. The Fair Use Issues Can Be Decided With Common Proof ..............35

III. COPYRIGHT OWNERSHIP IS READILY ASCERTAINABLE
  AND DOES NOT PRESENT INDIVIDUAL ISSUES THAT
  PREDOMINATE OVER ISSUES COMMON TO THE CLASS ...............43

  A. The Class Definition Is Based On Objective Criteria .........................44

  B. Whether A Book Has Been Timely Registered Is Reflected In
   Public Records ....................................................................46

  C. Determining Legal Or Beneficial Ownership Does Not Defeat
   Predominance .....................................................................48

  D. Proof Of Class Membership Is Not Relevant Until The Remedy
   Stage ................................................................................56

CONCLUSION ....................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF ELECTRONIC FILING

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Allen v. Dairy Farmers of America, Inc.*,
   2012 U.S. Dist. LEXIS 164718 (D. Vt. Nov. 19, 2012).....................................19

*Allen v. Dairy Farmers of America, Inc.*,
   279 F.R.D. 257 (D. Vt. 2011) .......................................................................19, 28

*Alston v. Virginia High School League, Inc.*,
   184 F.R.D. 574 (W.D. Va. 1999)..................................................................19, 28

*American Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994) ...........................................................................23, 36

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997).............................................................................................52

*Authors Guild v. Google Inc.*,
   282 F.R.D. 384 (S.D.N.Y. 2012) .....................................................................1, 7

*Authors Guild v. Google Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011) ...........................................................7, 24

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ..................................................................................14

*Bieneman v. City of Chicago*,
   864 F.2d 463 (7th Cir. 1988) ...............................................................................18

*Boisson v. Banian, Ltd.*,
   273 F.3d 262 (2d Cir. 2001) ................................................................................45

*Cambridge Univ. Press v. Becker*,
   863 F. Supp. 2d 1190 (N.D. Ga. 2012).........................................................41, 42

*Campbell v. Acuff–Rose Music, Inc.*,
   510 U.S. 569 (1994)...................................................................35, 36, 39, 42

*Carnegie v. Household International, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ...............................................................................58

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998) ...............................................................36

*Cortner v. Israel*,
  732 F.2d 267 (2d Cir. 1984) ................................................50, 51, 56

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993).............................................................................29

*Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) ...............................................................36

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ...............................................................20

*Dunnigan v. Metro. Life Ins. Co.*,
  214 F.R.D. 125 (S.D.N.Y. 2003) .........................................45, 46, 51

*Eisen v. Carlisle & Jacquelin*,
  391 F.2d 555 (2d Cir. 1968) ...............................................................22

*Erhardt v. Prudential Group, Inc.*,
  629 F.2d 843 (2d Cir. 1980) ...............................................................26

*Fogarazzo v. Lehman Bros., Inc.*,
  263 F.R.D. 90 (S.D.N.Y. 2009) ..........................................................51

*Freeland v. AT&T Corp.*,
  238 F.R.D. 130 (S.D.N.Y. 2006) ..................................................16, 17

*Hampton Hardware, Inc. v. Cotter & Co., Inc.*,
  156 F.R.D. 630 (N.D. Tex. 1994).......................................................25

*Harper & Row, Publishers v. Nation Enterprises*,
  471 U.S. 539 (1985)......................................................................36, 37

*In re American Int'l Group, Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ...............................................................14

*In re Currency Conversion Fee Antitrust Litig.*,
  361 F. Supp. 2d 237 (S.D.N.Y. 2005) ...............................................26

*In re Fedex Ground Package System, Inc., Employment Practices Litig.*,
  2007 U.S. Dist. LEXIS 76798 (N.D. Ind. Oct. 15, 2007) ...........................32, 33

*In re Flag Telecom Holdings, Ltd. Securities Litig.*,
  574 F.3d 29 (2d Cir. 2009) .......................................................................1,14, 32

*In re Franklin Nat'l Bank Sec. Litig.*,
  574 F.2d 662 (2d Cir. 1978) .............................................................................51

*In re Initial Public Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ..........................................................................45, 46

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
  241 F.R.D. 185 (S.D.N.Y. 2007) .......................................................................45

*In re Napster, Inc. Copyright Litigation*,
  2005 U.S. Dist. LEXIS 11498 (N.D. Cal. Mar. 31, 2005) ...............52, 53, 57, 58

*In re Nassau County Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006) ...........................................................................4, 33

*In re OSB Antitrust Litig.*,
  2007 U.S. LEXIS 56617 (E.D. Pa. Aug. 3, 2007) .............................................57

*In re School Asbestos Litig.*,
  842 F.2d 671 (3d Cir. 1988) .............................................................................25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010).........................................................45, 51, 52

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) .........................................................14, 22, 58, 59

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) .............................................................................36

*Island Software & Computer Serv. v. Microsoft Corp.*,
  413 F.3d 257 (2d Cir. 2005) .............................................................................46

*Kleiner v. First Nat'l Bank of Atlanta*,
  751 F.2d 1193 (11th Cir. 1985) .......................................................................25

*Lanzarone v. Guardsmark Holdings, Inc.*,
   2006 U.S. Dist. LEXIS 95785 (C.D. Cal. Sept. 7, 2006) ...................................28

*Marisol A. v. Giuliani*,
   126 F.3d 372, 377 (2d Cir. 1997) .......................................................................34

*Matyasovsky v. Housing Authority of Bridgeport*,
   226 F.R.D. 35 (D. Conn. 2005) ..........................................................................20

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
   246 F.R.D. 293 (D. D.C. 2007) ..........................................................................20

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010) ...............................................................................33

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
   166 F.3d 65 (2d Cir. 1999) .................................................................................36

*Norwalk CORE v. Norwalk Redevelopment Agency*,
   395 F.2d 920 (2d Cir. 1968) .....................................................................3, 16, 22

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
   558 F.2d 1090 (2d Cir. 1977) .............................................................................49

*Phillips v. Klassen*,
   502 F.2d 362 (D.C. Cir. 1974)......................................................................18, 21

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ....................................................................17, 18

*Ringgold v. Black Entertainment Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997) .................................................................................36

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001) ...............................................................................16

*Ruggles v. WellPoint, Inc.*,
   272 F.R.D. 320 (N.D.N.Y. 2011) .......................................................................17

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) .................................................................................36

*Smilow v. Southwest Bell Mobile Sys., Inc.*,
　323 F.3d 32 (1st Cir. 2003)...........................................................................20, 21

*Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*,
　996 F.2d 1366 (2d Cir. 1993) ...................................................................36

*Universal City Studios, Inc. v. Corley*,
　273 F.3d 429 (2d Cir. 2001) .....................................................................34

*Universal City Studios, Inc. v. Nintendo Co.*,
　746 F.2d 112 (2d Cir. 1984) .................................................................29, 31

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
　350 F.3d 1181 (11th Cir. 2003) .............................................................18, 20

*Vulcan Golf, LLC v. Google Inc.*,
　254 F.R.D. 521 (N.D. Ill. 2008)...............................................................53

*Wal-Mart Stores, Inc. v. Dukes*,
　131 S. Ct. 2541 (2011).........................................................................34, 42

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
　396 F.3d 96 (2d Cir. 2005) ...................................................................14, 15

*Ward v. Dixie Nat'l Life Ins. Co.*,
　595 F.3d 164 (4th Cir. 2010) ..................................................................20

## Federal Statutes

17 U.S.C. § 107 ...............................................................................35, 36

17 U.S.C. § 201 ...................................................................................53

17 U.S.C. § 409 ...................................................................................54

17 U.S.C. § 410 ..........................................................................44, 48, 49

17 U.S.C. § 501 ...................................................................................48

28 U.S.C. § 1292 ...................................................................................6

**RULES**

Fed. R. Civ. P. 23(a)(2)...........................................................................34

Fed. R. Civ. P. 23(a)(4)...........................................................................14

Fed. R. Civ. P. 23(b)(3).................................................................20, 26, 33

Fed. R. Civ. P. 23(c)(2)...........................................................................26

Fed. R. Civ. P. 23(d)...............................................................................26

Fed. R. Civ. P. 23(e)...............................................................................26

Fed. R. Civ. P. 23(f).................................................................................6

Fed. R. Civ. P. 23(g)...............................................................................14

**OTHER AUTHORITIES**

5 James William Moore et al., *Moore's Federal Practice* § 23.21 ........................45

6 William F. Patry, *Patry on Copyright* § 21:25 (2012).........................................50

Shari Seidman Diamond, "Reference Guide on Survey Research,"
    *Reference Manual on Scientific Evidence (Second)* (2000) ...............................28

*Manual for Complex Litigation (Second)* (1984) ....................................................24

*Manual for Complex Litigation (Third)* (1995) .....................................................24

*Manual for Complex Litigation (Fourth)* (2004)............................24, 25, 28, 29, 45

1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3.30
    (4th ed. 2002).................................................................................20

1 William Rubenstein, *Newberg on Class Actions* § 3.65 (5th ed. 2012) ...............17

Sergey Brin, *A Library to Last Forever*, N.Y. Times, Oct. 8, 2009, at A-31...........8

7AA Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1784 (3d ed. 1999) ........................................................................57

7A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1760 (3d ed. 2011) .................................................................44, 45

## INTRODUCTION

In certifying the class of authors in this copyright infringement lawsuit, Judge Chin applied the controlling legal standards of this Circuit and the Supreme Court to the record of this case, and determined the criteria for class certification are met. *Authors Guild v. Google Inc*., 282 F.R.D. 384 (S.D.N.Y. 2012), SPA1-35. This Court reviews for an abuse of discretion, applying a more deferential standard when the class has been certified than when certification has been denied. *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 34 (2d Cir. 2009). There was no abuse of discretion in the certification decision.

Google is without dispute a remarkable search engine. It searches and retrieves information made available to the public on the Internet. In this case, however, Google crossed the lawful boundaries by making use of offline content. It digitized millions of copyrighted physical books and displays selections from the books in response to Internet search queries, all without the permission of or compensation to the copyright holders. Google's brief barely mentions its verbatim copying of books in their entirety. It minimizes its Internet display of the books' verbatim content as a few "snippets," when in reality nearly 80% of the books' content is available for display. Google claims its purpose is philanthropic. Its internal documents show it to be plainly commercial.

1

In certifying the class,[1] Judge Chin appreciated that: (1) Google's copying process has been identical for every class member, and if there were no class, each individual author would be forced to re-prove Google's uniform practices countless times using identical evidence; (2) Google's snippet display protocols are uniform and common to the class; (3) Google's fair use defense is a common, central issue for litigation and, were there no class, the same legal issue based upon the same conduct would have to be re-litigated endlessly; and (4) plaintiffs seek the identical statutory damage minimum of $750 for each book infringed by Google, mooting any issue as to whether the calculation of damages presents individualized issues.

---

[1] The certified class consists of:

> All persons residing in the United States who hold a United States copyright interest in one or more Books reproduced by Google as part of its Library Project, who are either (a) natural persons who are authors of such Books or (b) natural persons, family trusts or sole proprietorships who are heirs, successors in interest or assigns of such authors. "Books" means each full-length book published in the United States in the English language and registered with the United States Copyright Office within three months after its first publication. Excluded from the Class are the directors, officers and employees of Google; personnel of the departments, agencies and instrumentalities of the United States Government; and Court personnel.

(SPA1.)

Google attacks class certification on three grounds. First, it argues there is a "fundamental antagonism" between plaintiffs and other class members, an argument without record basis. Every plaintiff and class member has the same copyright interests and identical statutory damages.

Plaintiffs collectively own copyrights in fiction, non-fiction, and academic books, as do class members. Google's manufactured "antagonism" depends upon its repeated misstatement that plaintiffs seek to "dismantle" Google Books whereas, according to an invalid and misleading survey, class members supposedly support Google Books. Neither premise is accurate. Moreover, "[t]he fact that some members of the class were personally satisfied with the defendants' [illegal actions] is irrelevant." *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 937 (2d Cir. 1968).

The glue that holds the class together establishes there is no conflict at all: plaintiffs and every class member timely registered their books (or had their publishers do so), an act that evinces a desire for maximum copyright protection. Plaintiffs are adequate to represent other authors of timely registered books that were grist for Google's mass digitization operation.

Google's second attack – that its fair use defense requires individualized adjudications – is also incorrect. Google filed a summary judgment motion contending that the entirety of its fair use defense can be adjudicated using only

generalized, class-wide evidence (Docket 1032). Google has admittedly scanned

millions of books of every genre and type and without regard to content,

distributed digital copies of those books to cooperating libraries, and displayed

verbatim text from those books, all based on uniform guidelines of its own making.

"[W]hen plaintiffs are allegedly aggrieved by a single policy of defendants, such as

the blanket policy at issue here, the case presents precisely the type of situation for

which the class action device is suited . . . ." *In re Nassau County Strip Search

Cases*, 461 F.3d 219, 228 (2d Cir. 2006) (internal quotation marks and citations

omitted).

It is duplicitous for Google to implement a single, mass digitization policy

affecting the rights of so many authors while at the same time argue that its policy

must be analyzed in countless separate lawsuits.

Google's third attack claims that determining membership in the class is

highly individualized. For one thing, proof of membership in a class, i.e.,

entitlement to damages, is not relevant until the remedy stage, and, like individual

damages issues, does not undermine the propriety of class certification. For

another, Google's contention is wildly overblown. Class membership is readily

determined based on objective criteria and documentary evidence. Whether a book

has been timely registered can be determined from publicly available copyright

records that are entitled to a legal presumption of validity. Whether a work was

"made for hire" can be determined on the face of the same records. Whether an author granted "promotion" or other rights to his publisher is of no moment because (1) the author nevertheless is a beneficial owner entitled to sue Google for infringement, (2) no class member granted any such rights to Google, and (3) there is no evidence Google's snippets were designed to promote books.

Objective indicia of class membership, e.g., registration documents, publishing contracts, royalty statements, are no more complicated than the confirmation slips and other documents necessary to prove membership in a securities fraud class, or the purchase orders, receipts and other documents necessary to prove membership in an antitrust class.

Finally, Google (and its *amici*) extol the supposed public benefits of Google's copyright violations. These efforts fail for two reasons. First, they are completely irrelevant to a class certification inquiry. Second, if anything, Google's extolling public benefits merely identifies another common issue, i.e., whether and to what extent the existence of public benefits arising out of Google's mass infringement is relevant to its fair use defense.

Distilled to their essence, Rule 23's requirements are designed to assess whether judicial economy is better served by adjudicating sufficiently similar claims in one representative action, and, if so, whether plaintiffs and their counsel are suitable representatives of the absent class members. Because district courts

5

preside over, i.e., "manage," class actions, an informed finding by them that the case in question will be manageable as a class action is accorded substantial deference. The same is true as to findings of adequacy of representation. Judge Chin carefully considered and analyzed the same arguments Google makes here, and the same record that is before this Court. In a thorough opinion addressing all such arguments, Judge Chin concluded plaintiffs have no disabling conflicts with the class, that common issues predominate over any individual issues, and that the case will be manageable to proceed as a class action. His ruling was the opposite of an abuse of discretion.

## STATEMENT OF JURISDICTION

Appellees agree this Court has jurisdiction pursuant to 28 U.S.C. § 1292(e) and Fed. R. Civ. P. 23(f).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the District Court abused its discretion in certifying a class of authors whose copyrighted books Google has copied and displayed without permission pursuant to a single, uniform mass digitization scheme.

## STATEMENT OF THE CASE

This case was filed in 2005 by authors and The Authors Guild shortly after Google launched its mass digitization program. After substantial discovery was conducted for a year or so, the parties entered into long, complex settlement

negotiations. In 2008, the parties presented a settlement to the District Court, and then presented an amended settlement in 2009. Judge Chin disapproved the settlement in March 2011, holding that its structure was outside the scope of the relief sought in the complaint. *Authors Guild v. Google Inc*., 770 F. Supp. 2d 666 (S.D.N.Y. 2011).

After attempts to negotiate another settlement, the parties resumed litigation efforts, producing and reviewing documents, completing depositions, filing expert reports, and moving for and opposing class certification. On May 31, 2012, Judge Chin certified the litigation class. *Authors Guild v. Google Inc*., 282 F.R.D. 384 (S.D.N.Y. 2012). On July 27, 2012, the parties filed cross-motions for summary judgment. (Docket 1031-56.) The parties were briefing responses when this Court granted Google's Rule 23(f) petition. This Court stayed litigation in the District Court pending this appeal.

## STATEMENT OF FACTS

Google operates the largest Internet search engine in the world. For the year ended December 31, 2011, Google reported over $36.5 billion in advertising revenues. (Docket 1054 ¶ 11.)[2]

---

[2] Docket 1054 is Plaintiffs' Rule 56.1 Statement of Undisputed Facts filed in Support of Summary Judgment on August 3, 2012, which contains record citations to each factual statement.

## A.    Google's Reproduction And Distribution Of Copyrighted Books

In December 2004, Google announced it would "digitally scan books" so that "users worldwide can search them in Google." (*Id.* ¶ 25.) Google obtained these books from cooperating libraries. (*Id.*) Google's CEO stated the objective was to copy digitally all of the world's books, irrespective of content.[3]

To copy *en masse*, Google set up state-of-the-art scanning facilities in California, Ann Arbor and Boston. (Docket 1054 ¶ 31.) Google engaged in "bulk scanning," with libraries providing "carts of books." (*Id.* ¶ 34.) Google used about three hundred scanning machines. (*Id.* ¶ 35.) The scanning alone cost $30 to $40 million a year. (*Id.*) Some libraries allowed Google to scan only public domain books, while others allowed Google to scan in-copyright books as well. (*Id.* ¶ 36.) In exchange for access to a library's print books, Google distributes digital copies of the scanned books to the contributing library. (*Id*. ¶ 30.)

Google copied books regardless of content. (*Id.* ¶ 39; A692-94, 863-67, CA11-16.) Google made no effort to obtain permission from rightsholders, or to compensate them for the copying, distribution, or subsequent display. (Docket 1054 ¶¶ 54-55; A524-26.) Google maintains records identifying all books copied. (Docket 1035 ¶ 6.)

---

[3] Sergey Brin, *A Library to Last Forever*, N.Y. Times, Oct. 8, 2009, at A-31.

Once scanned, each book is electronically reproduced numerous times for placement on servers and back-up tapes. (Docket 1054 ¶¶ 40-41; A520, 842-43.) The copying of in-copyright books continues to this day.

Google has digitally copied over four million in-copyright English language books. (Docket 1054 ¶ 53.) It has also distributed complete digital copies of over 2.7 million in-copyright books to libraries. (*Id*.)

## B.    Google's Display Of The Books

Since 2005, Google has displayed verbatim text from these books on the Internet in response to search requests. For each request, Google searches the complete text of the digitized books. (*Id.* ¶ 42; A523, 873.) Google divides each page into eighths, which Google calls a "snippet" and which are displayed verbatim in response to a search query. (Docket 1054 ¶ 44; A877.)

Google falsely claims it displays just three snippets of each book. (Google Br. 7.) By performing multiple searches using different search terms (including multiple search terms suggested by Google), a single user can view far more than three snippets. (Docket 1054 ¶ 45; A139-216.) For example, Google displayed to one user, who made a series of consecutive searches of plaintiff Jim Bouton's baseball classic *Ball Four*, about 37 different snippets, consisting of over 1900 words of verbatim expression. (Docket 1054 ¶ 46; A139-204.) Even minor

9

variations in search terms will result in different displays of text. (Docket 1054 ¶ 47; A205-16.)

Google displays snippets from all portions of the books, except for just 10% of blacklisted content. (Docket 1054 ¶¶ 48-50; A848.) Google displays about 78% of every in-copyright book.[4]

Google characterizes its mass digitization program as an "index." (*See, e.g.*, Google Br. 2, 3, 5, 8.) Real book indices have been created for many decades by many entities without objection because they were created without violating Section 106 of the Copyright Act – i.e., they were created without wholesale, unauthorized digitization, distribution and display of in-copyright books.

## C.    Google's Purpose Is Commercial

Google undertook these actions for commercial gain. (Docket 1054 ¶ 75; A676, 846.) Google's 2003 internal presentation states that "[w]e want web searchers interested in book content to come to Google not Amazon; . . . [e]verything else is secondary . . . but make money." (Docket 1054 ¶ 76.)

A subsequent internal presentation confirmed that Google's purpose is to "[g]ain a competitive advantage." (*Id.* ¶ 77.) Google Books' former chief engineer Dan Clancy testified it would "give us an advantage." (*Id.* ¶ 78; CA10.) Google

---

[4] Google claims to blacklist 10% of each book and one snippet per page. *Id.* Thus 77.5% of each book (90% minus 12.5%) is available for display.

10

earns billions of dollars by selling advertisements in response to search queries. (Docket 1054 ¶ 79.)

Mr. Clancy said Google invested $180 million in scanning alone. (*Id.* ¶ 81.) To protect this commercial investment, Google forbade its cooperating libraries from distributing digital copies to Google's competitors. (*Id.* ¶ 82.) As Mr. Clancy testified, "we did not want third parties that might be building an equivalent service to be able to obtain the documents directly from us." (*Id.* ¶ 83.)

### D.    The Representative Plaintiffs

Plaintiffs Jim Bouton, Betty Miles and Joseph Goulden are United States residents who authored and own United States copyrights in books that have been copied, distributed and displayed by Google without authorization. (Docket 1054 ¶ 1-4, 6; A217-25, 523-24.) Each has the rights in at least one book that was infringed by Google. Google procured many documents from, and took the depositions of, each plaintiff. Google does not contend any plaintiff is not a member of the class or is ignorant of the nature of and claims in this action.

Plaintiffs' claims are typical of the claims of the class, and Google concedes this critical fact. It is also undisputed that plaintiffs collectively have legal and/or beneficial ownership interests in books that are fiction, academic, non-fiction, in-print and out-of-print.

11

## SUMMARY OF ARGUMENT

The District Court did not abuse its discretion in rejecting Google's scattershot attacks on class certification. First, Google contends there is "fundamental antagonism" between plaintiffs, who Google says seek to "dismantle" Google Books, and a number of class members who support Google because they "feel" they benefit financially from and as consumers of Google Books. Google's argument fails on the facts and as a matter of law. Plaintiffs do not seek to dismantle Google Books. The suggestion class members support Google Books rests entirely on an invalid and misleading "survey" Google improperly conducted to defeat class certification. Google has no evidence a single author has financially benefitted from Google Books. Case law makes clear speculative conflicts do not defeat adequacy; nor do class members who support the defendant's illegal conduct. The cases Google relies on are distinguishable.

Second, the District Court correctly concluded the common questions of law or fact predominate over any individual questions. Google argues this is erroneous, conjuring phantom complexities to its fair use defense. Google, however, concedes: (1) the liability evidence is general and class-wide; (2) the statutory damage amount ($750 per book) presents no individualized issues; and (3) at least a substantial part of its fair use defense involves common, generalized proof. Most telling is that Google has moved for summary judgment, arguing its fair use

positions apply to every book at issue. Google's arguments here starkly contradict its representations to the District Court in its pending summary judgment motion.

Third, Google asserts that determining copyright ownership presents individualized issues. Judge Chin properly concluded that questions of ownership of individual books, which can be ascertained based on objective criteria, do not predominate over issues common to the class. Copyright registration can be determined from publicly available records entitled to a legal presumption of validity. Additionally, because either the legal *or* the beneficial owner of the copyright has standing to sue for infringement, Judge Chin properly rejected Google's contention that the court would be required to engage in fact-intensive analyses to determine membership in the class and eligibility for damages.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews class certification for abuse of discretion, affording district courts more discretion where, as here, a class has been certified. As this Court recently summarized the standard:

> We review both a district court's ultimate decision on class certification and its rulings as to individual Rule 23 requirements for abuse of discretion. When reviewing a denial of class certification, we accord a district court noticeably less deference than when we review a grant of class certification. To the extent a district court's ruling on an individual Rule 23 requirement involves an issue of law, our review is de novo.

*In re Am. Int'l Group, Inc. Sec. Litig.,* 689 F.3d 229, 237 (2d Cir. 2012) (citations omitted).

## I.    THE CLASS REPRESENTATIVES ARE ADEQUATE

Google challenges plaintiffs' adequacy under Rule 23(a)(4). Adequacy is a two-pronged analysis: (1) the named plaintiffs must not have claims antagonistic to or in conflict with other class members, and (2) class counsel must be qualified, experienced, and generally able to conduct the litigation. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir. 2000). Google challenges only the first prong.

### A.    The District Court Adopted And Applied The Correct Legal Standard

The District Court employed the correct legal standard for judging adequacy (*see* SPA26), recognizing that "'[t]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage.'" *Id.* (quoting *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir. 2001)(citations and internal quotation marks omitted), *superseded on other grounds by rule,* Fed. R. Civ. P. 23(g), *as stated in Attenborough v. Const. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 100 (S.D.N.Y. 2006)); *see also Flag Telecom,* 574 F.3d at 35-36 (single class could be certified despite potential conflict between class members holding two types of claims); *Wal-Mart Stores,*

*Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 110-11 (2d Cir. 2005) (plaintiffs do not need

complete identity with class members to be adequate representatives).

Judge Chin applied this standard to the record, finding that adequacy had

been established:

> [T]heir copyright claims do not conflict in any way with
> the copyright claims of the other class members. This is
> not a case where the lead plaintiffs, in pursuing their own
> claims, might compromise the claims of another group of
> class members. Indeed, Google has not pointed to any
> legal or factual argument made by the lead plaintiffs that
> would undermine the copyright claim of any other class
> member.

(SPA30-31, footnote omitted.)

This is correct. Each plaintiff is a United States resident who holds a United

States copyright interest in one or more books copied and displayed by Google.

Plaintiffs' interests are aligned with the other class members. All took affirmative

steps to secure maximum copyright protection by timely registering their books (or

having their publishers do so). Plaintiffs seek an adjudication that Google's mass

digitization program constitutes copyright infringement, and seek statutory

damages of $750 per book copied, no more than any other class member. It is

difficult to conceive of a case with a greater alignment of interests.

Further, plaintiffs have vigorously pursued the interests of the class by

possessing a good understanding of the case, responding to document requests,

sitting for their depositions and staying apprised of the litigation. (A595-608

15

(Bouton); A610-632 (Goulden); A634-646 (Miles).) *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001) ("assurance of vigorous prosecution" is a factor in adequacy).

Plaintiffs collectively have copyright interests in fiction, non-fiction, academic, in-print and out-of-print books that have been scanned and displayed by Google. (Docket 1054 ¶¶1-4; A140-225.) Betty Miles' late husband taught at Columbia Teacher's College, and her copyright interests include his textbooks, such as *Organization Development in Schools,* that Google has scanned and displayed. She testified that "[h]e was an academic author" who "wrote textbooks," and that she is an adequate representative of all authors, because, "I know a great many academics, as I know a great many plain authors and I know that no matter what kind of book they are writing, they are all concerned about their copyright and the rights of holders of copyright to control their books." (A645-46.) *Accord* Bouton: "Whether it is a gardening book or a history book or academic textbook or a baseball book, we are all protected by copyrights." (A607.)

Google and its *amici* seek to create a schism between "academic" and "non-academic" authors. But as this Court held: "The fact that some members of the class were personally satisfied with the defendants' relocation efforts is irrelevant [to class certification]." *Norwalk CORE,* 395 F.2d at 937; *see also Freeland v. AT&T Corp.*, 238 F.R.D. 130, 142 (S.D.N.Y. 2006) (rejecting defendants'

argument that some members benefitted from the challenged practices, and finding
adequacy because plaintiffs "possess the same interest and suffer the same injury
as the class members") (citation omitted). "Disapproval of the action by some class
members will not preclude a class action on the ground of inadequate
representation." 1 William Rubenstein, *Newberg on Class Actions* § 3.65 (5th ed.
2012).

Even if Google could show some class members stood to benefit from its
practices, "when maintaining the status quo involves continuation of an illegal
practice, courts are reluctant to find the class representatives inadequate." *Id.*
§ 3:64 (citing *Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 338 (N.D.N.Y. 2011))
("Adequacy is not undermined where the opposed class members' position
requires continuation of an allegedly unlawful practice."). Moreover, Google's
(and the amicus professors') argument is based on the academics' vantage point as
consumers of Google Books, not from the position of authors whose books were
timely registered and are thus undeniably affected in the same way as plaintiffs.

Google relies upon cases where courts found a genuine antagonism inherent
in the litigation between the plaintiffs and class members, or among class members
themselves. (Google Br. 18-21.) None are from this Circuit, and none involve
copyright infringement litigation. In *Pickett v. Iowa Beef Processors,* 209 F.3d
1276, 1277-80 (11th Cir. 2000), the class included cattle producers attacking

17

"forward contracts" as illegal and cattle producers benefitting from those same contracts. In *Valley Drug Co. v. Geneva Pharmaceuticals, Inc*., 350 F.3d 1181, 1189-91 (11th Cir. 2003), the plaintiffs claimed Abbot's market foreclosure of generic drugs harmed them, while the three largest class members had financially benefitted from this very foreclosure.

In *Bieneman v. City of Chicago,* 864 F.2d 463, 465 (7th Cir. 1988), an individual complained of O'Hare Airport's noise and pollution, and sought to represent a class of 300,000, including some class members who benefitted from O'Hare's increased traffic (e.g., homeowners who want to sell their property to businesses) and others who had disparate impact based "on topography, flight patterns, and many other variables." The court stated, "[n]o wonder courts routinely decline to certify classes in airport-noise cases." *Id.*

In *Phillips v. Klassen,* 502 F.2d 362 (D.C. Cir. 1974), the plaintiff sought to represent thousands of postal employees who had accepted bonuses and early retirement benefits. He claimed he had been "coerced" and sought to represent a highly subjective class of those "who were coerced into premature retirement." *Id.* at 365. The court held that the voluntary retirement program "was probably received quite differently by different employees," including a number who were "affirmatively pleased to have the opportunity to resign with retirement benefits and a substantial bonus." *Id.* at 366.

In *Allen v. Dairy Farmers of America, Inc.,* 279 F.R.D. 257 (D. Vt. 2011), dairy farmers sued milk producers and milk cooperatives for conspiring to depress the price of milk. The plaintiffs' proposed class included dairy farmers who belonged to the very defendant organizations being sued for damages and injunctive relief. The court described these class members as "quasi-defendants." *Id.* at 273 n.19. The court held this created "a fundamental conflict with regard to both the monetary and injunctive relief sought . . . ." *Id.* at 274. Even in that case, however, the solution was to create two sub-classes.[5]

In *Alston v. Virginia High School League, Inc.,* 184 F.R.D. 574 (W.D. Va. 1999), the plaintiffs sought to change the seasons in which girls sports would be played. The court found a "schism between girls who may benefit from reclassification and those who are injured by reclassification." *Id.* at 579. Even the plaintiffs' experts agreed that "there is a conflict between satisfying the majority of the girls in the class and satisfying these plaintiffs." *Id.*

---

[5] *Dairy Farmers* actually supports plaintiffs here, not Google. In that case the court ultimately certified a modified class notwithstanding the objections of some putative class members, concluding they "should not be heard to complain that the court has ordered the discontinuation of illegal conduct even if they find such conduct beneficial and would like to preserve the status quo." *Allen v. Dairy Farmers of Am., Inc.*, 2012 U.S. Dist. LEXIS 164718, at *23 (D. Vt. Nov. 19, 2012).

In contrast, courts have routinely rejected defense claims of antagonism that vitiate adequacy. *See* decisions of this Court cited on p. 14-15 above; *Ward v. Dixie Nat'l Life Ins. Co.,* 595 F.3d 164, 179-80 (4th Cir. 2010) (rejecting argument that increased insurance premiums differently impacting plaintiff and class members created a fundamental antagonism); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007) (holding no conflict where class representative was harmed by defendants' antitrust conduct, but three largest class representatives had benefitted from same conduct, and citing decisions criticizing *Valley Drug*); *Matyasovsky v. Housing Auth. of Bridgeport,* 226 F.R.D. 35, 42-43 (D. Conn. 2005) (no conflict even though plaintiffs and class members all sought access to the same limited number of public housing units).

Further, the opt-out provision of Rule 23(b)(3) "is an important method for determining whether alleged conflicts are real or speculative. It avoids class certification denial for conflicts that are merely conjectural and, if conflicts do exist, resolves them by allowing dissident class members to exclude themselves from the action." 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3.30 (4th ed. 2002); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268-69 (2d Cir. 2006) (no conflict in certifying a class where the class representatives already knew the full extent of their injury while other class members did not, where class members had the opportunity to opt out); *Smilow v. Sw. Bell Mobile*

20

*Sys., Inc.*, 323 F.3d 32, 43 (1st Cir. 2003) (because opt-out was an option,

"hypothetical conflict provides no basis for decertification"). Google cites *Philips*

*v. Klassen, supra,* for the proposition that the opt-out mechanism is not a sufficient

answer (Google Br. 24), but that early retirement case turned on its specific facts

and the court's concerns that adequate remedies could not be administered for opt-

outs. 502 F.3d at 367.

## B.     Google's Improper "Survey" Does Not Defeat Class Certification

Because there is no actual antagonism, Google has tried to manufacture one.

It suggests there is a "fundamental antagonism" based upon a "survey" of class

members Google conducted in early 2012, while the class certification motion was

pending. Judge Chin summarized Google's survey as showing that "500 authors

(58% of those surveyed) 'approve' of Google scanning their work for search

purposes, and approximately 170 (19% of those surveyed) 'feel' that they benefit

financially, or would benefit financially, from Google scanning their books and

making snippets available in search." (SPA30.)

The District Court held that "the survey results do not preclude a finding of

adequacy":

> [T]hat some class members may prefer to leave the
> alleged violation of their rights unremedied is not a basis
> for finding the lead plaintiffs inadequate. "'The court
> need concern itself only with whether those members
> who are parties are interested enough to be forceful
> advocates and with whether there is reason to believe that

21

a substantial portion of the class would agree with their representatives were they given a choice.'" *Eisen v. Carlisle and Jacquelin,* 391 F.2d 555, 563 n.7 (2d Cir. 1968)….

In any case, the survey does not prove that any individual author would not want to participate in the instant class action. ***Importantly, the survey did not ask the respondents whether they would want to be part of a law suit through which they might recover damages.*** Indeed, it is possible that some authors who "approve" of Google's actions might still choose to join a class action. Therefore, the court cannot conclude from the survey that the representative plaintiffs' interests are in conflict with any subset of class members.

(SPA31-32, emphasis supplied.)

Google argues Judge Chin "erred as a matter of law in failing to give any weight to this evidence of a fundamental conflict in the class." (Google Br. 21.) To the contrary, Judge Chin considered the survey, and found it an insufficient reason to deny certification. This was not an abuse of discretion, but rather was substantively correct under this Court's decision in *Norwalk CORE,* 395 F.2d at 937. Google's alleged "conflict" is hypothetical and speculative at best and certainly not "fundamental." *Visa Check*, 280 F.3d at 145.

### (1)    Google's Premises Are Faulty

Google's argument is based upon three false premises: (1) plaintiffs seek to "dismantle" Google Books (Google Br. 20); (2) class members support Google

22

Books, based upon Google's survey (*id.*); and (3) Google Books benefits class members. (*Id.* at 23.) Each premise is faulty.

As to the third, Google pretends there is evidence Google Books financially benefits class members. In reality, Google admitted it has no idea whether its snippets have actually led to the sale of a single book. (A678-79, 702.)

The first premise is also false. As Google knows full well, plaintiffs do not seek to dismantle Google Books.[6] Google points to no deposition testimony, no documents they authored, and no interrogatory answers, in support of its characterization. Rather, it simply cites to plaintiffs' claim for injunctive relief. (Google Br. 17, citing A131-32 ¶¶ 45-52.) Count II of the operative complaint, however, seeks an injunction against Google's ongoing "continued infringement of the copyrights of plaintiff and the Class," not an injunction against Google Books operating in a legal manner.[7]

---

[6] Plaintiffs have at least twice disabused Google of its false assertion, yet Google continues to press it just the same. *See* Pls.' Answer in Opposition to Def.'s Petition for Permission to Appeal Pursuant to Fed. R. Civ. P. 23(f) (No. 12-2402, Docket 12), p. 10; Pls.' Reply Memo. in Support of Motion for Class Certification (Docket 1008), p. 6 n.4.

[7] There are other types of equitable relief short of pulling the plug. *See, e.g.*, *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 932 n.19 (2d Cir. 1994) ("[T]his appears to be an appropriate case for exploration of the possibility of a court-imposed compulsory license.").

Google's argument is ironic, because plaintiffs supported Google Books during the class action settlement proceedings in 2008-2011, *see Authors Guild,* 770 F. Supp. 2d at 670-72, and the class representatives would continue to do so, if Google Books was operated in a lawful manner.

### (2)    Class Members Do Not Support Copyright Violations

The final premise – that class members support Google's infringement – is equally meritless.[8] Google relies entirely upon the survey it commissioned, a survey undertaken for the sole purpose of defeating class certification. Neither the District Court nor plaintiffs' counsel were apprised of the survey until it was completed, contrary to the *Manual for Complex Litigation* published by the Federal Judicial Center.[9]

Google sought to contact 15,256 authors (4,962 by email and 10,294 by telephone). (A833-34.) Its survey consists of 880 responses (less than 6%), 756 by phone and 124 by Internet. (A233, 243.) Google's purpose was to elicit

---

[8] Indeed, the fact that the class is limited to authors whose books were timely registered signifies that all class members have affirmatively sought the fullest protection afforded by the Copyright Act.

[9] The *Manual for Complex Litigation (Second)*, p. 89 (1984) states that "the parties should be required, before conducting any poll, to provide other parties with an outline of the proposed form and methodology, including the particular questions that will be asked . . . and resolve any disagreements concerning the manner in which the poll is to be conducted." *Accord Manual for Complex Litigation (Third)*, p. 102 (1995) and *Manual for Complex Litigation (Fourth)*, p. 103 (2004).

information from potential class members to frustrate their legal right to be

represented in a class action. In furtherance of that end, Google did not disclose to

those surveyed (1) the existence of this lawsuit, (2) their right to participate in it, or

(3) their answers would be used by Google to seek to deprive them of this right. As

Judge Chin correctly found (and Google does not rebut in its brief): "Importantly,

the survey did not ask the respondents whether they would want to be part of a law

suit through which they might recover damages." (SPA32.)

### (a)    The Survey Was Procedurally Improper

As soon as a class action is filed, a defendant's unilateral contact with class

members is disfavored and can lead to sanctions. *See Manual for Complex

Litigation (Fourth)* § 21.12, p. 248. Here, Google sought to use class members to

undermine the ability of the entire class to obtain redress. *See, e.g.*, *Kleiner v. First

Nat'l Bank of Atlanta*, 751 F.2d 1193, 1201 n.16 (11th Cir. 1985) (bank's

communications were intended to "solicit as many exclusions as possible before

the court was alerted to the operation"); *In re Sch. Asbestos Litig.,* 842 F.2d 671,

681 (3d Cir. 1988) (booklet defendants circulated to class members was misleading

because it did not reveal author's role in the litigation nor present evidence on all

sides of issue); *Hampton Hardware, Inc. v. Cotter & Co., Inc.,* 156 F.R.D. 630,

632-34 (N.D. Tex. 1994) (defendant was restricted from sending pre-class

certification letters to potential class members).

25

In *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 845-46 (2d Cir. 1980), the defendant sent class members communications urging them to disassociate themselves from the lawsuit. This Court found these actions "imprudent," *id.* at 846, and explained why court-approved communications were essential in class actions:

> Notice to class members is crucial to the entire scheme of Rule 23(b)(3). It sets forth an impartial recital of the subject matter of the suit, informs members that their rights are in litigation, and alerts them to take appropriate steps to make certain their individual interests are protected. [citations omitted]…

> It is the responsibility of the court to direct the "best notice practicable" to class members, Rule 23(c)(2), and to safeguard them from unauthorized, misleading communications from the parties or their counsel. Unapproved notices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice.

*Id.*; *see also In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 251-52 (S.D.N.Y. 2005) ("Communications that threaten the choice of remedies available to class members are subject to a district court's supervision.").

Here, throughout the settlement proceedings, the District Court regulated and approved all class communications pursuant to Fed. R. Civ. P. 23(d) and (e). After the District Court declined to approve the settlement and the parties returned to litigation, Google unilaterally (i.e., without the consent of plaintiffs' counsel or

approval from the District Court) contacted 15,256 authors with communications that could not help but be confusing.

In Fall 2008, class members were formally notified of the proposed class settlement, including rich benefits from commercial uses of Google Books, e.g., "63% of the revenues earned from Google's sale of subscriptions to an electronic books database, sale of online access to books, advertising revenues, and other commercial uses"; "$45 million paid by Google to copyright owners whose works Google has digitized without permission." (Docket 56, Ex. 1, attachment I, pp. 1-2.) The parties then modified the settlement, which required dissemination of a court-approved supplemental notice that also described the benefits to class members of the Google Books program. (Docket 735, 770, 772.)

Accordingly, between October 2008 and March 2011 (when the court denied final settlement approval), the District Court supervised and approved all communications to class members, who were twice informed that the use of their books by Google would generate revenue for each author.

In light of the wide dissemination of the two notices (as well as considerable publicity about the settlement and its benefits to authors), Google's "survey" in January 2012 was highly misleading and confusing, as it omitted the following material facts: (1) the settlement, and benefits that went with it, was disapproved; (2) Google's program of scanning and displaying in-copyright books was being

27

undertaken without authorization or compensation, and was the subject of a

copyright class action; (3) respondents were potential class members with potential

rights to recover damages from Google in that action; and (4) their answers could

be used to influence whether or not they could be represented in that class action.

### (b)     The Survey Was Misleading And Confusing

Surveys are not properly used to deprive people of their legal right to

participate in a class action. See cases cited above at 25-26.[10] Rather, they are used,

for example, in Lanham Act cases where one trademark owner sues another

claiming potential consumers have been actually or potentially misled. *See* Shari

Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on*

*Scientific Evidence (Second)* 229, 235 (2000), at A790. When they are appropriate,

surveys must meet rigorous standards for methodological reliability and are

---

[10] Google states that in three cases the courts relied on "similar surveys in rejecting class certification on adequacy grounds." (Google Br. 21-22.) Two of Google's cases, however, did not involve surveys at all, but rather the submission of declarations from class members. *Dairy Farmers,* 279 F.R.D. 257 (further distinguishable as shown at page 19 and n.5 above); *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 U.S. Dist. LEXIS 95785 (C.D. Cal. Sept. 7, 2006). In the third, *Virginia High School League*, the female students who would be affected by changing the seasons of their sports were surveyed about concrete proposals to change those dates and how it would affect them. 184 F.R.D. at 579. Presenting all the litigation alternatives in an objective manner is critically different from Google's invalid and misleading survey. Further, before that survey was undertaken, defense counsel provided it to plaintiffs' counsel and sought their input, just as the *Manual for Complex Litigation* recommends. (Plaintiffs' counsel here confirmed this with defense counsel of record in that case, a partner at McGuire Woods in Charlottesville, VA.)

frequently held inadmissible when they do not. *See, e.g.*, *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984). *See generally Daubert v. Merrell Dow Pharm.*, 590 U.S. 579 (1993); *Manual for Complex Litigation (Fourth)* § 11.493.

The survey here does not pass muster as objective or reliable. (A270-76 (questions); A316-44 (verbatim responses).) The survey vaguely and cursorily described Google Books (A273, No. 220) ("As you may or may not know, Google scans books so that their content can be searched online and results displayed in Google Books.") Google did not disclose that its scanning and display were without permission by or compensation to the authors. (A237-38, A734-740.)

When asked for their understanding of Google Books, a number of respondents thought Google only used books that were out of copyright. Others thought Google was paying royalties (as the class settlement notice had twice advised). As examples, when asked their understanding of Google Books, they stated:

- "They are e-books put out by Google" (A318 No. 221);

- "public domain books site" (A317 No. 125);

- "it has digitized many books and is selling them online at prices negotiated with publishers." (A318, No. 234.)

- "You can download my book if you want, you still have to pay for it." (A321 No. 100357);

- "They're often old books. They are orphans meaning the author of the book cannot be found or they're out of copyright." (A318 No. 100040);

- "I imagine that it is similar to electronic publishing by Amazon." (A319 No. 100086);

- "I guess it's sort of a kindle" (A322 No. 100462);

- "Plan to do public domain books in Harvard library." (A319 No. 100116);

- "I have a vague memory of informing [sic] I might be able to get royalties from Google books." (A324 No. 100756);

- "Know that they are out of copyright books that are online and some in copyright books are available with arrangements with the publishers." (A322 No. 100528);

- "A lot of them are ebooks. One of my publishers went through Google to get the book electronically. I get royalties through that from the publisher." (A319 No. 100057);

- "I think they're like kindle. You can look at it in small print." (A320 No. 100217);

- "That it's a project to make electronically available all published books that are not under copyright I assume. I don't know if that's correct or not." (A320 No. 100188); and

- "I do get a check for permission to download a chapter or whatever is download[ed]." (A326 No. 100357.)

Google's survey did nothing to dispel these misapprehensions.[11] Google

claims that 56% of the respondents "approved" of Google Books and 17.6% "felt"

---

[11] Some of these misapprehensions (e.g., Nos. 100057, 100357, 100528) arise from the fact that "Google Books" encompasses both a "Partner Program" and a "Library Project." Under the Partner Program, Google displays portions of books

*(footnote continued)*

they had financially benefitted. (A306 and Google Br. 20.) A number of those "approving" were under the misapprehension that Google was scanning only books it was authorized to scan, and a number of those who "felt" they were financially benefitted included those under the misapprehension they were receiving royalties.

Google also misled respondents by understating the amount of each book it displayed, which further skewed the "approval" rating. While the record reveals as much as 78% of the complete verbatim text is available for display (*see* pp. 9-10 above), Google represented:

- "Again, we would <u>only</u> like to ask you specifically about the display of short excerpts – *about one-eighth of a page* – as search results." (A273, first emphasis in original.)

Google repeated this misrepresentation no less than five separate times. (A273-74, nos. 220, 223, 225, 235, 240.)

In *Universal City Studios,* this Court held a telephone survey was inadmissible because it was not "fairly prepared" and its results were not "directed to the relevant issues." 746 F.2d at 118. This Court disapproved of a question that implied Universal had produced the movie "King Kong" when in actuality it only acquired the trademark rights. *Id.*

---

*with* rightsholder permission. Only Google's Library Project, where Google copies, distributes and displays books *without* permission, is at issue in this lawsuit. Google's survey is further misleading by failing to explain this important distinction. (*See* A273; A738-742.)

Here, asking respondents whether they "approve" of Google Books and whether they "feel" they have benefitted financially are similarly irrelevant. A federal lawsuit is not a referendum, and hence "approval" is irrelevant. Nor are vague "feelings" at issue. Unlike, for example, a Lanham Act case, where the pivotal legal question frequently turns on consumer "perception," adequacy of representation under Rule 23 cannot be determined on the basis of "feelings," but instead depends on whether there are actual "fundamental conflict[s]" between the class representatives and the absent class members. *Flag Telecom*, 574 F.3d at 35.

Google's survey provided no information, and did not ask the respondents their "feelings," about the remedies to which they might be entitled if Google were held liable. (*See* A741-43, 749-54.) In fact, the record shows that authors and publishers who were actually knowledgeable about Google's practices *did* complain to Google. (A668-72, 699-701; CA5-8, CA19-37.)

A court recently found that a defense survey in the class certification context was "meaningless" and "unpersuasive." *In re Fedex Ground Package System, Inc., Emp't Practices Litig*., 2007 U.S. Dist. LEXIS 76798, at *19 (N.D. Ind. Oct. 15, 2007). The plaintiffs challenged FedEx's classification of drivers as independent contractors rather than employees. Defendant FedEx surveyed drivers and claimed that 52% would "prefer" to be independent contractors. *Id.* at *11. FedEx claimed this showed a "conflict" about "forward-looking" relief, *id.* at *18, the very

argument Google makes here. The court found that survey question to be

"meaningless" because "the question doesn't inquire into the respondents'

preferences as to the remedy" if the defendant is held liable. *Id.* at *19. Nor did

Google's survey. (A270-76, A742.)

The District Court's decision that plaintiffs are adequate class

representatives was not an abuse of discretion.

## II.  COMMON QUESTIONS PREDOMINATE AS TO GOOGLE'S FAIR USE DEFENSE

Google argues incorrectly that its fair use defense defeats predominance

under Fed. R. Civ. P. 23(b)(3). (Google Br. 26-36.)

### A.  The District Court Adopted And Applied The Correct Legal Standard

The District Court adopted the correct legal standard in finding that common

questions of law or fact predominate.

> The predominance requirement is satisfied "if resolution
> of some of the legal or factual questions that qualify each
> class member's case as a genuine controversy can be
> achieved through generalized proof, and if these
> particular issues are more substantial than the issues
> subject only to individualized proof." *Myers v. Hertz
> Corp.,* 624 F.3d 537, 547 (2d Cir. 2010). . . . That an
> affirmative defense may arise that affects different class
> members differently "does not compel a finding that
> individual issues predominate over common ones." *In re
> Nassau Cnty. Strip Search Cases,* 461 F.3d 219, 225 (2d
> Cir. 2006).

(SPA27-28.)

The District Court correctly applied this to the record. It first identified the

common questions:

> Every potential class member's alleged injury arises out
> of Google's "unitary course of conduct." [*Marisol A. v.
> Giuliani,* 126 F.3d 372, 377 (2d Cir. 1997)]. Specifically,
> every potential class member has allegedly been injured
> by Google's Library Project, whereby Google, without
> authorization, copied books in which the class members
> own copyright interests. Whether Google's actions
> constitute an infringement of these copyright interests
> and whether Google's use of "snippets" of these works
> constitutes "fair use" are "common questions" capable of
> class-wide resolution. [*Wal-Mart Stores, Inc. v. Dukes,*
> 131 S.Ct. 2541, 2551 (2011)].

(SPA29.)[12]

The District Court then held that these common questions predominated:

> The common issues presented in this litigation
> predominate over any individual ones…. Every potential
> class member's claim arises out of Google's uniform,
> widespread practice of copying entire books without
> permission of the copyright holder and displaying
> snippets of those books for search. Whether this practice
> constitutes copyright infringement does not depend on
> any individualized considerations. Furthermore, the
> question of "fair use" may be evaluated on a sub-class-
> wide basis. The Court would determine whether the
> defense applies to a particular type of book, obviating the

---

[12] *Amicus* American Library Association argues there are no common questions
under Fed. R. Civ. P. 23(a)(2). An *amicus* cannot seek to expand an appeal by
raising new issues. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d
Cir. 2001). In any event, the argument is completely without merit for reasons
stated by the District Court at SPA29.

> need to evaluate each book individually. Finally, because representative plaintiffs only ask for statutory damages, there is no need for any individualized inquiry into the harm suffered.

(SPA32-33.)

There was no abuse of discretion in this ruling. Google concedes that adjudicating liability, adjudicating statutory damages and adjudicating portions of its fair use defense involve class-wide proof. Google argues, rather, that some aspects of its fair use defense involve individualized proof. Predominance, however, does not require that *only* common issues be present, but rather that they "predominate," as they plainly do. Further, Google's litany of purported individual questions is exaggerated.

### B. The Fair Use Issues Can Be Decided With Common Proof

Google bears the burden of proof on its fair use defense. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 590 (1994). Therefore, Google's representations in the District Court as to how this defense will be adjudicated are significant, because they contradict Google's current assertions to this Court.

Section 107 of the Copyright Act, 17 U.S.C. § 107, sets forth four factors in evaluating Google's fair use defense:

> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)   the nature of the copyrighted work;

(3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the copyrighted work.

Google asserts that (4) above "carries the most weight," citing dicta in *Harper & Row, Publishers v. Nation Enterprises,* 471 U.S. 539, 566 (1985), and then arguing its resolution requires individualized proof. (Google Br. 30.) Both assertions are wrong. First, subsequent decisions by the Supreme Court and this Court have found "transformative use" under factor (1) to be the most important determinant.[13] Because that factor focuses upon defendant's use of the books, it is susceptible to common proof, as Google readily concedes. (Google Br. 29.) Second, even as to factor (4), Google itself has represented to the District Court this too should be resolved with common proof, as explained below.

Google's citation to *Harper* is further misplaced because it held that *Nation* magazine infringed a copyright in President Ford's book-length memoir when it

---

[13] *See Campbell,* 510 U.S. at 578-93; *Salinger v. Colting*, 607 F.3d 68, 83 (2d Cir. 2010); *Davis v. The Gap, Inc*., 246 F.3d 152, 174-76 (2d Cir. 2001); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc*., 166 F.3d 65, 72-73 (2d Cir. 1999); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108-09 (2d Cir. 1998); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137-42 (2d Cir. 1998); *Ringgold v. Black Entm't Television, Inc*., 126 F.3d 70, 78-79 (2d Cir. 1997); *Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 918-25 (2d Cir. 1994); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd*., 996 F.2d 1366, 1374-76 (2d Cir. 1993).

only copied 300 to 400 words from the entire book, which it included in a 2,500-word summary. Under *Harper,* Google's copying of 100% of millions of books and verbatim display of up to 78% of each book clearly constitutes copyright infringement.

With respect to factor (1), Google devotes a great deal of its brief touting the supposed "transformative" nature of Google Books (Google Br. 5-9), without addressing this Court's case law on the issue. Plaintiffs rely on the cases cited in fn. 13 above to establish that Google's verbatim copying and display are not "transformative" – Google's "snippets" are the exact words the authors wrote, displayed for the exact same content and meaning for which the authors wrote them.

The merits of whether or not Google's actions are a transformative use for purposes of factor (1), however, are not before the Court on this appeal. What is relevant is that both plaintiffs and Google agree the legal issue is ripe for cross-motions for summary judgment (Docket 1032-1054), and Google admits this issue can be decided on generalized, not individualized, proof. (Google Br. 29, last sentence.)

With respect to the remaining factors (2), (3), and (4), while Google now argues – for the first time – that it is entitled to present a "full fair use defense based on individual book-specific considerations" (Google Br. 37), it did not make

37

book-by-book determinations in its Library Project. To the contrary, Google

indiscriminately and in bulk copied millions of books, regardless of content. *See*

SPA18 (finding that Google "copied and made search results available *en masse*").

In its contention interrogatory responses, served at the end of merits discovery,

Google represented it would argue on the merits that its Library Project is a fair use

as to all books; it said nothing about adducing book-by-book evidence as to fair

use. (A865, 867-78.) Nor did Google provide a single example of evidence it

would proffer to show lack of market harm on a book-by-book basis. (A869, 873-

74, 877-78.)

Google's pending summary judgment motion also contradicts its claim that

its fair use defense requires highly individualized proof. (Docket 1031-43.) Google

sought summary judgment against plaintiffs as representatives of "all persons

similarly situated." (Docket 1031.) Its appellate brief acknowledges it sought

summary judgment against the entire class: "Google has argued, in turn, that the

transformative nature of Google Books and the significant public benefits of the

project render the entire project fair use and defeat the infringement claim of ***every***

***member of the proposed class***." (Google Br. 28, emphasis supplied.)

Google's summary judgment brief (Docket 1032) explained why the nature

of the fair use defense depended entirely on generalized, not individualized, proof.

It did not make any book-by-book arguments. Rather, Google treated them in an

38

"across the board" fashion.[14] As to the first fair use factor, it argued (*id*. at 20-23) that factor could be determined by general proof. Its appellate brief agrees. (Google Br. 29, final sentence.)

As to factor (2), "the nature of the copyrighted work," Google said "[t]his factor recognizes 'that some works are closer to the core of intended copyright protection than others.'" (Docket 1032, p. 25)(quoting *Campbell,* 510 U.S. at 586). Google argued, however, this was not true or relevant here because "Google Books encompasses almost every imaginable type of book," and therefore "no conclusions may be drawn as to whether all the books within Google Books are closer to the core or the periphery of the copyright law." (*Id*.)

Now that the subject is class certification and not summary judgment, Google abandons this frank admission and argues the second fair use factor cannot be adjudicated with common proof after all, because "[d]ifferent works will fall along a spectrum depending on their relative mix of factual and creative content." (Google Br. 33-34.)

---

[14] Google tells this Court it was "[p]laintiffs' strategic choice to litigate the fair use issue in an across-the-board manner." (Google Br. 29.) While plaintiffs did file a cross-motion (Docket 1049-50, 1053-54), it was solely ***Google's*** strategic choice to represent in its summary judgment brief that its fair use defense can and should be adjudicated using only generalized proof. (Docket 1032.)

In any event, whether a book is fiction or non-fiction (or in-print or out-of-print) does not implicate individualized book-by-book determinations. As the District Court correctly determined, at most such distinctions apply to broad categories of books, and, if necessary, could be dealt with through sub-classes. (SPA33.)

As to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Google argued on summary judgment that this factor easily can be adjudicated by generalized proof. (Docket 1032, p. 27.) There is no dispute that: (1) Google copies 100% of each book, maintains entire digital copies of the books on its servers, provides digital copies to its library partners, and searches the complete book to respond to search queries; and (2) 78% of every in-copyright book is available for display. While its appellate brief argues weakly that "dictionaries and cookbooks" are not displayed in snippets (Google Br. 33), even that is generalized evidence as to dictionaries and cookbooks.

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." In its summary judgment memorandum, Google argued there was no adverse effect for any plaintiff or class member, because there was no potential market for the services Google Books was providing. Google asserted that in essence this factor was therefore irrelevant:

40

### b.  There is no market for Google's uses

> There are no "traditional, reasonable, or likely to be
> developed markets' for the copying of works for
> purposes of indexing and snippet display." Publishing
> industry history confirms this fact: booksellers have
> never been charged to allow the browsing of texts, and
> authors are not paid merely for the right to index their
> books or for allowing their books to be browsed.

(Docket 1032, p. 29, citations omitted.) Google did not suggest there was any need

to adjudicate this issue on an individualized basis.[15]

Now that the arena is class certification and not summary judgment, Google

found a welter of purported individualized issues, such as whether Google Books

helps an author "get speaking engagements" or "increases his or her name

recognition." (Google Br. 30-31.) Google has admitted there is no evidence

Google Books has led to any increased financial benefit to any author. (A650, 678-

79.) Thus, Google *has* no affirmative evidence to present on that issue, let alone

"individualized" evidence.[16]

---

[15] Plaintiffs agreed the issue could be adjudicated on a class-wide basis, based on
common proof. (*See* Docket 1050, pp. 41-47 and the opinion of plaintiffs' experts,
A536-94.)

[16] Google relies upon *Cambridge Univ. Press v. Becker,* 863 F. Supp. 2d 1190
(N.D. Ga. 2012) for the proposition that a fair use analysis is "fine grained."
(Google Br. 27.) That case involved small amounts of copying for college course
packs. The court held this verbatim copying was non-transformative, but because
the amount was small (averaging 10% or less), the remaining factors had to be
examined. Here, in contrast, pursuant to its uniform policies and practices, Google

*(footnote continued)*

Google cites *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2561 (2011), for the proposition that a class cannot be certified "on the premise that [Google] will not be entitled to litigate its statutory defenses to individual claims." (Google Br. 35, 48.) The citation is misleading, because the Court is addressing the remedies of re-instatement and backpay, traditionally individual remedies in employment discrimination suits that require individual evaluation of each employee's behavior. *Wal-Mart*, 132 S. Ct. at 2561. The Ninth Circuit, in a "novel project," decided it could apply a "Trial by Formula," where a "sample set" of class members' individual evidence would be extrapolated for the entire class of hundreds of thousands of employees. *Id.* The Court rejected this approach. Here, in contrast, plaintiffs seek for every class member the same amount per book infringed, and there is no need for a "Trial by Formula."

Google may argue that, in certifying the class on May 31, 2012, Judge Chin could not know what representations Google would subsequently make on July 27, 2012 in moving for summary judgment. That misses the point. When plaintiffs moved for class certification, they presented record evidence and legal arguments

engaged in unauthorized reproduction and distribution of entire in-copyright books, and maintains entire digital copies on its servers, searches entire books in response to search requests, and makes available for online display the vast majority of the text of each book. Nothing in *Campbell* indicates that this activity is a fair use, or that these common practices across all books would require a book-by-book analysis.

as to why the proofs in the present case of liability, damages, and the fair use defense were overwhelmingly general and class-wide in nature. (Docket 989-991 and 1008-10.) Google's subsequent summary judgment memorandum simply confirmed and validated those points. Judge Chin – who had extensive familiarity with the issues in this case – did not abuse his discretion by holding that the issues to be resolved by general, common proof predominate over any individualized issues.

## III.  COPYRIGHT OWNERSHIP IS READILY ASCERTAINABLE AND DOES NOT PRESENT INDIVIDUAL ISSUES THAT PREDOMINATE OVER ISSUES COMMON TO THE CLASS

Google's final argument is that proof of copyright ownership will require "individual adjudications," such that the class definition is inappropriate and predominance cannot be satisfied. (Google Br. 39.) To the contrary, the class definition is based on objective criteria, and proving membership in the class and entitlement to damages can be accomplished with publicly available information and the sort of documentation that is customarily used in class actions.

What Google seeks to portray as a "cascade of individualized issues" (Google Br. 47), turns out to be a school of red herrings. As Judge Chin found: "to obtain relief, it may be that an author will have to submit some documentation proving that he retains a beneficial interest in the copyrighted work. This

'individual' issue, however, does not predominate over the 'common' ones . . . ."

(SPA33.) Judge Chin did not abuse his discretion.

### A.    The Class Definition Is Based On Objective Criteria

Google's attack on the class definition glosses over the class definition itself,

which provides that an author will be a class member if:

- Google has copied his or her book. This fact can be established from Google's records, because it admits: "Google analyzes each scan and creates an overall index of all the books that have been scanned." (Clancy Declaration, Docket 1035 ¶ 6);

- The book has been timely registered. This fact can be determined from publicly available copyright records that are entitled to a legal presumption of validity. *See* 17 U.S.C. § 410(c); *Boisson v. Banian, Ltd.,* 273 F.3d 262, 267 (2d Cir. 2001); *see also* Section III.B, *infra*;[17] and

- He or she is a legal or beneficial copyright holder of the book. This fact can be established based on documents such as royalty statements and publishing contracts, obviating the need for "mini-trials" or the taking of testimony, *see* Section III.C, *infra*.[18]

The class definition is thus based on objective criteria and "sufficiently

definite so that it is administratively feasible for the court to determine whether the

particular individual is a member" of this class. 7A Charles Alan Wright & Arthur

---

[17] Examples of registration records obtained from the public records of the U.S. Copyright Office are found at A218-225.

[18] The class is further objectively defined to limit members to U.S. residents and their books to be in the English language. Google does not contend these attributes of class membership will be difficult to ascertain.

R. Miller et al., *Federal Practice and Procedure* § 1760 (3d ed. 2011); *see also*

*Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003) ("'An

identifiable class exists if its members can be ascertained by reference to objective

criteria.'") (citations omitted); 5 James William Moore et al., *Moore's Federal*

*Practice* § 23.21 (same); *Manual for Complex Litigation (Fourth)* § 21.222 (2004)

(same).

As the District Court recognized, whether authors will have to submit some

documentation to establish copyright ownership does not undermine the propriety

of class certification. SPA33; *see In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267

F.R.D. 583, 592 (N.D. Cal. 2010) ("The fact that class members will be required to

submit some information in order to determine whether they are members of the

class does not render the class definition unascertainable."); *Dunnigan,* 214 F.R.D.

at 136 ("[T]he class can be identified through an examination of the individual files

of each of the participants."); *see also In re Methyl Tertiary Butyl Ether (MTBE)*

*Prods. Liab. Litig.,* 241 F.R.D. 185, 196 (S.D.N.Y. 2007) ("[A]scertainability of a

class depends on whether there will be a definitive membership in the class once

judgment is rendered.").

Google's reliance on *In re Initial Public Offering Securities Litigation*, 471

F.3d 24 (2d Cir. 2006) ("*IPO*") (Google Br. 37-38), is misplaced. *IPO* was a

securities fraud case where there was no "developed market" and hence the "fraud

45

on the market" presumption of reliance was unavailable. *Id.* at 42-43. Thus, every

class member would have to prove he or she relied on the allegedly misleading

information. *Id.* This copyright infringement action, in contrast, has no fraud

element, and class members need not prove they relied on a misrepresentation by

Google. In *IPO*, this Court held: "'Where membership in the class requires a

*subjective* determination, the class is not identifiable.'" *IPO*, 471 F.3d at 44-45

(quoting *Dunnigan,* 214 F.R.D. at 135) (emphasis supplied). No subjective

determination is required here. Class membership can be established from

government records and other documentary evidence, as explained below.

### B.    Whether A Book Has Been Timely Registered Is Reflected In Public Records

The class is defined to include authors of books "registered with the United

States Copyright Office within three months after its first publication." (SPA1.)

Giving short shrift to the existence of records maintained by the U.S.

Copyright Office as the office of public record for copyright registration, Google

argues that determining the effective date of registration is very complex. This

argument fails.

Courts are entitled to take judicial notice of federal copyright registrations,

as published by the Copyright Office. *See Island Software & Computer Serv. v.*

*Microsoft Corp*., 413 F.3d 257, 261 (2d Cir. 2005). The Copyright Office has long

maintained registration records, published indices of such records, and now makes registration available online for millions of books.

Google concedes, as it must, that determining whether a book was timely registered is not an issue with regard to any book published in the last 35 years. *See* Google Br. 39 (arguing only that determining whether books "*published before 1978*" will require individual adjudications) (emphasis added). For any book published since 1978, the Copyright Office provides comprehensive records that are searchable online. *See* http://cocatalog.loc.gov. Those records contain both the date of publication and the date of registration. *Id.* Thus, Google's argument does not apply at all to a vast universe of books at issue.

Instead, Google focuses on books published prior to 1978. Contrary to Google's arguments, registration can be established by publicly-available records, without the need for testimony about decades-old events. The Copyright Office's indices of books registered before 1978 exist and are available both in hard copy (e.g., A496-99) and online. *See* http://books.google.com/googlebooks/ copyrightsearch.html.

For those books published prior to 1978 for which there are any questions as to publication and registration date, that information can be found on the face of the Application for Registration of a Claim of Copyright, obtainable for each book from the Copyright Office. Each application has both the date of first publication

47

(e.g., A224) and the date of receipt by the Copyright Office (e.g., A225). Once the book is registered, this latter receipt date becomes the effective registration date. 17 U.S.C. § 410(d) ("effective date of a copyright registration is the day on which an application, deposit, and fee . . . have all been received in the Copyright Office"). As an example, A224-225 shows that plaintiff Goulden's *The Superlawyers* was first published on April 13, 1972 (A224) and has an effective registration date of June 29, 1972 (A225), well within the three month period.

It may well be, as Google suggests, that such documentation will not be at the class members' fingertips, but that hardly means the case is unsuitable for class treatment. If a class member does not have a copy of the application form, it can be obtained from the Copyright Office either directly or through a search service.

Thus, publicly available records exist from which this information can be readily ascertained. It would not, as Google erroneously posits, require "live testimony about decades-old events."

## C.    Determining Legal Or Beneficial Ownership Does Not Defeat Predominance

The Copyright Act provides that both legal and beneficial copyright owners can sue for infringement. 17 U.S.C. § 501(b). Google argues incorrectly that individual showings of a legal or beneficial copyright interest in a book defeat predominance. (Google Br. 40-46.)

Here, unlike class members in securities, antitrust and consumer class actions, many, perhaps most, authors here enjoy a legal presumption of class membership. As this Court held, "[t]he Copyright Office certificate of registration is *prima facie* evidence of the facts stated therein. This has generally been held to mean *prima facie* proof of ownership and validity." *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 n.1 (2d Cir. 1977). The District Court confirmed this at SPA16. *See also* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration . . . shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."). Thus, many class members will be able to present *prima facie* evidence of legal ownership in the form of publicly available copyright office records.

To cut through Google's argument about ownership, the Copyright Registration application will often show that the author is the legal owner of the copyright. For example, Mr. Bouton is the legal copyright owner of *Ball Four* (A218), Ms. Miles is the legal copyright owner of *The Trouble with Thirteen* (A221)*,* and Mr. Goulden is the legal copyright owner of *The Superlawyers* (A224)*.* Where the publisher (not the author) is the legal copyright owner, the author can be the beneficial owner, and hence entitled to damages, if he or she receives royalties. This can be shown by the existence of a publishing contract providing for royalties, and/or a royalty statement showing the receipt of royalties.

Finally, where a work is "for hire," the Copyright Registration requires that the copyright be applied for by the employer, not the author or publisher. (A218 ("Where a work was made for hire, the employer is the author") and A855.) Those books are excluded. This type of proof, which will occur at the damages stage, is based on objective, documentary evidence, and does not defeat predominance.

Google elides this reality by trotting out an array of edge-case ownership scenarios, e.g., works made for hire, all rights contracts. (Google Br. 38, 40-46.) As we demonstrate below, however, those scenarios neither defeat predominance nor present manageability problems. Indeed, Google's own industry expert testified that his staff at Time Inc. had no difficulty determining the copyright status of books (A715-17). (*See also* A688-89 (Google witness could determine copyright renewal status using publicly available copyright records).)

Courts and commentators agree that "[t]he classic beneficial owner is an author who transfers exclusive rights (that is, parts with legal title to that right) to a purchaser in exchange for royalty payments from sales of copies of the work or from other forms of exploitation." 6 William F. Patry, *Patry on Copyright* § 21:25 (2012); *accord Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984). This is a common arrangement in book publishing contracts. As Google's industry expert admitted at his deposition, all of the publishing contracts submitted in discovery by Google (A434-488) provide for the payment of royalties. (A715.) He further

50

admitted that it was "typical in [his] experience in the book publishing industry" for "a book publishing contract to provide for royalties." (*Id.*) Under *Cortner*, therefore, all of those authors – and countless others – are beneficial owners of their books, and thus are entitled to sue infringers. That an author may have to submit a publishing contract or royalty statement to show legal or beneficial ownership – especially when the District Court has found that doing so would not be unmanageable or present predominating individual questions – cannot defeat class certification. *See, e.g.*, *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. at 592; *Dunnigan*, 214 F.R.D. at 136.

In other class actions, proving beneficial ownership has been no bar to class certification. For example, in securities class actions it is the beneficial owners of the subject stock who comprise the class. However, the stock is frequently not held in their name, but rather in "street" name by their brokers or bankers, a practice that facilitates transfer of the shares. *See, e.g.*, *In re Franklin Nat'l Bank Sec. Litig.*, 574 F.2d 662, 664 & n.2 (2d Cir. 1978). Therefore, to claim a share of the judgment, shareholders must come forward with adequate proof of their beneficial ownership. This presents no barrier, and securities class actions are routinely certified. *See, e.g., Fogarazzo v. Lehman Bros., Inc.,* 263 F.R.D. 90, 101 (S.D.N.Y. 2009). The Supreme Court has held that "[p]redominance is a test readily met in

certain cases alleging consumer or securities fraud . . . ." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Similarly, in "indirect purchaser" cases under state antitrust laws, consumers must prove their class membership, i.e., that they were the ultimate purchasers of the product, several steps removed from the defendant supplier. In *TFT-LCD,* 267 F.R.D. 583, the court certified a class of consumers in 23 states, holding the class definition involved objective criteria, and that class members could provide sufficient individual purchase information. *Id.* at 592.

The District Court's rejection of Google's ownership arguments is further supported by *In re Napster, Inc. Copyright Litigation*, 2005 U.S. Dist. LEXIS 11498 (N.D. Cal. Mar. 31, 2005). That case arose from the mass copyright infringement committed as a result of Napster's peer-to-peer file-sharing network. Like Google here, Napster argued that demonstrating proof of ownership, registration, and actual damages on a work-by-work basis precluded a finding of predominance. *Id.* at 28-29. The court rejected that argument, explaining that "while it is true that proof of ownership, registration, and actual damages ultimately requires a work-by-work inquiry, viewing these determinations as purely 'individual issues' ignores the fact that the claims of every member of the class are uniformly premised upon the uploading or downloading of a copyrighted work by Napster users." *Id.*

Likewise, plaintiffs' claims here all stem from Google's unilateral decision to digitally copy, distribute and display verbatim content from millions of printed books, without permission. Further, the *Napster* court certified the class in the face of individual differences in damages; here, the damages sought – $750 per book – are identical for every plaintiff and class member.[19]

Google's edge cases are equally unavailing.

**Works-Made-for-Hire**. Google's argument concerning works made for hire (Google Br. 41-43) is a red herring. Those who write such works are not legal or beneficial owners, do not claim to be, and are not members of the class. 17 U.S.C. § 201(b).[20] The copyrights in these books are registered in the names of the employers. The registration application form elicits information as to whether the work was made for hire. 17 U.S.C. § 409(4). When applying to register the book, the claimant must check a box as to whether the work was made for hire. *See* U.S.

---

[19] Google cites *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521 (N.D. Ill. 2008), where the court declined to certify a class in part due to potential disputes over intellectual property ownership. (Google Br. 36-37.) *Vulcan Golf*, a trademark case, is fatally distinguishable as it involved "unregistered marks and personal names" and affirmative defenses not present here. *See id*. at 528-30. (*See also* A881 (Google's interrogatory answer concerning affirmative defenses).)

[20] An author of a "work made for hire" who can produce an agreement with his or her employer giving him or her ownership rights in such work would be a member of the class. However, such agreements must be express and in writing, 17 U.S.C. § 201(b), so this would not present any complex individualized determination.

Copyright Office Form TX, *available at* http://www.copyright.gov/

forms/formtx.pdf.

Similarly, the application form used prior to the 1976 Copyright Act

instructed that, in identifying the author of the work, "Where a work is made for

hire, the employer is the author." (*See, e.g.*, A218.) Thus, the publicly available

records from the U.S. Copyright Office will indicate whether the book is a "work

made for hire" (*see, e.g.*, A855), or will be in the name of the employer.

Google uses the example of plaintiff Joseph Goulden, but its argument

backfires. Google asserts that *The News Manipulators,* of which Mr. Goulden is a

co-author, was made for hire. (Google Br. 41.) Mr. Goulden does not contend

otherwise. When asked at his deposition, he stated he was *not* making a claim for

this book, because he wrote it for Accuracy in Media and therefore did not own the

copyright. (A383.)

Ultimately, whether some books may have been made for hire means only

that not every book infringed by Google will be covered in this action. Nor are

public domain books, books written in a language other than English, or books

wholly owned by entities and not natural persons (or their heirs).

**"Promotional Uses."** Google contends that any author who granted royalty-

free "promotional" rights to a publisher is not a beneficial owner of that right, and

therefore cannot sue Google. (Google Br. 44-46.) As the District Court correctly

held, "while these authors may have authorized a publisher to promote their works, they have not authorized Google to do so." (SPA34 n.9.) Google has cited no authority for the proposition that it has a unilateral right to "promote" someone else's in-copyright book. Besides, there is no record evidence that Google's snippets constitute book "promotions."

Google's argument actually presents a common legal issue that can be resolved in the class context. Its own industry expert, Mr. Perle, testified that he is "not suggesting that an author who has given a publisher a royalty-free promotional right has given up its [sic] beneficial interest in the copyright." (A706.) Authors should not be required in case after case to defend against Google's specious contention that its unauthorized uses of books are "promotional uses" that somehow strip authors of their status as legal or beneficial owners of their copyrights – an argument endorsed by no statute, case law or even Google's own expert. (*See* A705-14.)

**Reversions, Transfers of Ownership and All Rights Contracts.** Google contends the District Court will have to analyze each book's publishing contract to determine whether the author transferred legal ownership, whether legal ownership reverted back to the author, and whether the author entered into an "all rights"

contract.[21] (Google Br. 43-46.) This is not at all the case, and Google's interminable exposition on the complexities of copyright law (Google Br. 41-47) is a diversion and of no practical consequence to the issue of class membership.

Despite Google's claims otherwise, it is unnecessary to determine who as between the author or publisher was responsible to register the book, whether legal title to an exclusive right has reverted from publisher to author, or whether or not a book is in-print. Irrespective of the answer to all those questions, an author with royalty rights is a beneficial owner entitled to sue an infringer like Google. *Cortner*, 732 F.2d at 271.

### D.    Proof Of Class Membership Is Not Relevant Until The Remedy Stage

Even if, arguendo, determining eligibility for damages is more involved here than, say, the production of a receipt, the District Court considered this and nevertheless held the case is manageable and superior to any other method of resolving this mass digitization action. Numerous courts have recognized that

---

[21] Google argues that "an author who transfers legal title 'in exchange for percentage royalties based on sales or license fees' is a beneficial owner, but an author who receives an 'outright fixed payment' for his copyright is not." (Google Br. 44 (citations omitted); *see also* A900 (Oral Arg. Trans.) (discussing the case of an author enters into "an all rights contract in which for a lump sum they forever disclaimed all interests in their copyright").) As with Google's works-made-for-hire argument, all this means is that not every book's author will be a member of the class.

(1) the issue of class membership is one that is relevant only at the remedy stage of

the proceedings, and (2) a variety of procedures may be used following an

adjudication of liability to determine entitlement to damages.

> The formulation of procedures by which the individual issues of class
> membership and damages are determined for each of the claimants,
> who may number in the hundreds, thousands, or even millions, may
> demand considerable foresight and ingenuity . . . . [C]ourts [may]
> await the adjudication of the liability issue before adopting
> procedures requiring class members to come forward and assert their
> claims . . . .  [T]he Courts frequently use a proof-of-claim form that
> must be filed by members intending to prove damages.

7AA Wright et al., *Federal Practice and Procedure* § 1784 (3d ed. 1999) (citing

cases); *In re OSB Antitrust Litig.*, 2007 U.S. LEXIS 56617, at *36-37 (E.D. Pa.

Aug. 3, 2007) (challenges to individual claims based on class membership may be

resolved at the claims phase of the litigation); *Dunnigan,* 214 F.R.D. at 136 ("[T]he

class can be identified through an examination of the individual files of each of the

participants. The fact that this manual process may be slow and burdensome cannot

defeat the ascertainability requirement.").

The raft of common questions at the core of this litigation far outweighs any

class membership inquiries at the remedy stage. *See Napster*, 2005 U.S. Dist.

LEXIS 11498, at *28-29 ("[W]hile it is true that proof of ownership, registration,

and actual damages ultimately requires a work-by-work inquiry, viewing these

determinations as purely 'individual issues' ignores the fact that the claims of

every member of the class are uniformly premised upon the uploading or downloading of a copyrighted work by Napster users.").

"[N]or is there any question that considerations of judicial economy heavily favor litigating these common issues once, as part of a single class action, rather than rehashing the same questions of law and fact in each of what could likely amount to thousands of individual lawsuits." *Id*. at \*29. This is particularly true when the class is large, as the "more claimants there are, the more likely a class action is to yield substantial economies in litigation." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660-61 (7th Cir. 2004) (Posner, J.) (endorsing the procedures for managing individual damages issues described by this Court in *Visa Check*).

For this reason, district courts have "the flexibility to address any individualized damages issues." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001). "There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action," including "creating subclasses," "appointing a magistrate judge or special master to preside over individual damages proceedings," "decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages," and "altering or amending the class." *Id*. at 141 (footnote omitted); *accord Carnegie,* 376 F.3d at 660-61.

This Court has "emphasize[d] that the issue of manageability of a proposed class action is always a matter of justifiable and serious concern for the trial court and peculiarly within its discretion." *Visa Check*, 280 F.3d at 141 (internal quotation marks and citation omitted). Especially in light of the management tools available under Rule 23, the number of affected rightsholders, and the magnitude of the common issues, the District Court did not abuse its discretion in certifying the class.

## CONCLUSION

The Order certifying the class should be affirmed.

Dated:  February 8, 2013                    Respectfully submitted,

                                            /s/ Michael J. Boni
ROBERT J. LAROCCA                           MICHAEL J. BONI
KOHN SWIFT & GRAF, P.C.                     JOSHUA D. SNYDER
One South Broad Street, Suite 2100          JOHN E. SINDONI
Philadelphia, PA 19107                      BONI & ZACK LLC
Tel:  (215) 238-1700                        15 St. Asaphs Rd.
Fax:  (215) 238-1968                        Bala Cynwyd, PA  19004
                                            Tel: (610) 822-0200
SANFORD P. DUMAIN                           Fax : (610) 822-0206
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Tel:   (212) 594-5300
Fax:  (212) 868-1229

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, the brief contains 13,792 words, including footnotes.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 Point Times New Roman font.

/s/ Michael J. Boni
Michael J. Boni

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on this 8th day of February, 2013, I caused a pdf version of the foregoing brief to be filed electronically using the CM/ECF system. Prior to transmittal, the pdf was scanned for viruses and no viruses were detected.

/s/ Michael J. Boni
Michael J. Boni

## CERTIFICATE OF SERVICE

I certify that on this 8th day of February, 2012, I caused the foregoing brief to be filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Michael J. Boni
Michael J. Boni