# 12-3200-cv

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

⟫⟪

THE AUTHORS GUILD, INC., ASSOCIATIONAL PLAINTIFF, BETTY MILES,
JOSEPH GOULDEN, and JIM BOUTON, individually and on behalf of
all others similarly situated,

*Plaintiffs-Appellees,*

*v.*

GOOGLE, INC.,

*Defendant-Appellant.*

_____

*On Appeal from the United States District Court for the Southern
District of New York (New York City), No. 1:05-cv-08136-DC*

## BRIEF FOR *AMICUS CURIAE* AMERICAN SOCIETY OF JOURNALISTS AND AUTHORS, INC. IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

David Leichtman
Hillel I. Parness
Shane D. St. Hill
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
*Counsel for Amicus Curiae American
  Society of Journalists and Authors, Inc.*
601 Lexington Avenue, Suite 3400
New York, New York 10022
212-980-7400
dleichtman@rkmc.com
hiparness@rkmc.com
ssthill@rkmc.com

February 15, 2013

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* American Society of Journalists and Authors, Inc. ("ASJA") is

a non-governmental, 501(c)(6) not for profit organization incorporated in the State

of New York with a membership of approximately 1,400 outstanding freelance

writers of magazine articles, trade books, and many other forms of nonfiction

writing.  ASJA has no parent corporation, and no publicly held corporation owns

10% or more of its stock.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES .................................................................................... iii

I.     INTEREST OF *AMICUS CURIAE* ....................................................... 1

II.    STATEMENT OF ARGUMENT ......................................................... 3

III.   ARGUMENT ..................................................................................... 7

      A.    The Trial Court Conducted A Meaningful Inquiry Into Whether The Named Plaintiffs Are Adequately Representing The Interests of The Class. ............................................................................................ 7

      B.    Attacking Plaintiffs-Appellees' Adequacy Of Representation Is Not The Proper Vehicle For Academic Authors To Object To The Certified Class, Rather, Academic Authors Can Opt Out Of The Class And Advocate Their Position In Other Ways. .............................. 16

      C.    Attacking Plaintiffs-Appellees' Adequacy Of Representation Is Not The Proper Vehicle For Attacking The Merits Of Plaintiffs-Appellees' Claims. ............................................................................ 20

      D.    The Class Action Vehicle Is Critical For Enforcing The Rights Of Artists And Copyright Owners In The Digital Age. ............................... 23

IV.    CONCLUSION .................................................................................. 25

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a) ........................................ 27

CERTIFICATE OF ELECTRONIC FILING ........................................................... 28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Authors Guild v. Google, Inc.*,
   282 F.R.D. 384 (S.D.N.Y. 2012) ("Class Certification Order")....................................... passim

*Authors Guild v. Google, Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011).................................................................................. 20

*Authors Guild v. Hathitrust*,
   No. 11 CV 6351 (HB), 2012 U.S. Dist. LEXIS 146169 (S.D.N.Y. Oct. 10, 2012) ................ 22

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000)................................................................................................... 17

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003)............................................................................................................. 11

*Hansberry v. Lee*,
   311 U.S. 32 (1940)......................................................................................................... 17, 19

*In re Beacon Assocs. Litig.*,
   282 F.R.D. 315 (S.D.N.Y. 2012) ......................................................................................... 24

*In re Brand Name Prescription Drugs Antitrust Lit.*,
   115 F.3d 456 (7th Cir. 1997) ............................................................................................... 19

*In re KMart Corp. Sec. Litig.*,
   No. 95-CS-75584-DT, 1996 U.S. Dist. LEXIS 22609 (E.D. Mich. Dec. 16, 1996) ............... 12

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
   236 F.R.D. 62 (D. N.H. 2006) ....................................................................................... 10, 13

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) ............................................................................................. 15

*Oracle, Inc. v. Google, Inc.*,
   No. 3:10-cv-3561 (WHA), Dkt Item 1240 (N.D. Cal. Aug. 24, 2012)....................................... 4

*Tsereteli v. Residential*,
   No. 08 Civ. 10637 (LAK), 2012 U.S. Dist. LEXIS 91017 (S.D.N.Y. June 29, 2012) ............... 7

*U.S. v. Am. Soc'y of Composers, Authors and Publishers (In re AT&T Wireless)*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009) (Conner, J.)................................................................. 24

**Rules**

Fed. R. App. P. 29(a) ................................................................................ 1

Fed. R. App. P. 29(c)(5) ........................................................................... 1

Rule 23(c)(2)(B) ..................................................................................... 10

Rule 29.1 .................................................................................................. 1

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 ..................................................................... 8

**Other Resources**

The Federalist No. 43, p. 272 (C. Rossiter ed. 1961) .............................. 10

Theodore Eisenberg and Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1537 (2004) ............. 10

## I.    INTEREST OF *AMICUS CURIAE*

*Amicus curiae* American Society of Journalists and Authors, Inc. ("ASJA"), founded in 1948, is a non-governmental, 501(c)(6) not for profit organization with headquarters in New York City and with active regional chapters in Arizona, Chicago, Illinois, New York City (local chapter separate from headquarters), Northern California, Southern California, San Diego, California, the Rocky Mountains region (Denver area), the Southeast (Atlanta area), the Upper Midwest (Minneapolis area), upstate New York (Rochester area), and Washington, DC.[1]

ASJA has a membership of approximately 1,400 outstanding freelance writers of magazine articles, trade books, and many other forms of nonfiction writing, each of whom has met ASJA's exacting standards of professional achievement.  The requirements for membership in the organization are stringent: an author is required to demonstrate a substantial professional resume before being admitted to membership.  Nonfiction book authors qualify with two or more traditionally published nonfiction books, or one book with a second under contract.

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Rule 29.1 of the Local Rules of the United States Court of Appeals for the Second Circuit, *amicus* ASJA hereby states that (1) no party or their counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting this brief; and (3) no person — other than *amicus* ASJA, its members, and its counsel — contributed money intended to fund preparing or submitting this brief.  Pursuant to Fed. R. App. P. 29(a), *amicus* ASJA also states that all parties have consented to the filing of this brief.

1

Article authors must provide a minimum of six substantial bylined articles written on a freelance basis in national publications that pay for content. A reader browsing any U.S. news stand would find many articles by ASJA members. *See generally*, *http://www.asja.org/our-members/member-news/*.

ASJA offers extensive benefits and services focusing on professional development, including regular confidential market information, meetings with editors and others in the field, an exclusive referral service, seminars and workshops, discount services and, above all, the opportunity for members to explore professional issues and concerns with their peers.

Additionally, ASJA is the publisher and author of several works. Therefore, ASJA is a member of the Author Sub-Class, and potentially may be a member of the Publisher Sub-Class, and has a great interest in the outcome of this appeal.

ASJA opposes Defendant-Appellant Google, Inc.'s ("Google") appeal of the Order of the District Court (Chin, J., sitting by designation) granting Plaintiff's motion for class certification, and ASJA urges this Court to uphold the ruling certifying the class. Specifically, ASJA writes in response to the Brief of *Amici Curiae* Academic Authors In Support of Defendant-Appellant and Reversal ("Academic Authors Br.") because *amici* academic authors ("Academic Authors") provide a misguided discussion of the law governing the concept of adequate representation in class actions.

2

## II.  STATEMENT OF ARGUMENT

On May 31, 2012, Judge Chin, sitting by designation in the Southern District of New York, granted Plaintiffs-Appellees' motion for class certification (hereafter, "*Class Cert. Order*").  Google has appealed this ruling, arguing that class certification was improper.  In support of Google's appeal, Academic Authors submitted a Brief of *Amici Curiae* opposing certification of the class as improperly granted because they claim that the District Court "failed to conduct a rigorous analysis of the adequacy of representation factor, as Rule 23(a)(4) requires."  Academic Authors Br. at 2.  Based on their own apparent self-interest, Academic Authors have misstated the concept of adequate representation in class actions.  ASJA submits this Brief of *Amicus Curiae* in response to Academic Authors, and respectfully requests that the judgment of the District Court granting class certification be affirmed.

Academic Authors are led by professors of law at a clinic, the Samuelson Law, Technology & Public Policy Center at the University of California, Berkeley.  *See generally*, Academic Authors Br. at 18.  The Center, and the clinic it is associated with, tout themselves as representing clients such as The Electronic Frontier Foundation, the Center For Democracy and Technology and Public Knowledge, a number of whom are known to be financially supported by Google.  *Compare*  http://www.law.berkeley.edu/samuelsonclinic.htm *with Oracle, Inc. v.*

3

*Google, Inc.*, No. 3:10-cv-3561 (WHA), Dkt Item 1240 (N.D. Cal. Aug. 24, 2012)

(Google's *Response To Order To Supplement*, listing Google-supported persons

and entities who commented on Google's litigation with Oracle).  ASJA does not

mean to suggest that the signatories to the brief do not legitimately hold the beliefs

they espouse, but only to point out to the Court their association with Google.  It is

not surprising then that Academic Authors assert that they are strong advocates of

Google's position on the merits.  A perusal of some of the titles of the works they

have authored demonstrates their ideological bias.  (*E.g.*, "*Access to Knowledge in

the Age of Intellectual Property*"; "*Free Culture: The Nature and Future of

Creativity*"; "*The Knockoff Economy:  How Imitation Sparks Innovation*"; "*Open

Access*"; "*The Access Principle:  The Case For Open Access To Research And

Scholarship*."  *See* Academic Authors Br., Appendix A).

Even taken at face value, the stated motivation of Academic Authors for

opposing class certification is that they want free access to the entire corpus of

written works through Google Books without compensation to the authors, and

they also would like to make their own works available to the public through

Google Books.  Opposing class certification in this litigation, however, is not the

proper vehicle for Academic Authors to advance their interests concerning the

merits of the copyright issues at the heart of this case.  While Academic Authors

frame their "commit[ment] to maximizing access to knowledge" as being opposed

diametrically to the positions of certified class members, that purported dichotomy is false.  Academic Authors Br. at 7.  Copyright Law has always been interpreted to entwine the benefits of access with protections as an incentive for creative individuals.[2]

The individual authors represented by ASJA have registered their copyrighted works and depend on the licensing of their exclusive rights for their livelihood.  Academic Authors appear to make their living in other ways, and seem willing to give away their works of authorship for free.  That is, of course, their prerogative.  They can give Google a royalty-free license, advocate that others do the same, and otherwise dedicate their works to the public however they see fit.  But their interest in the preservation of Google Books is not a legitimate argument against the adequacy of representation of the named plaintiffs or the associational plaintiff.  Instead, Academic Authors' proper course of action is to opt out of the class action, cease to be class members, and advocate their position in other ways.

Rather than opting out of the class, Academic Authors submit a Brief of *Amici Curiae* alleging that the District Court abused its discretion.  Academic Authors' position is flawed because objecting to the adequacy of representation

---

[2] The Academic Authors write that members of the class seek to "reap a windfall from [Google]" (Academic Authors Br. at 12), whereas from the Plaintiffs' point of view, they seek to stop Google from building a business on the backs of the work of authors without paying the authors for their creative labor.  Resolution of this issue is not the proper function of the class certification inquiry.

prong of the class certification analysis is <u>not</u> the proper vehicle for class members who object to the merits of a class action lawsuit.  Academic Authors accuse Judge Chin of failing to make factual findings with respect to "adequacy," but in fact, when evaluating Plaintiffs-Appellees' motion for class certification, Judge Chin made a robust factual finding about the composition of the class.  *See The Authors Guild v. Google, Inc.*, 282 F.R.D. 384, 392-95 (S.D.N.Y. 2012) .

Academic Authors further speculate that the personal views held by the particular academic authors signing on to the brief represent the majority of the certified class and that <u>all</u> scholarly, academic authors "desire broad public access to their works such as that which the Google Books project provides."  Academic Authors Br. at 2.   Yet these bald assertions are not supported by fact, indeed, they are not supported by any admissible evidence at all.  Academic Authors only cite questionably performed surveys not before the District Court (which likely would have failed the *Daubert* test had the District Court been asked to consider them) and their own letters to Judge Chin in support of these doubtful propositions.

Without admissible evidence supporting Academic Authors' position that they represent the views of a majority of the class, there is no basis for Academic Authors to claim that Plaintiffs-Appellees are not adequately representing the interests of the class.  In any event, this question pertains to "numerosity," <u>not</u> the "adequacy of representation."

For the reasons discussed in greater detail below, the District Court's grant of class certification should be affirmed.

## III.  ARGUMENT

### A.  The Trial Court Conducted A Meaningful Inquiry Into Whether The Named Plaintiffs Are Adequately Representing The Interests of The Class.

Class action suits vindicate statutory policies in situations where the filing of individual actions is inefficient or noneconomic.  *Tsereteli v. Residential*, No. 08 Civ. 10637 (LAK), 2012 U.S. Dist. LEXIS 91017, at *49 (S.D.N.Y. June 29, 2012) (ruling in favor of class certification because "[r]equiring [] claims to proceed as separate cases on behalf of multiple plaintiffs therefore would be inefficient, would fragment the recovery effort, and would diminish the incentives for pursuing the claims.").  Here, the District Court did not abuse its discretion regarding the factual inquiry surrounding class certification.  Judge Chin properly considered the certified class' numerosity, commonality, typicality, and adequacy of representation, correctly recognized the statutory policies at issue in this case, and certified a class to reflect them.

The goals of Copyright Laws in the United States are twofold: to (1) "promote the [p]rogress of [s]cience and useful [a]rts," *e.g.*, knowledge; (2) "by securing for limited [t]imes to [a]uthors and [i]nventors the exclusive [r]ight to their respective [w]ritings and [d]iscoveries."  U.S. Const. art. I, § 8, cl. 8.  The

7

copyright system, thus, stands on two unshakeable and time-worn premises: (1) that the creation and dissemination of works is a public benefit; and (2) that the promotion of individual incentives is the best way to accomplish that end.

Academic Authors' argument would upend that constitutional design and the way that Congress has implemented it, as they seek to sever those conjoined principles. Academic Authors argue that the District Court abused its discretion in certifying the class because they assert that many most academic authors do not write for profit, which is to say, to earn a portion of their income (an unproven naked statement in any event), and extrapolate from that bold (but unsupported) statement to argue that making works available is the sole goal of the Constitutional support for copyright. Academic Authors Br. at 7 ("Academic authors, almost by definition, are committed to maximizing access to knowledge. The Authors Guild and the Association of American Publishers, by contrast, are institutionally committed to maximizing profits." (internal quotations omitted)).

This effort at describing polar opposites widely misses the mark. ASJA's members may or may not be interested in "maximizing profits," but all are certainly interested in earning a fair wage for their professional work and in putting food on their families' tables.[3] Instead, authors should be focusing their time on

---

[3] Google itself is a multinational corporation institutionally committed to maximizing profits. *See* Verne G. Kopytoff, *Revenue Rises at Google but Profit Misses Forecasts, and Analysts Point to Spending*, N.Y. TIMES, Apr. 14, 2011,

creating works that enhance the public weal, not on individually bringing lawsuits that are unlikely to return more in damages than the cost of pre-trial discovery. Very few could afford to litigate against the likes of Google individually, taking into account both the time and financial resources that such a litigation would require.  Moreover, it is well-known that academic salaries are not uniform among the various academic disciplines, or even within the same department of a single university.  While a tenured professor might be content with completely free access to her work, a colleague with the rank of assistant professor might hope that his book's royalties will provide the down payment on a house, or send children to summer camp.  It is fallacious to assume that all academics are so adequately compensated that they can universally afford to make no money on their copyrighted books.

In any event, Academic Authors' biases merely represent a disagreement with the merits of the claims held by all class members (including themselves) against Google's acknowledged mass acts of copyright infringement (which Google argues should be excused for fair use).  Thus, Academic Authors' proper course of action is simply to opt out of the litigation – no one is compelling them to sue to vindicate their rights.  *See, e.g.*, *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 236

---

available at *http://www.nytimes.com/2011/04/15/technology/15google.html?_r=0* (noting that Patrick Pichette, Google's chief financial officer, stated "Google would remain a technology company looking for new users and 'billion dollar businesses.'").

F.R.D. 62, 69 (D. N.H. 2006) (regarding a potential conflict of interest, "equity holders who do not want to be a part of the class can exercise their right under Rule 23(c)(2)(B) to opt out of the litigation."); Theodore Eisenberg and Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1537 (2004) ("[I]f class members are not afforded the right to opt-out, this may result in a more stringent application of the adequacy of representation requirement.").

More fundamentally, Academic Authors' position is wrong because the public benefit of the creation and dissemination of works and promotion of individual incentives have never been severable principles.  As the Founders, this Circuit and the Supreme Court have repeatedly recognized, "the public good . . . fully coincides with the claims of individuals."  *See, e.g.*, The Federalist No. 43, p. 272 (C. Rossiter ed. 1961) ("[T]he public good fully coincides . . . with the [copyright] claims of individuals."); *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) ("Rewarding authors for their creative labor and promoting . . . [p]rogress are thus complementary; . . . JUSTICE BREYER's assertion that copyright statutes must serve public, not private, ends . . . similarly misses the mark.  The two ends are not mutually exclusive; copyright law serves public ends by providing individuals with an incentive to pursue private ones.").

The author's profit motive is what ensures access to particular works, and

10

that incentive has formed the basis of every United States copyright law since the first enactment of the Constitutional principle by Congress in 1790.  The current version of the Copyright Act, and all of its predecessors, have given exclusive rights to authors for limited times and prohibited others from exploiting those works without authorization.  The class certified by the District Court fits comfortably within those contours.

Judge Chin fully considered the arguments now being made by Academic Authors, and upon reviewing them he made the appropriate decision to reject them. In particular, Judge Chin noted that the copyright claims of the Plaintiffs-Appellees "do not conflict in any way with the copyright claims of the other class members." *Authors Guild*, 282 F.R.D. at 394.  This is the case because Google's conduct that forms the basis for all class members' claims is the same, and all class members' have a claim of copyright infringement against Google based on that conduct.  All class members share the same copyright infringement claims against Google stemming from the same conduct, rendering class adjudication appropriate.  *See, e.g.*, *In re KMart Corp. Sec. Litig.*, No. 95-CS-75584-DT, 1996 U.S. Dist. LEXIS 22609, at *27 (E.D. Mich. Dec. 16, 1996) ("The inclusion of equity (holders), along with non-equity (sellers) class members, does not engender a substantial conflict where the equity plaintiffs have a personal interest in the success of the class action.").

Academic Authors try to set up a conflict by writing that "the only way for the interests of academic authors to be vindicated in this litigation, given the positions that the plaintiffs have taken thus far, is for Google to prevail on its fair use defense and for the named plaintiffs to lose."  Academic Authors Br. at 3. While Academic Authors may disagree with the rest of the certified class because of their personal interest in free access to copyrighted works, or their views on the role and scope of the fair use doctrine, this philosophical discrepancy is not sufficient to create a conflict requiring a finding of inadequacy of representation for class certification in this case.  If Academic Authors want to freely license their works to Google or dedicate them to the public, they are free to do so.  ASJA and its members, however, are entitled to litigate the legality of Google's conduct, and their ability to litigate in the more efficient class action format should not yield to the Academic Authors' views on the merits.

Judge Chin correctly noted that "some potential class members' interests may be different from other members' interests.  But this fact does not undermine the overall efficacy of a class action.  If any author feels that her interests are not aligned with those of the other class members, she may request to be excluded." *Id.* at 394 n.8 (citing Letter from Pamela Samuelson, Professor of Law and Information, UC Berkeley School of Law (Feb. 13, 2012) (on file with the court)). No conflict exists in the class action sense – if Academic Authors do not want to

12

pursue their claims, they can opt out. *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, *supra.*

The number of authors who may share the views of Academic Authors is irrelevant to the "adequacy of representation" inquiry. There is no limit on the number of opt outs in a class action. While it is theoretically possible that so many members of a class could disagree with the merits of an action that it would reduce the number of claimants to make a class fail the "numerosity" test, Academic Authors have failed to make their case. They make the twin claims that academics constitute a "substantial part of the class" and that all authors of academic works share the desire for open access to the entire corpus of written works without compensation to authors. Yet, for these propositions, Academic Authors cite only to their own letters as proof. Academic Authors Br. at 5-6. This is neither admissible evidence, nor do their own letters even support their speculative statement. *See id.* at 8 ("Despite the strong likelihood that academic authors constitute a substantial portion of the class . . . ." (emphasis added)).

Judge Chin fully addressed this claim in his *Class Cert. Order*. *See Authors Guild*, 282 F.R.D. at 393 ("The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage."). In fact, the record already includes evidence of holders of copyrights in academic works who favor strong

13

protection of their copyrighted works.  *See, e.g.*, Br. for Appellees, dated Feb. 8, 2013, Dkt. 81 at 16 (stating that the widow of a Professor at Columbia University's Teacher's College, who held copyright interests in her late husband's textbooks, testified that "[h]e was an academic author" who "wrote textbooks," and that she is an adequate representative of all authors, because, "I know a great many academics, as I know a great many plain authors and I know that no matter what kind of book they are writing, they are all concerned about their copyright and the rights of holders of copyright to control their books.").

Academic Authors do refer to some survey evidence, but this evidence was not before the District Court and should not be considered now.[4]  In any event, the surveys offered are akin to those already presented by Google that were rejected properly by Judge Chin.  Academic Authors stated that a 2011 survey, among others, of academic authors, "which asked about attitudes toward open access

---

[4] *See*, *e.g.*, *Metcalf v. Daley*, 214 F.3d 1135, 1141 n.1 (9th Cir. 2000) ("The Humane Society of the United States . . . made a motion for leave to file an amicus brief, which we granted.  However, we also granted appellees' joint motion to strike the extra-record documents that the Humane Society submitted with its amicus brief."); *High Sierra Hikers Ass'n v. Powell*, 150 F. Supp. 2d 1023, 1045 (N.D. Cal. 2001) ("At this stage, Amici are not parties and cannot introduce evidence.").  In any event, if the court is inclined to consider Academic Authors' extra-record evidence, ASJA notes that a Bowker report for 2011 shows that 347,178 books were published in United States that year.  *See generally*, *http://www.bowker.com/en-US/aboutus/press_room/2012/pr_06052012.shtml*.  For the same year, the Association of American University Presses indicates that its members (which include publishers outside the United States) published a total of 12,000 books.  *See generally*, *http://www.aaupnet.org/about-aaup/about-university-presses/aaup-snapshot*.

14

publishing, showed that over 75% of the more than 8,000 respondents indicated that it was 'very important' or 'important' to be able to offer their work free online to a global audience."  Academic Authors Br. at 13.  No information is provided that would support admissibility of this survey, which is no different in kind than Google's survey "in which slightly over 500 authors (58% of those surveyed) 'approve' of Google scanning their work for search purposes, and approximately 170 (19% of those surveyed) 'feel' that they benefit financially, or would benefit financially, from Google scanning their books and making snippets available in search."  *Authors Guild*, 282 F.R.D. at 394.  Judge Chin's criticism of Google's survey evidence is equally applicable to those now presented by the Academic Authors: "it is possible that some authors who 'approve' of Google's actions might still choose to join the class action.  Therefore, the court cannot conclude from the survey that the representative plaintiffs' interests are in conflict with any subset of class members."  *Id.*

Academic Authors also try to advance the idea that scholarly writers outnumber generalist writers "by a factor of more than ten to one" according to their interpretation of figures from the Bureau of Labor Statistics.  Academic Authors Br. at 6.  Besides the fact that this is also not admissible evidence, it assumes that everyone reporting their job as "postsecondary" is a published author, owns their own works, and agrees with Academic Authors' position.  There is

15

simply no support for these leaps in logic.

If Academic Authors "prefer to leave the alleged violation of their rights unremedied [then that] is not a basis for finding the lead plaintiffs inadequate [because] [t]he court need concern itself only with whether those members who are parties are interested enough to be forceful advocates and with whether there is reason to believe that a substantial portion of the class would agree with their representatives were they given a choice." *Authors Guild*, 282 F.R.D. at 394 (internal citation omitted). The District Court's ruling granting certification of the class should be affirmed.

### B. Attacking Plaintiffs-Appellees' Adequacy Of Representation Is Not The Proper Vehicle For Academic Authors To Object To The Certified Class, Rather, Academic Authors Can Opt Out Of The Class And Advocate Their Position In Other Ways.

On the issue of adequacy of representation, the only grounds on which Academic Authors challenge the District Court's decision relate to their "interests [as] antagonistic to the interest of other members of the class . . . ." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Academic Authors' challenge to adequacy of representation is not fundamental, but rather purely speculative. And it is in any event meritless because Academic Authors can opt out of the certified class.

Academic Authors cite *Hansberry v. Lee*, 311 U.S. 32 (1940), as support for their position that adequacy of representation is not met here. But Academic

16

Authors plainly misread *Hansberry*, which presents a factually distinguishable situation.  In *Hansberry*, the lawsuit at issue was "to enjoin the breach by petitioners of an agreement restricting the use of land [by African-Americans] within a described area of the City of Chicago . . . ."  311 U.S. at 37.  Respondents were successful at the lower state court levels in relying on an earlier litigation to enforce the agreement, arguing that *res judicata* foreclosed any later challenge to the enforceability of the agreement.  *Id*. at 39-40.  The Illinois Supreme Court affirmed, retroactively finding that the earlier litigation was a "class" or "representative" suit "where the remedy is pursued by a plaintiff who has the right to represent the class to which he belongs, other members of the class are bound by the results . . . ."  *Id*. at 39.  In particular, "petitioners in the [*Hansberry*] suit were members of the class represented by plaintiffs in the earlier suit and consequently were bound by its decree, which had rendered the issue of performance of the condition precedent to the restrictive agreement *res judicata* . . . ."  *Id*. at 39-40.

The United States Supreme Court reversed because Respondents were not afforded their right to due process, which is plainly not at issue here for the Academic Authors.  In *Hansberry*, the plaintiffs in the earlier litigation "did not designate the defendants in the suit as a class or seek any injunction or other relief against others than the named defendants, and the decree which was entered did not purport to bind others."  *Id.* at 45.  Importantly, "defendants in the first suit

17

were not treated by the pleadings or decree as representing others [opposed to the agreement] or as foreclosing by their defense the rights of others . . . ." *Id.* at 46. The Supreme Court specifically noted that, "[s]tate courts are free to attach such descriptive labels to litigations before them as they may choose . . . .  But when the judgment of a state court . . . is challenged for want of due process it becomes the duty of this Court to examine the course of procedure . . . ." *Id.* at 40.

     *Hansberry* is inapposite because of the substantial procedural underpinnings of the two cases, and because Academic Authors' attempt to analogize the facts is both indecorous and unavailing.  Unlike the procedural situation in *Hansberry*, this action has been a putative class action from its inception.  Importantly, Academic Authors have had adequate notice as members of the class from the inception of the litigation, as evidenced by, among other things, their numerous letters to the District Court and their Brief of *Amici Curiae*.  Unlike Respondents in *Hansberry*, Academic Authors had notice of the class litigation (and will later receive formal notice of the certification if they are owners of their works) and are class members with the right to opt out.  This is among the proper remedies for a class member seeking to end her membership in the class – an attack on adequacy of representation of the named plaintiffs is not.  *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Lit.*, 115 F.3d 456, 457-58 (7th Cir. 1997) ("If the certified class representative does not adequately represent the interests of some of

the class members, those class members can opt out of the class action, can seek

the creation of a separately represented subclass, can ask for the replacement of the

class representative, or can intervene of right and become named plaintiffs

themselves, or even class representatives, represented by their own lawyer.").

It is also surprising that Academic Authors view themselves as equals with

those aggrieved in *Hansberry*, where the alleged class seeking to enforce racially

restrictive real estate covenants would have included African-Americans, the very

group aggrieved by the compact sought to be enforced.  Seeking free access to

copyrighted works against the wishes of authors and copyright owners does not

lend itself to a comparison to being forced to acquiesce to race-based

discrimination.

Similarly, Academic Authors improperly view their interests as comparable

to the unknown authors of unclaimed "orphan" works.  *See* Academic Authors Br.

at 7.  Academic Authors cite *Authors Guild I* for the proposition that "the court

further found that the named plaintiffs had inadequately represented the interests of

authors of unclaimed works."  *The Authors Guild v. Google, Inc.* 770 F. Supp. 2d

666, 680 (S.D.N.Y. 2011) (hereinafter, "*Authors Guild I*").  However this

proposition is taken grossly out of context.

In *Authors Guild I*, the court explained that one, among the many, of the

problems with the proposed settlement was that it did not properly account for

orphan works, because under the proposed settlement "class members would be giving up certain property rights in their creative works, and they would be deemed – by their silence – to have granted to Google a license to future use of their copyrighted works." *Id*. But the District Court rejected the proposed settlement on numerous grounds, and the orphan works problem is thus no longer an issue. The named plaintiffs represent the rights of all class members, including the unknown owners of orphan works, in connection with Google's acts of copyright infringement, and there is no factual basis on which to assert that owners of so-called orphan works would, as a group, want to relinquish their claims.

The only appropriate course of action for the Academic Authors is to opt out, not challenge the class. The District Court's grant of class certification should be affirmed.

### C. Attacking Plaintiffs-Appellees' Adequacy Of Representation Is Not The Proper Vehicle For Attacking The Merits Of Plaintiffs-Appellees' Claims.

As noted above, if Academic Authors disagree with the merits of the claims in the lawsuit or with the remedies sought against Google, they are free to exercise those views in numerous ways. But attacking the merits of the lawsuit is not properly before the Court at this time and is not pertinent to the "adequacy" inquiry.

Academic Authors are free to opt out of the class and not pursue their

20

particular claims of copyright infringement against Google. They can license their works, free of charge, to Google, or anyone else, and dedicate their works to the public. They can advocate that their fellow academic authors (and others) join them in doing so. They can file amicus briefs in support of Google's fair use argument and provide Google with evidentiary support. And they can picket the offices of the Authors' Guild and use the Internet as a pulpit for their views. What they have not done is make a good argument against the efficiency of the class action vehicle.

Academic Authors incorrectly argue that the "most fundamental conflict of interest that warrants decertification of the class concerns the merits of the plaintiffs' claims" because they believe that "Google's fair use defense [is] more persuasive [to the Academic Authors themselves] than the named plaintiffs' theory of infringement." Academic Authors Br. at 14. But the reality is that no court decision has ever stated that a technology provider may, for its own profit-seeking reasons, indiscriminately make copies of works without the permission of the copyright owner that the owner did not intend to make available digitally without permission or payment.

In support of their dubious position, Academic Authors misleadingly quote *The Authors Guild v. Hathitrust*, No. 11 CV 6351 (HB), 2012 U.S. Dist. LEXIS 146169 (S.D.N.Y. Oct. 10, 2012). In *Hathitrust*, which is on appeal in any event,

the defendants entered into agreements with Google, which was not a party to the lawsuit, "that allowed Google to create digital copies of works in [Defendants'] libraries in exchange for which Google provides digital copies to Defendants." *Id.* at *8. "For works with known authors, Defendants use the works within the HDL in three ways: (1) full-text searches; (2) preservation; and (3) access for people with certified print disabilities." *Id.* at *9. Defendants admitted that Plaintiffs established a "*prima facie* case of infringement as to some . . . works," but Defendants asserted the defense of fair use. *Id.* at *40.

The views of the *Hathitrust* court on the copyright issues in that case do not speak to class certification in this case, where the court has yet to address the merits. Moreover, there are meaningful differences between this case and *Hathitrust* that argue for further caution when making comparisons. Neither Google nor the Academic Authors were parties to the *Hathitrust* action, which was brought largely against university libraries and organizations for blind scholars. Further, Defendants in *Hathitrust* were not seeking open access for anything close to the scale of the Google Books project; rather, Defendants sought digitization of their resources for non-commercial use by their students and patrons. *Compare U.S. v. Am. Soc'y of Composers, Authors and Publishers (In re AT&T Wireless)*, 599 F. Supp. 2d 415, 424-28 (S.D.N.Y. 2009) (Conner, J.) (rejecting AT&T's argument that preview clips of ringtones and ringbacktones were transformative fair

22

use because "the music segments used in [AT&T's] previews are exact copies of ASCAP music," and offering consumers the opportunity to listen to ringtones was not "criticism, comment, news reporting, teaching . . . scholarship or research," but was rather AT&T's commercial use which was a "deliberate use of ASCAP music . . . to sell [AT&T's] own product.").

**D.  The Class Action Vehicle Is Critical For Enforcing The Rights Of Artists And Copyright Owners In The Digital Age.**

The efficiencies and benefits of properly-constituted class actions are well-known.  *See, e.g., In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 326 (S.D.N.Y. 2012) ("Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." (emphasis added)).

The need for the class action vehicle is even more critical in cases involving Internet and new media technologies, where many of the traditional elements of cases have become magnified.  Entities employing new technologies are able to engage in acts of infringement more rapidly, on a greater scale, and with substantially-reduced costs (if costs are not eliminated altogether).  Once the initial infringements have taken place, these entities can instantly disseminate the resulting copies on a vast scale with, once again, negligible costs.

23

For the injured parties, however, the effects are reversed.  It becomes increasingly difficult, costly and time-consuming for copyright owners to keep up with the rising tide of infringing activity and seek meaningful resolution of their claims.  While large scale copyright owners like record labels and music publishers have their own problems playing "Whack-A-Mole," the problems of enforcement in today's digital environment are especially magnified for authors and owners of single, or limited numbers of, works.  Those authors have neither the resources nor the financial ability to mount any effort to enforce their rights unless they can do so collectively.  And unlike other laborers whose work conditions are protected by unions, most authors are not protected by collective bargaining for fear that efforts to do so will be attacked (whether meritorious or not) under the antitrust laws.  So associations like the named associational plaintiff The Authors Guild, ASJA and others are all that authors have to serve as watchdogs for their rights.  And only the class action can be effective when those rights need to be vindicated in court.

Thus, as this problem is reflected in the "adequacy of representation" inquiry, the district court recognized:

> When Google copied works, it did not conduct an inquiry into the copyright ownership of each work; nor did it conduct an individualized evaluation as to whether posting "snippets" of a particular work would constitute "fair use."  It copied and made search results available *en masse*. Google cannot now turn the tables and ask the Court to require each copyright holder to come forward individually and assert rights in a separate action.

> Because Google treated the copyright holders as a group,
> the copyright holders should be able to litigate on a group
> basis.

*Authors Guild*, 282 F.R.D. at 391.

This appeal on class certification is not the time to consider or decide whether Google has a meritorious fair use defense, or whether the Academic Authors have an entitlement to give away their own work for free and enjoy free access to the works of others. What is relevant is that Google's decision to proceed in the way that it did, on the scale that it did, with full knowledge of its impact on the class, makes it a quintessential example of why the class action vehicle exists, and why it is a perfect fit for cases such as this, especially in this digital age.

## IV. CONCLUSION

For the foregoing reasons, ASJA respectfully requests that the order of the District Court granting certification of the class be affirmed.

Dated: February 15, 2013

Respectfully submitted,

*/s/ David Leichtman*
David Leichtman (DL 7233)
Hillel I. Parness (HP 1638)
Shane D. St. Hill (SS 1361)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980–7400
Facsimile: (212) 980–7499
dleichtman@rkmc.com

25

hiparness@rkmc.com
ssthill@rkmc.com

*Counsel for Amicus Curiae The American Society of Journalists and Authors*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(d) because this brief contains 6,101 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on this 15th day of February, 2013, I caused a PDF

version of the foregoing brief to be filed electronically using the CM/ECF system.


*/s/ David Leichtman*
David Leichtman