# 12-3200

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES,
JOSEPH GOULDEN, and JIM BOUTON, individually and
on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

*v.*

GOOGLE INC.,

*Defendant-Appellant*.

---

On Appeal from an Order Granting Certification of a Class Action, Entered on
May 31, 2012, by the United States District Court for the Southern District of New
York, No. 1:05-cv-08136-DC Before the Honorable Denny Chin

---

### REPLY BRIEF FOR APPELLANT

---

DARALYN J. DURIE
JOSEPH C. GRATZ
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
(415) 362-6666

SETH P. WAXMAN
LOUIS R. COHEN
RANDOLPH D. MOSS
DANIEL P. KEARNEY, JR.
ARI HOLTZBLATT
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

March 6, 2013

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................... ii

I.    PLAINTIFFS CANNOT DEMONSTRATE ADEQUACY UNDER RULE 23(a) .............2

II.   GOOGLE'S FAIR USE DEFENSE RAISES INDIVIDUAL ISSUES THAT
      DEFEAT PREDOMINANCE UNDER RULE 23(b)(3) ...........................14

III.  PROOF OF COPYRIGHT OWNERSHIP AND TIMELY REGISTRATION
      WILL PRESENT ADDITIONAL INDIVIDUAL ISSUES THAT WEIGH
      AGAINST PREDOMINANCE ..............................................21

CONCLUSION ....................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF ELECTRONIC FILING

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988) .................................3, 4

*Cambridge University Press v. Becker*, 863 F. Supp. 2d 1190 (N.D. Ga. 2012) ................................................................................................14

*Crasto v. Kaskel's Estate*, 63 F.R.D. 18 (S.D.N.Y. 1974)........................................21

*Dunnigan v. Metropolitan Life Insurance Co.*, 214 F.R.D. 125 (S.D.N.Y. 2003) ................................................................................................26

*Erhardt v. Prudential Group, Inc.*, 629 F.2d 843 (2d Cir. 1980) ...........................11

*Fogarazzo v. Lehman Brothers*, 263 F.R.D. 90 (S.D.N.Y. 2009) ..........................26

*Freeland v. AT&T*, 238 F.R.D. 130 (S.D.N.Y. 2006)...............................................6

*Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630 (N.D. Tex. 1994) ................................................................................................11

*In re Fedex Ground Package Systems, Employment Practices Litigation*, 2007 WL 3027405 (N.D. Ind. Oct. 15 2007) ..................................................9

*In re Franklin National Bank Securities Litigation*, 574 F.2d 662 (2d Cir. 1978) ................................................................................................25, 26

*In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ................................................................................................21, 27

*In re Napster, Inc. Copyright Litigation*, 2005 U.S. Dist. LEXIS 11498 (N.D. Cal. May 31, 2005).............................................................................27

*In re OSB Antitrust Litigation*, 2007 U.S. Dist. LEXIS 56617 (E.D. Pa. Aug. 3, 2007) ................................................................................................24

*In re School Asbestos Litigation*, 842 F.2d 671 (3d Cir. 1988) ..............................12

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583 (N.D. Cal. 2010) ................................................................................................24

*Kirshner v. Uniden Corp. of America*, 842 F.2d 1074 (9th Cir. 1988) .................19

*Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) ..........11

*Matyasovsky v. Housing Authority of Bridgeport*, 226 F.R.D. 35 (D. Conn. 2005) ....................................................................................6

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293 (D.D.C. 2007) ........................................................................................6

*Moore v. PaineWebber*, 306 F.3d 1247 (2d Cir. 2002) ...........................................20

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010) ...............................................20

*Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000) ...........................8

*Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920 (2d Cir. 1968) .................................................................................5

*Nunez v. Caribbean International News Corp.*, 235 F.3d 18 (1st Cir. 2000) ..................................................................................17

*Oboler v. Goldin*, 714 F.2d 211 (2d Cir. 1983) .....................................................20

*Phillips v. Klassen*, 502 F.2d 362 (D.C. Cir. 1974) ..................................................4

*Silberman v. Innovation Luggage, Inc.*, 2003 WL 1787123 (S.D.N.Y. Apr. 3, 2003) ...............................................................................24

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003) ...................................................................................4

*Vulcan Golf LLC v. Google*, 254 F.R.D. 521 (N.D. Ill. 2008) ...............................25

*Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541 (2011) .................................................18

*Ward v. Dixie National Life Insurance Co.*, 595 F.3d 164 (4th Cir. 2010)..............6

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003)................23

## STATUTES AND RULES

17 U.S.C.
    § 107 ...........................................................................................14
    § 501 ...........................................................................................23
    § 504 ...........................................................................................20
    § 505 ...........................................................................................20

Fed. R. App. P. 23 ............................................................................*passim*

## OTHER AUTHORITIES

16A *Federal Practice and Procedure* (4th ed. West 2012)....................................19

*Manual for Complex Litigation* (4th ed. 2004)..................................................10, 11

1 *Newberg on Class Actions* (5th ed. updated Nov. 2012).........................................3

Plaintiffs' suit cannot satisfy Rule 23 for two principal reasons. *First*, adequacy under Rule 23(a) is lacking because Plaintiffs cannot claim to represent the many class members who approve of and benefit from Google Books and would be harmed by accomplishment of the very objectives of Plaintiffs' suit—to shut down or drastically curtail the project. *Second*, common issues do not predominate under Rule 23(b)(3) because Plaintiffs cannot prevail on the central issue in this litigation—Google's fair use defense—without individual assessments of the fair use factors with respect to the vast array of books in Google Books and because determining copyright ownership and timely registration in many instances will require the district court to conduct book-specific evidentiary assessments.

Plaintiffs do not directly engage these arguments. As to the adequacy requirement, Plaintiffs contend, for example, that whether a substantial portion of the class would be helped or harmed by Google Books is irrelevant, yet they cannot distinguish the many cases holding otherwise. Plaintiffs also focus singularly on the validity of Google's survey, even though the survey only confirmed the obvious (that many authors benefit from Google Books), and the district court itself did not find the survey misleading or invalid.

Plaintiffs take a similar approach to the fair use issue. They do not dispute that fair use is the principal issue in this case. They do not dispute that the fair use

defense can, and often does, turn on individual issues—including how each of the fair use factors weighs in the overall balance required by Section 107 as to each work. Rather than explain how a court can make these fact-specific judgments on a classwide basis, Plaintiffs argue, illogically, that Google cannot have a context-specific fair use defense as to each individual work because Google has also argued (after the class was certified) that the entire project is fair use. That contention cannot be right: the fact that, once a class was certified, Google argued fair use on a classwide basis cannot preclude it from arguing on appeal that the district court should not have certified a class in the first place in light of its individual fair use defense.

As for proof of copyright ownership and timely registration, Plaintiffs' argument that these issues involve "objective" evidence (Br. 43) does not make them any less "individual," as the district court recognized (SPA33), nor does it avoid the complications of adjudicating copyright ownership and registration on a book-by-book basis.

## I.  PLAINTIFFS CANNOT DEMONSTRATE ADEQUACY UNDER RULE 23(a)

This case is about whether Google's modern version of the card catalog—a search tool that allows anyone with access to the Internet to search among millions of books—can continue to exist. A substantial portion of the class benefits from Google Books and, not surprisingly, approves of it. The interests of those authors

- 2 -

are contrary to the objectives of Plaintiffs' suit, which seeks to thwart the project. *See* Google Br. 17-25. As Google explained in its opening brief, this defeats adequacy under Rule 23(a).

Plaintiffs do not directly confront this hurdle to class certification but instead argue that (1) there is no cognizable "conflict" because there is no reason to believe that lead plaintiffs "might compromise the claims of another group of class members" (Pls.' Br. 15, quoting the certification decision), and (2) in any event, the district court properly disregarded evidence of the conflict. Both arguments are wrong.

1. The Rule 23(a) adequacy requirement is not there merely to guard against "conflicts" that might cause the lead plaintiffs to "compromise the claims" (Pls.' Br. 15) of other class members. The requirement also serves the more fundamental purpose of ensuring that class members are not conscripted into litigation that is contrary to their interests. "[C]onflicts may preclude certification on adequacy grounds if some class members have an explicit desire to maintain the status quo or otherwise stand to benefit if the defendant continues the challenged practices." 1 *Newberg on Class Actions* § 3:64 (5th ed. updated Nov. 2012). The cases Google cited in its opening brief demonstrate this. *See* Google Br. 18-19 & n.5. In *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988), for example, the Seventh Circuit affirmed denial of certification not because of a risk that lead

- 3 -

plaintiffs could compromise other class members' claims, but because many absent class members would not want the litigation to go forward *at all*. These class members "derive[d] great benefit from [the challenged additional] operations" at the airport and included "homeowners who … may benefit from extra flights and so oppose homeowners differently situated." *Id. See also, e.g.*, *Valley Drug Co. v. Geneva Pharm.*, 350 F.3d 1181, 1189-1191 (11th Cir. 2003) ("interests and objectives" of class members not aligned where the "record indicates that some [class members] are further injured rather than benefitted by generic competition" allegedly suppressed by defendants); *Phillips v. Klassen*, 502 F.2d 362, 366-367 (D.C. Cir. 1974) ("question arises whether the parties to the action in fact represent the interests of those affected" where many class members would oppose having the challenged early retirement plan declared unlawful).

Plaintiffs' sole response to these cases is that "[n]one are from this Circuit, and none involve copyright infringement litigation." Br. 17. But they cite no case suggesting that the Second Circuit applies different adequacy standards under Rule 23(a). Nor do they offer any reason or authority for exempting copyright infringement litigation from Rule 23(a) or explain why copyright claims should be held to a less exacting rule. Plaintiffs' only Second Circuit case did not concern

Rule 23(a) adequacy but rather the distinct requirement of commonality.  *See Norwalk CORE v. Norwalk Redev. Agency*, 395 F.2d 920, 937 (2d Cir. 1968).[1]

The conflict in this case is in no way "speculative" (Pls.' Br. 22); some class members will clearly be harmed if Plaintiffs prevail—harmed by the very relief Plaintiffs seek.  It is clear that a substantial portion of the class benefits from Google Books because it enhances their readership, and would not want to see Google Books declared unlawful, enjoined, or crippled by damages.  While Plaintiffs claim (at 23) that they do not seek to "dismantle" Google Books, the very purpose of their suit is to enjoin Google Books from continuing in its current form (A131-133), and there is ample evidence that Plaintiffs' purpose is to stop the project, (*e.g.*, A380 (Goulden Dep.) ("Q. Are you asking the Court to order Google to shut down the snippet view portion of the Google books Website?  A. Yes."); A394 (Miles Dep.) (stating that she is "asking for the Court to order Google to shut down the snippet view portion of Google Books" and to stop "digitizing full copies of books"); A364 (Bouton Dep.) ("Q. Would you want the Court to shut down [the

---

[1]      In *Norwalk CORE*, the district court held that commonality was lacking because the plaintiffs' legal claims—whether they had been discriminated against and whether the statutory relocation standards under the Housing Acts of 1949 and 1954 were met—required proof of individual issues.  *See* 395 F.2d at 937.  It was only in this commonality context that this Court, in reversing the district court, made the statement that Plaintiffs repeatedly quote (at 3, 16)—that it was irrelevant that some residents were "personally satisfied" with the relocation efforts.  *Id*.  The decision has no bearing on the adequacy issue in this appeal.

snippet view] feature in Google Books?  A. If it is part of what Google needs to do in order to avoid copyright violations, yes.")).[2]

That basic conflict over the objectives of this litigation is far more fundamental than the conflicts asserted in the various cases cited by Plaintiffs.  *See* Pls.' Br. 20; *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (asserted conflict rested "on the uncertain prediction that this lawsuit will cause [insurance] premiums to increase enough to adversely affect some members of the class"); *Meijer v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 303-305 (D.D.C. 2007) (argument that three members of plaintiff class benefited from defendants' conduct refuted by record evidence including a declaration from the three class members "disavow[ing] a potential disadvantage from participating in the same proposed class"); *Freeland v. AT&T*, 238 F.R.D. 130, 141 (S.D.N.Y. 2006) (adequacy satisfied where several named plaintiffs shared the perspective of absent class members that defendant's "inclusion of additional features in their [cellphone] handsets" was beneficial); *Matyasovsky v. Housing Auth. of*

---

[2]    Plaintiffs assert (at 23) that they are not seeking "an injunction against Google Books operating in a legal manner," but they claim that Google's digitization of books for inclusion in the search index and its display of snippets are unlawful; Google disputes that claim, and the present issue is whether Plaintiffs adequately represent the many class members who want Google to prevail. Likewise, the suggestion by Plaintiffs (at 23; *see also* Dramatists Br. 27) that "there are other types of equitable relief short of pulling the plug," such as a court-ordered compulsory license, does not change the fact that such relief could render the entire project nonviable.

*Bridgeport*, 226 F.R.D. 35, 42-43 (D. Conn. 2005) (asserted conflict based on mere fact that there was not enough housing at public apartment complex to accommodate every class member).

2. Plaintiffs and their amici also contend (Br. 21-33; Dramatists Br. 14; ASMP Br. 9) that the district court properly disregarded survey evidence showing, among other things, that 58% of respondents "approve[d] of Google scanning their copyrighted books so that they can be searched online and short excerpts displayed in search results" and 45% believed that demand for their books improved or would improve as a result of Google Books. A251-252. To begin with, the survey results merely confirm common sense: many authors benefit from inclusion of their works in a searchable index through which an Internet user anywhere in the world can identify and locate their books. Google Books is not a substitute for buying or borrowing books; it does not sell or display books, but merely allows users to *find* books—to search for books that match their interests and to decide, based on a few short snippets, whether the book is potentially relevant or useful. It stands to reason that authors benefit from such a tool.[3]  *See* Google Br. 20-22; *see*

---

[3]  Plaintiffs' repeated statement that "up to 78%" of each book is "display[ed]" is not supported by the record. *See* Br. 10, 31, 37, 40. As Google's opening brief explains (at 7-8), Google Books displays no more than three snippets from a book in response to a search query; for a book of 500 pages, a query will display less than one-tenth of one percent of the book. Of course, a person already in possession of the text of the physical book could laboriously (and pointlessly) create searches to summon additional snippets. But snippet display is designed to

*also* A859 (Authors Guild statement that many titles "that are receiving little attention … may benefit from additional exposure in searches"); *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 378 (2000) ("The quantum of empirical evidence needed … will vary up or down with the novelty and plausibility of the justification raised."). Indeed, in the world of Internet-originated content, prominent inclusion in search results is highly coveted, and entire businesses are focused on how best to optimize websites' visibility in search results.

The district court erred in failing to give weight to Google's survey evidence. First, the court dismissed the survey as irrelevant because, it believed, the fact "that some class members may prefer to leave the alleged violation of their rights unremedied is not a basis for finding the lead plaintiffs inadequate." SPA31. But the conflict here is not that some class members may not wish to pursue their rights; it is that they will be harmed by the relief their "representatives" are seeking. The fact that a substantial portion of the class opposes the objectives of Plaintiffs' suit precludes certification under Rule 23(a)(4). *See supra* pp. 1-5; Google Br. 18-22. Second, the court stated that "the survey does not prove that any individual author would not want to participate in the instant class action"

---

prevent users from creatively stringing together a significant portion of any book. For example, the placement of snippets in a page is fixed (*e.g.*, a user cannot search the last word in a snippet and generate a different snippet), only one snippet per page is displayed in response to a given search, and one snippet per page and every tenth page are "blacklisted" from snippet view. A506.

because it "did not ask the respondents whether they would want to be part of a law suit through which they might recover damages." SPA31-32. But this again misses the legal significance of the survey, which was not designed to determine who might opt out of the litigation but whether class members' interests would be served if Plaintiffs' suit secured its objective of stopping or curtailing Google Books. Of course many authors might welcome a result in which Google Books continues as is *and* each author receives $750 per book. But that is not Plaintiffs' stated objective (*see supra* at 5-6), and a judgment declaring Google Books unlawful would threaten the project.[4]

Plaintiffs offer two additional reasons for disregarding the survey evidence. Neither was adopted by the district court, and neither can be a basis for deferring to that court's discretion. First, they argue (at 25) that the survey was "procedurally improper." Pls.' Br. 25. Second, they argue that the survey was "misleading" and "confusing." Pls.' Br. 28. Both arguments are wrong.

Plaintiffs' contention that Google acted improperly in commissioning the survey is incorrect and only highlights the weakness of their arguments regarding the survey. Plaintiffs never raised any issue of impropriety before the district

---

[4]    Plaintiffs' citation to *In re Fedex Ground Package Systems, Employment Practices Litigation*, 2007 WL 3027405 (N.D. Ind. Oct. 15 2007), is inapposite because in that case the survey was offered to suggest a potential conflict about the "form" of relief in the event the plaintiffs prevailed on liability, not to show a conflict about the very objectives of the litigation.

court.  They were given a full opportunity to examine the report of Google's

survey expert, including the complete survey data file, and to depose him.  *See*

A226-344 (Poret report); A720-781 (Poret deposition excerpts).  They never

complained to the court about Google's conduct, and the court never suggested that

Google had done anything improper.  Plaintiffs cite no authority suggesting it

would be appropriate for this Court to determine *de novo* that the survey was

improper and exclude the evidence on that ground.

In any event, Google was not required even to apprise Plaintiffs of the

survey or confer with Plaintiffs about the survey's questions or methodology.  No

rule or order of the district court required Google to do so.  The *Manual for

Complex Litigation* contains no such requirement.[5]  The sections of the *Manual*

cited by Plaintiffs merely offer general guidance to courts dealing with "sampling"

or "survey evidence" and state that "[p]arties who propose to offer sampling or

survey evidence may want to consider whether to disclose the details of the

proposed sampling or survey methods to the opposing parties before the work is

done[.]"  *Manual for Complex Litigation* § 11.493, at 103 (emphasis added).[6]  And

---

[5]     The Manual, moreover, does not carry the force of law.  *See Manual for
Complex Litigation* (4th ed. 2004), Introduction, at 1 (the *Manual* "is not, and
should not be cited as, authoritative legal or administrative policy").

[6]     Recent versions of the *Manual* omit the language quoted by Plaintiffs (at 24
n.9) from the 1984 edition stating that parties "should be required" to confer
regarding survey evidence.

while elsewhere the *Manual* notes that some precertification communications "can lead to abuse," such as attempts "to obtain releases" from potential class members, it states that courts generally do not restrict such communications "except when necessary to prevent serious misconduct." *Id.* § 21.12, at 248.  There was none here.

None of the cases cited by Plaintiffs supports their charge that Google's actions were improper.  *See* Br. 25-26.  All but one involved blatant attempts by defendants to extract opt-outs from class members.  *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1200-1201 n.16 (11th Cir. 1985) (defendant violated court orders in coordinated campaign to secure opt-out commitments from thousands of customers in certified class); *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 632-634 (N.D. Tex. 1994) (defendant improperly sent letters "urg[ing] potential class members not to participate in the lawsuit"); *Erhardt v. Prudential Group*, 629 F.2d 843, 845-846 (2d Cir. 1980) (vacating civil contempt citation where defendant's communications "urging [class members] to disassociate themselves from the lawsuit" did not violate the terms of district court's order).  The one other cited case addressed the particular question whether a district court acted within its discretion under Rule 23(d) in requiring a defendant-funded association to indicate its involvement in the litigation when

providing members of a certified class with a booklet describing asbestos risks. *See In re Sch. Asbestos Litig.*, 842 F.2d 671, 681-684 (3d Cir. 1988).

Nothing remotely like those circumstances is present here. Google was not trying to get potential class members to do anything. The survey was conducted under "double-blind" conditions by a leading independent polling firm. A232, 249. Out of more than 142,000 living U.S. authors, the survey included a sample of 880 respondents (*see* A245)—a fraction large enough to obtain valid survey results but far too small to meaningfully influence participation in the litigation. Moreover, the survey merely asked questions, and provided enough information and context to make those questions understandable, without influencing respondents' views. There is thus no basis to contend that the survey was intended to "frustrate [potential class members'] legal right to be represented in a class action" or to "undermine the ability of the entire class to obtain redress." Pls.' Br. 25.

The survey itself was neither misleading nor confusing (and the district court did not find that it was). The survey did not "vaguely or cursorily describe[] Google Books." Pls.' Br. 29. Rather, the survey explained at the outset:

> As you may or may not know, Google scans books so that their content can be searched online and results displayed in Google Books.
> …
> For some books, short excerpts of a book – about one-eighth of a page each – are viewable in Google Books search results. A user who

> performs a search can see up to three short excerpts of the book
> containing the relevant search terms. A user can also click on a link to
> find the book in a bookstore or library. This scanning of books and
> displaying of short excerpts in search results is what we would like to
> ask you about.

A273.[7] This is precisely correct.  Plaintiffs also claim (Br. 29) that respondents did

not understand that Google Books' scanning and display of snippets were without

authors' permission.  But the survey showed that greater familiarity with Google

Books tended to *increase* respondents' approval of the project.  *See* A256 (69% of

respondents "very" or "extremely" familiar with Google Books approved versus

56% of those "not at all familiar" or who had "not heard of" the project).  In

addition, contrary to Plaintiffs' contentions (at 30-31 & n.11), the survey made

very clear to respondents that there was a difference between books scanned and

included in snippet display and "other books" for which "the full book or longer

portions of a book are viewable in response to searching Google Books, with

special permission from the publisher or author."  A273.[8]

    In sum, there was nothing untoward or misleading about the survey, and its

results are entirely consistent with what is intuitively obvious:  that many authors

---

[7]     For comparison, this description includes more detail about the nature of the
project than Plaintiffs' complaint.  *See* A128-129 (Compl. ¶¶ 30-35).

[8]     The survey also explained: "Our questions are not about the display of full
books or longer portions… [w]e would only like to ask you specifically about the
display of short excerpts—about one-eighth of a page—as search results."  *Id*.  All
the verbatim responses cherry-picked by Plaintiffs (at 29-30) were solicited at the
very outset of the call, *before* the survey explained this distinction.

benefit from Google Books and would not want to see it dismantled or curtailed.

Those authors' interests are not served by litigation that would do just that.

## II. GOOGLE'S FAIR USE DEFENSE RAISES INDIVIDUAL ISSUES THAT DEFEAT PREDOMINANCE UNDER RULE 23(b)(3)

Google's principal defense in this case—and the core disputed issue—is fair use. Before rejecting that defense, the district court would need to conduct individual book-specific weighings of the fair use factors, and three of the factors themselves depend on the individual book, author, and use at issue (the nature of the book, the amount and substantiality of the portion used, and market impact of the use). *See* 17 U.S.C. § 107; Google Br. 26-36. More specifically, the court would need to assess and then balance how and to what extent a given book benefits from Google Books, whether displaying a three- or four- line snippet would be significant in the context of that book, and to what degree the content of the book is factual or creative.[9] Google believes it also has a valid argument that the entire project is fair use, but there is no inconsistency in saying that (a) the entire project is fair use, and (b) in any event, individual circumstances provide a fair use defense with respect to most or all books.

---

[9]    *See, e.g.*, *Cambridge Univ. Press v. Becker*, 863 F. Supp. 2d 1190, 1263-1264, 1268-1269 (N.D. Ga. 2012) (reaching opposite fair use conclusions about 37-page excerpts from two different books because one book earned significant digital licensing income and the other did not).

The argument that Google's fair use defenses raise significant individual issues was a centerpiece of Google's opposition to class certification in the district court. *See* Google's Opp. to Mot. for Class Cert. (Dist. Ct. Doc. #1000, filed Feb. 8, 2012), at 17-22. Google introduced ample book-specific evidence related to the fair use factors. Most of that evidence concerned the only individuals who were in the case at the time—Plaintiffs themselves. Google offered evidence related to the nature of Plaintiffs' books and how each was used in Google Books. A139-210. It also presented evidence that the decision whether to place a book in snippet view is made following human review of each book. A506. In Plaintiffs' depositions, Google repeatedly elicited individual evidence about the market impact of Google Books on the Plaintiffs and their books and about the nature of Plaintiffs' books. *See, e.g.*, A365 ("Q. Do you know whether you derived any economic benefit from purchasers of your book using the Google book service in order to find copies of your books that they can buy?"); A366 ("Q. Do you know whether any other members of the class have suffered any economic harm as a result of the display of quotes from their books in Google Books?"); A381 ("Q. Have you been harmed by Google's program of scanning books?"); *id.* ("Q. Have you been financially benefited by Google's action?); A396 ("Q. Have you lost any sales of books as a result of Google Books? A. I have no way of knowing that."); *id.* ("Q. Do you know whether anyone has bought a copy of one of your books after finding it

- 15 -

through Google Books?  A.  No, I don't know that."); A401 ("Q.  With respect to

each of the children's picture books that you've written, [would] short snippets …

obviate the need for purchasing the book?").[10]

Moreover, contrary to Plaintiffs' assertion (at 38), Google's interrogatory

responses stated, among other things, that the nature of the work (factor two) "tilts

more [or less] strongly" in favor of fair use depending on whether the book at issue

is more or less factual and on whether the book is in-print or out-of-print.  A868,

876.  They also stated that the amount and substantiality of the use (factor three)

"tilts more [or less] strongly" in favor of a finding of fair use depending on the

type of book at issue and how much of the book is available in snippet view.

A876-877.

With respect to absent class members, Google's survey responses show that

the nature of each book and the impact on each book's market are highly

individualized.  *See* Google Br. 30-34; A326-344.  Of course, Google believes that

the impact is positive or neutral for all of the books (and Plaintiffs of course take a

different view) but there is no denying that there is great variation.  Many survey

respondents indicated that Google Books increases "exposure" for their books or is

---

[10]    The supplemental evidence that the ASMP amici seek to introduce (ASMP Br. 23-24 (motion filed Feb. 27, 2013)) has no bearing on class certification and does nothing to undermine the evidence that individual authors benefit from inclusion of their books in Google Books.

equivalent to "free advertising" (*e.g.*, A326, respondents 231, 100422, 100463, 100835; A327, respondents 92, 103, 157, 179).  Others had particular reasons for believing that Google Books had a positive market impact on their works.  *See* Google Br. 30-31; *see, e.g.*, A335 (respondent 162: Google Books will provide "wider visibility" to academic books, which "are frequently not well known or marketed beyond a narrow university community"); A339 (respondent 100496: Google Books would allow "[m]ore younger women [to] learn something from my book").[11]

Plaintiffs' opposition brief does not contest that fair use is the central issue in this dispute or that, as a general matter, adjudicating fair use can raise individual issues.  Rather, Plaintiffs' principal argument is that Google litigated fair use on a classwide basis in the district court and should be held to that "strategic choice."  Pls.' Br. 39 n.14.  But that argument is contrary to the record before the district court and wrong as a matter of logic and law:  there is no conflict between

---

[11]    Plaintiffs' amici argue that this evidence is somehow irrelevant because "favorable market impact is not enough."  ASMP Br. 23; *see also* Dramatists Br. 23.  Even if it is not "enough," favorable market impact is certainly relevant to the fair use analysis and must be weighed with the other factors in assessing Google's use of each book.  *See, e.g.*, *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000) (holding that fourth factor favored a finding of fair use because "the only discernible effect of the publication … was to increase demand" for the photograph at issue).  It surely is relevant to evaluating Google's use and determining whether it is fair that, for example, a specialty book long out of print might have gained renewed interest or become more useful in its field (*e.g.*, because it is now searchable) as a result of Google Books.

Google's classwide fair use defense and its context-specific defense based on

book-specific assessments of the fair use factors; Plaintiffs must overcome both,

and that is precisely how Google framed the issue before the district court.

Google defended against Plaintiffs' classwide claims of infringement by

arguing that the entire project is fair use. As Google explained in its petition and

opening brief, the Google Books tool is so clearly transformative—because it

allows users to identify and find books in a way never before possible, but does not

substitute for buying or borrowing books—that it should be deemed fair use as to

all books in this suit. *See* Google Br. 1-2, 28-29; Pet. 2, 12. Google believes it

should prevail on that contention. But the fact that Google is able to present such a

defense does not mean it cannot *also* show fair use on a book-specific basis—and

its right to do that should defeat class certification. *See Wal-Mart Stores v. Dukes*,

131 S. Ct. 2541, 2561 (2011) (class may not be certified "on the premise that [the

defendant] will not be entitled to litigate its statutory defenses to individual

claims").

Moreover, Google's summary judgment arguments, which Plaintiffs and

their amici repeatedly rely on (Br. 37-43; ASMP Br. 16-18), have no proper

bearing on this Court's review of the class certification decision. That briefing

occurred after the district court certified a class and before this Court stayed

proceedings below. *See* SPA35 (class certification decision dated May 31, 2012);

Google's Mot. for Summary Judgment (Dist. Ct. Doc. #1032, filed July 27, 2012); Stay Order (2d Cir. Doc. #30, issued Sept. 17, 2012). The materials are not part of the record in this appeal, and this Court should disregard them. *See Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988) ("[p]apers submitted to the district court *after* the ruling that is challenged on appeal should be stricken from the record on appeal"); 16A *Fed. Prac. & Proc.* § 3956.1 (4th ed., West 2012) ("ordinarily, the court of appeals will not consider matter that was filed with the district court … *after* the date of the judgment or order that is challenged on appeal"). Further, allowing Plaintiffs to rely on Google's post-certification arguments to defend the certification decision would put Google (and all class defendants) in the impossible position of having to choose whether to mount a classwide defense or to forgo such a defense and preserve for appeal a challenge to class certification based on individual defenses.

There is also no merit to the contention of various amici that fair use should be decided on a classwide basis because the project stemmed from a "centralized decision" by Google (Dramatists Br. 21; *see also* Journalists & Authors Br. 25). Whether or not the decision to undertake the Google Books project was "centralized" is irrelevant; the issue is whether Google's actual use of each book is fair. The same book-specific considerations—the nature of the particular book, the substantiality of the portion of the book used, and impact on the book's market—

must be weighed whether the project involves one individual or many.  In any

event, Google *did* incorporate individual human review in the decision whether to

place a book in snippet view (A506) and thus the claim (Br. 37-38) that Google

"did not make book-by-book determinations in its Library Project" is simply

incorrect.

In the end, the district court's certification decision cut off Google's context-

specific fair use defenses and required Google to defend itself only on a classwide

basis.  That was error.  Fair use is Google's "principal defense" (SPA9) and the

"central disputed issue[]" in this case.  *Moore v. PaineWebber*, 306 F.3d 1247,

1253 (2d Cir. 2002).  The individual issues raised by that defense clearly

predominate over any common issues in this case.  *See Myers v. Hertz Corp.*, 624

F.3d 537, 550-551 (2d Cir. 2010) (predominance requirement not met where

"conceded" common issues were "clearly less substantial in the overall mix of

issues … present[ed] when compared to the ultimate (contested) question the

district court would have to decide in any potential class action").[12]

---

[12]     Amici also claim (ASMP Br. 12 n.3) that there is no practical alternative to
class litigation, but that is not so.  The Copyright Act's allowance for recovery of
statutory damages of up to $150,000 in certain circumstances (not merely $750, as
amici state) and of costs and attorneys' fees is designed to make individual
lawsuits feasible.  *See* 17 U.S.C. §§ 504(c), 505; *see also Oboler v. Goldin*, 714
F.2d 211, 213 (2d Cir. 1983) (awarding attorneys' fees "assures equal access to
courts, provides an economic incentive to challenge infringements, and penalizes
the losing party").  The fact that copyright class actions are exceedingly rare, but
there is no shortage of individual suits for statutory damages, belies the suggestion

- 20 -

### III. PROOF OF COPYRIGHT OWNERSHIP AND TIMELY REGISTRATION WILL PRESENT ADDITIONAL INDIVIDUAL ISSUES THAT WEIGH AGAINST PREDOMINANCE

Plaintiffs concede (Br. 43-56) that the district court will have to determine on an author-by-author and book-by-book basis whether each putative class member can sue for infringement as a legal or beneficial copyright owner and whether each book was registered within three months of publication. They argue that these individual issues nonetheless do not weigh against class certification because each can easily be resolved using public records or otherwise available documentation. But Plaintiffs' evidence shows, to the contrary, that the determination whether an author can claim infringement will in many cases require complex book-by-book inquiries, often involving the taking of live testimony. That issue, together with the individual issues raised by Google's context-specific fair use defense, further weighs against predominance. *See In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 44-45 (2d Cir. 2006) ("*In re IPO*").

Plaintiffs' argument regarding legal or beneficial ownership boils down to reliance on three types of documents: the copyright registration application,

---

that it is impractical for an individual party to sue. In addition, class litigation is not superior where, as here, class members have a strong interest in controlling their own claims given their differences about the objectives of the litigation. *See, e.g.*, *Crasto v. Estate of Kaskel*, 63 F.R.D. 18, 24 (S.D.N.Y. 1974) (superiority lacking because class members had an "interest in individually controlling" their claims given uncertainty that "that the ends sought or the strategy adopted by the class representatives will be shared by all members of the class whose individual monetary interests may be transcended by other considerations").

royalty statements, and publishing contracts. *See* Br. 49-50. None of these documents can resolve legal ownership claims that depend on whether rights transferred to a publisher have reverted back to the author. This is no trivial or "edge case[]" issue (Br. 53): at least nineteen of the twenty-four "representative [publishing] contracts produced by the Authors Guild" contain reversion-of-rights clauses. A349-350. Whether rights have reverted cannot be resolved by any of these documents; Plaintiffs do not contend otherwise. Nor do they dispute (*see* Br. 55-56) that it would be unmanageable to sort out these individual reversion-of-rights issues in a class setting. Plaintiffs argue only (Br. 55-56) that putative class members can nonetheless prevail by showing proof of *beneficial* ownership of some copyright interest—even if the particular interest is not implicated by Google's use.

But proving beneficial ownership presents similar complications. Plaintiffs have not shown that putative class members would usually be able to produce publishing contracts or royalty statements, as Plaintiffs would have them do to prove beneficial ownership. Those documents are not held by the U.S. Copyright Office or any other central repository. And in many cases, the documents are likely to be missing altogether. Plaintiffs themselves failed to produce publishing contracts for thirty-five of their fifty-three books. A357. And no Plaintiff produced any royalty statements or any proof that such evidence is available.

Thus, despite diligent efforts—one plaintiff described (A370) "[t]urn[ing] [his] basement upside down"—even the most motivated members of the class presumably could not prove beneficial ownership as to perhaps two-thirds of their books without resorting to other book-specific evidence, such as personal correspondence or live testimony.

Even if the key documents are available, adjudicating authors' beneficial ownership claims as to each book would present complications.  Where a work was "made for hire," simply proving that an author receives royalties would be insufficient because the author may receive royalties even though he is not a legal or beneficial owner.  *See Warren v. Fox Family Worldwide*, 328 F.3d 1136, 1140 (9th Cir. 2003).[13]  Moreover, even if an author is entitled to receive royalties for the use of certain rights (such as reproducing and distributing hard-copy books or full-text e-books), he may not be entitled to royalties for (and thus might not hold a beneficial interest in) the *particular* right allegedly infringed by Google—*i.e.*, the right to include the copyrighted book in an on-line, searchable index that returns short snippets of text.  *See* 17 U.S.C. § 501(b); *see also* Google Br. 44-46.  The

---

[13]     Plaintiffs claim (Br. 53-54) the district court could determine which books were "made for hire" using information supplied in the copyright registration application, but that evidence also may not be available, as in the case of Mr. Goulden's book *The News Manipulators*.  Google only learned *The News Manipulators* was "made for hire" when Goulden testified about it during his deposition.  A383.  And other authors may be less forthcoming, forcing the court to apply the relevant multi-factor test.  *See* Google Br. 41-43.

district court would thus have to examine each publishing contract to determine whether an author holds the relevant beneficial stake.  *See, e.g.*, *Silberman v. Innovation Luggage*, 2003 WL 1787123, at *6-7 (S.D.N.Y. Apr. 3, 2003).  That issue cannot be resolved as a "common legal issue" (Br. 55) across the class, contrary to Plaintiffs' contention.  Plaintiffs make no attempt to explain how authors (collectively or individually) would map their beneficial interests to Google's conduct, effectively ignoring section 501(b)'s requirement that they beneficially own the "particular," "exclusive right" allegedly infringed.[14]

These individual ownership issues are more complex than in the cases on which Plaintiffs rely.  In *In re OSB Antitrust Litigation*, the court needed only to examine a receipt or a photograph to determine whether each putative class member had purchased the relevant product.  *See* 2007 U.S. Dist. LEXIS 56617, *36-37 (E.D. Pa. Aug. 3, 2007).  In *In re TFT-LCD (Flat Panel) Antitrust Litigation*, a serial number was sufficient for that purpose.  *See* 267 F.R.D. 583, 592 (N.D. Cal. 2010).  In the securities cases Plaintiffs cite, lists of beneficial owners of a relevant stock could be obtained easily without having to interpret any

---

[14]    A promotional use clause is one, but not the only, kind of provision potentially relevant to the scope of each author's beneficial interests.  *See* Google Br. 45-46.  Plaintiffs disagree (at 55) because such clauses do not grant Google a "unilateral right to 'promote' someone else's in-copyright book."  But the right to sue under section 501(b) turns on the beneficial (or legal) rights held by a plaintiff, not on those held by the alleged infringer.

- 24 -

contracts.  *See, e.g.*, *In re Franklin Nat'l Bank Sec. Litig.*, 574 F.2d 662, 674-675 (2d Cir. 1978).  Here, by contrast, the district court would have to construe individual publishing contracts (sometimes based on testimony about what a missing contract contained).  In this respect, this case more closely resembles *Vulcan Golf v. Google*, 254 F.R.D. 521, 528, 537 (N.D. Ill. 2008), in which "the possibility of hundreds if not thousands of individual hearings related to [intellectual property] ownership" rendered class certification improper.

Similar deficiencies would complicate proof of timely registration as to each book published before 1978.  Plaintiffs assert that each book's copyright registration application contains both a book's publication date and the date the application was received (which becomes the "effective date" if the application is approved).[15]  But a court scrutinizing Bouton's 1970 application for *Ball Four*—one of three applications Plaintiffs produced—would find no such information, because the stamp showing when the Copyright Office received the application is illegible.  A219.  Applications for other pre-1978 books are likely to have similar defects, in part because it was only with passage of the Copyright Act of 1976 that a copyright's "effective date" became legally significant.  *See* Google Br. 39-40 & n.10.  Yet, the defect in these records means that to resolve whether an author has a

---

[15]    Plaintiffs also point (Br. 47) to the Copyright Office's pre-1978 "indices," but those indices do not include effective dates of registration.  A496-499; *see also* Google Br. 39.

valid claim, the district court would have to evaluate testimony about an event (the date the Copyright Office received a registration application) that many authors are unlikely to remember.

These evidentiary challenges complicating proof of ownership and registration distinguish this case from the cases cited by Plaintiffs, in which class members could establish their claims based on standard business records maintained by a relatively small number of custodians. *See In re Franklin Nat'l Bank Sec. Litig.*, 574 F.2d at 674-675 (list of all beneficial owners could be obtained from 661 specific banks, brokerage houses, and other institutions); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 101 (S.D.N.Y. 2009) (beneficial owners "can be readily identified from 'RSL's books and records, as well as records maintained by the applicable transfer agents'"); *Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 135-136 (S.D.N.Y. 2003) (class "members can be readily identified" from defendant's computer database and paper files). Here, in contrast, the evidence Plaintiffs point to (publishing contracts and royalty statements) would have to be obtained from the private files of possibly hundreds of thousands of individual putative class members. As Plaintiffs' own production confirms, it is far more likely that putative class members in this case will be unable to produce the hoped-for documents and will instead resort to other types of

evidence, such as testimony, that will require case-by-case assessments by the district court.

These individual proof complications are a further mark against certification given the substantial individual issues raised by Google's fair use defense. This case differs significantly from circumstances such as those in *In re Napster Copyright Litigation*, 2005 U.S. Dist. LEXIS 11498 (N.D. Cal. May 31, 2005), on which Plaintiffs rely (at 57-58). In *Napster*, the manageability of sorting out copyright ownership and registration was the principal obstacle to certification, for those were the *only* liability-stage issues that had to be resolved by the court on a work-by-work basis. Here, overcoming Google's principal defense of fair use would require book-specific adjudications similar to those necessary to resolve individual issues of copyright ownership and timely registration. *See* Google Br. 47. This case is thus far more like *In re IPO*, in which the *combination* of other significant individual issues *and* the need for "numerous individualized determinations" to assess class membership led this Court to the "basic conclusion that individual questions … permeate[d] [the] litigation" and that the Rule 23(b)(3) predominance requirement was not met. 471 F.3d at 44-45.

## CONCLUSION

For these reasons and those explained in Google's opening brief, the Court should reverse the district court's class certification decision.

Respectfully submitted

/s/  Seth P. Waxman

DARALYN J. DURIE                          SETH P. WAXMAN
JOSEPH C. GRATZ                           LOUIS R. COHEN
DURIE TANGRI LLP                          RANDOLPH D. MOSS
217 Leidesdorff Street                    DANIEL P. KEARNEY, JR.
San Francisco, CA  94111                  ARI HOLTZBLATT
(415) 362-6666                            WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                          1875 Pennsylvania Avenue, NW
                                          Washington, DC  20006
                                          (202) 663-6000


Dated:  March 6, 2013

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 6,999 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/  Seth P. Waxman
SETH P. WAXMAN

March 6, 2013

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on this 6th day of March 2013, I caused a pdf version of the foregoing brief to be filed electronically using the CM/ECF system. Prior to transmittal, the pdf was scanned for viruses and no viruses were detected.

/s/  Seth P. Waxman
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

I certify that on this 6th day of March 2013, I caused the foregoing brief to be filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/  Seth P. Waxman
SETH P. WAXMAN